## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| RETURN TO FREEDOM, a non-profit organization; FRONT RANGE EQUINE RESCUE, a non-profit organization; MEG FREDERICK; and ANGELIQUE REA, <br><br> Plaintiffs, <br><br> vs. <br><br> DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior; <br><br> TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; <br><br> KIMBERLEE FOSTER, in her official capacity as Field Manager of Rock Springs Field Office, Bureau of Land Management <br><br> Defendants. | Case no. <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF <br><br> Administrative Procedure Act Case |

## COMPLAINT

Plaintiffs Return to Freedom ("RTF"), Front Range Equine Rescue ("FRER"), Meg Frederick, and Angelique Rea, by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.     The Bureau of Land Management ("BLM") is the federal agency responsible for caring for and preserving America's wild horses.

2.     Despite its statutory mandate to protect, manage, and control wild horse populations in the United States, the Department of the Interior's ("DOI") BLM, Rock Springs Field Office has approved a Resource Management Plan ("RMP") amendment and accompanying Final

Environmental Impact Statement ("FEIS") (the "RMP Amendment and EIS for Wild Horse Management in the Rock Springs and Rawlins Filed Offices, Wyoming", DOI-BLM-WY-D040-2013-0001-RMP-EIS (January 2020)), as approved in the "Wild Horse Management for the BLM Rock Springs and Rawlins Field Offices, Record of Decision and Approved Resource Management Plan Amendment" (May 8, 2023) ("Record of Decision" or "ROD"), collectively referred to herein as the "Decision") that if implemented, will drastically reduce the wild horse population by approximately 60% of its current level, decrease the land used by wild horses by 74%, and utilize extreme fertility control measures across four affected Horse Management Areas ("HMAs") in the planning area, including the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs.  (FEIS at 5-6; 71.)  More specifically, the Decision will (i) convert the Salt Wells Creek, Great Divide Basin, and the Rock Springs portion of the Adobe Town HMAs to Herd Areas ("HAs"), which would subsequently wipe out the wild horses that the BLM is mandated to protect in those areas, (ii) reduce the Appropriate Management Level ("AML") of the portion of Adobe Town that remains an HMA to 259-536 wild horses (the current AML is 610-800 wild horses), and (iii) set the AML of the White Mountain HMA to 205-300 wild horses (consistent with historic level) but employ radical population management tools including gelding, spaying, sex ratio skewing, and "other" population growth suppression methods to reduce the population growth rate for the herd.

3.      The planning area and these four impacted HMAs fall within a region known as the "Wyoming Checkerboard," a name that refers to the patchwork of alternating private and public lands that define the area.[1]  The Wyoming Checkerboard has had a long history of controversy and

---

[1] The planning area encompasses roughly 2,811,401 acres of land, 1,920,314 acres of which is public and managed by the BLM and 814,086 acres of which is private. FEIS at 1.

litigation involving the management of wild horses, but the requirements of federal law override any decisions that have been made by the parties to those disputes, even where judicially approved.

4.      The BLM premises much of its decision to engage in this illegal and precedential action on a consent decree that it reached in 2013 (the "Consent Decree") with the Rock Springs Grazing Association ("RSGA"), a private ranchers' group that owns and leases private land within the Wyoming Checkerboard.  (*See, e.g.*, FEIS at 11-12; ROD at 5-8.)  The Consent Decree resolved litigation that RSGA had brought against BLM concerning the removal of wild horses from RSGA land.  As discussed in more detail below, in its Decision, BLM claims that it has duties and obligations arising under the Consent Decree.  But these "obligations" are created by the BLM, not the Consent Decree, and can be found nowhere in the Consent Decree.  Moreover, regardless of what the Consent Decree states, it does not, and cannot obviate the BLM's requirements under federal law.

5.      The BLM has effectively elevated the terms of the Consent Decree over its statutory obligations, in direct violation of federal law.

6.      Plaintiffs seek a declaration from this Court that the BLM's decision to amend the Rock Springs and Rawlings RMP and adopt fully the proposed FEIS is arbitrary and capricious and in violation of federal law.  In fact, the BLM failed to consider meaningful alternatives, more reasonable actions that would stabilize, and where necessary, reduce the wild horse population appropriately while keeping the BLM in compliance with both the Consent Decree and its statutory obligations to manage wild horses in compliance with federal law.

7.      In short, the Decision violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. § 1331 *et*

*seq.*, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

9.      This civil action is brought against officers of the United States acting in their official capacities.  Venue is proper in the District of Wyoming under 28 U.S.C. § 1391(e)(B) because the events at issue occur in this district.

10.     An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. § 2201 *et seq.*   This Court may review Defendants' actions and appropriate relief under the APA, Wild Horses Act, FLPMA, and NEPA.

## PARTIES

11.     Founded in 1997, Plaintiff Return to Freedom ("RTF") is a 501(c)(3) non-profit wild horse conservation organization that is headquartered in Lompoc, California.  RTF is dedicated to preserving the freedom, diversity, and habitat of America's wild horses through sanctuary, education, advocacy, and conservation while enriching the human spirit through direct experience with the natural world.

12.     One of RTF's most important missions is to preserve and protect the natural behaviors of wild horses and educate the public through comment and observation on natural herd behaviors.

13.     RTF has developed a unique, nationally respected voice on policy issues by advocating for humane, science-based alternatives to wild horse management rooted in its own hands-on experience with 500 wild equines and over 50 burros, and its focus on maintaining family bands and herd groups.

14.     RTF's sanctuary was formed as a model to explore minimally intrusive natural herd management that could be easily adopted by the federal governmental agencies overseeing wild horse management.  RTF has developed viable management solutions that will easily translate on the range.

15.     RTF's proven success establishes programs that, if adopted by the federal government, will provide effective alternatives to the BLM's traumatic and costly wild horse round-ups, capture, and removal and will reduce the warehousing of wild horses and burros – as well as eliminating exactly the kind of action challenged here.

16.     Protecting America's wild horses, such as those in the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs, and educating the public are prime objectives of RTF's mission.

17.     RTF provides educational programs that attract visitors of all ages including young children and families, university students, photographers, writers, and others to its sanctuary locations and on western rangelands.

18.     Through the years, RTF has expended extensive resources, and diverted funds from its other programs in order to monitor the BLM's treatment of wild horses.

19.     For several years, RTF has utilized its precious resources to continue to alert the public to comment on BLM's actions that contravene its mandate of minimal feasible management and protection of wild horses in the long-term as an important cultural and natural resource on public lands.

20.     RTF has specifically focused on the BLM's management of the horses in the Wyoming Checkerboard for several years now and expended particular resources and directed campaigns targeting the BLM's actions and round-ups in the Wyoming Checkerboard.

21.     RTF continues to update its supporters about the well-being of wild horses taken to holding facilities and treated by BLM, and specifically in the Wyoming Checkerboard.

22.     As an organization whose primary goals include the humane treatment of wild horses, RTF has devoted considerable resources to advocate against the exact type of action at issue here that if successful, will drastically deplete, even zero out wild horse populations in three of the HMAs at issue.

23.     The funds, time, and effort dedicated to trying to stop BLM from engaging in actions that contravene its mandate to manage wild horses at the minimum feasible level have forced RTF to divert and use its resources that would have otherwise been spent on its other programs, including adoption, educational programs, and donor development to benefit the wild horses and burros already in RTF's care, among other projects that are important to the future of the organization.

24.     BLM's plans to reduce 60 % of the wild horses currently found in the four HMAs at issue and employ permanent, severe fertility control methods without sufficient justification or meaningful consideration of more measured, reasonable alternatives is antithetical to the mission of RTF to ensure humane treatment for wild horses and will directly harm the organization's ability to further its mission and core goals.

25.     If the Decision is carried out, it will subvert and frustrate RTF's mission to protect wild horses, provide them with the most appropriate form of fertility control, and avoid permanent and dangerous changes to their populations.

26.     Further, RTF will be required to divert additional resources and begin new programs directed solely at the Wyoming Checkerboard and the BLM's mismanagement of the

horses there.  This will force RTF to further divert resources from its other core programs and the recognition of its mission.

27.     A court order declaring the Decision unlawful would protect RTF's interests in humane treatment, safety, and continued health and viability of the horses in the Wyoming Checkerboard and will allow RTF to dedicate its limited resources to other wild horse conservation programs that are part of its core mission and that will further protect wild horses.

28.     Plaintiff Front Range Equine Rescue ("FRER") is a 501(c)(3) nonprofit organization incorporated in Colorado with a second location in Florida.  Established in 1997, FRER is dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation. FRER is actively involved in the rescue, rehabilitation, and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse round-ups.  FRER has assisted thousands of horses through its rescue and educational programs.

29.     For over twenty years, one of FRER's primary goals has been to protect wild horses on federal public lands, by ensuring they are not subject to abuse, harassment, or mismanagement at the hands of the federal agencies charged with ensuring their long-term survival and presence on those lands, as well as to ensure the well-being of those horses captured and removed from federal lands and sent to long-term holding corrals or transferred from the BLM to (usually private) third parties.

30.     FRER's "Save the Wild Horses" campaign is dedicated to the protection of all wild horses and includes regular provision of information to the public and partnerships with other wild horse groups.

31.     One of FRER's core activities is the rescue and rehabilitation of abused, neglected, and abandoned horses, whether domestic or wild.  FRER puts a substantial amount of its resources

into this work.  The majority of FRER's rescued horses would have been sent to slaughter but for FRER's rescue of them.

32.    FRER also actively engages in education regarding the safe rehoming of horses who are in need of new homes, and FRER steps into crisis situations such as natural disasters and large animal cruelty rescues, whenever it can.

33.    In order to keep its supporters informed, FRER expends significant time and resources investigating, monitoring, and reporting on the federal agencies' wild horse programs.

34.    Since BLM confirmed its plans with respect to the horses of the Wyoming Checkerboard, FRER has been diverting its limited resources to investigate, evaluate, monitor, and assess the BLM's decisions challenged in this action.  FRER has used its resources that it would have used for other programs, if it were not for Defendants' illegal actions identified in this Complaint.  Because of BLM's actions, FRER has had to divert some of its attention to focus on Defendants' illegal actions and has taken its resources away from other core FRER programs, including the Save the Wild Horses campaign.

35.    FRER will continue to monitor, evaluate, and investigate BLM's conduct with respect to the Wyoming Checkerboard wild horses, and will continue to provide reports to its supporters about that conduct.  These actions will continue to divert FRER's limited resources from FRER's other programs, including direct rescue work and assistance with rehoming and rescue of wild and domestic horses found in abusive situations.

36.    Because of BLM's illegal actions, FRER has been and continues to be forced to expend its limited resources investigating and tracking Defendants' unlawful actions.  The resources that have been used in this regard would otherwise have been used for FRER's other campaigns and organizational goals, including its efforts to keep wild horses free from other round-

ups and long-term confinement in BLM corrals, its adoptions of rescued horses or formerly wild horses to good homes, its sanctuary program permanently adopting and caring for horses, and its educational efforts regarding wild horse round-ups, the cruelty of horse slaughter, and responsible horse ownership.

37.     Defendants' actions challenged here impede FRER's programmatic work and frustrate its ability to pursue its organizational goals for several reasons.  For instance, the Decision at issue will result in further inhumane treatment of wild horses and many more wild horses suffering, which requires FRER to divert its limited organizational and programmatic resources to continue to monitor these activities.  These resources would otherwise be spent on programmatic rescue and educational activities to protect wild and domestic horses, in furtherance of FRER's goals.

38.     There is a direct conflict between the Defendants' conduct and FRER's mission of protecting wild horses, both on the range and after they have left the range.

39.     Defendants' actions will also cause FRER to divert its programmatic and organizational resources to prevent an expansion of the Wyoming round-ups.  FRER will be forced to expend additional resources investigating, evaluating, and educating the public about the BLM's current and future planned activities with respect to the Wyoming Checkerboard horses, which are both illegal and inhumane.  Because these resources would otherwise be spent on rescue, rehabilitation, and education, Defendants' unlawful conduct directly impedes FRER's activities, and causes a significant drain on its resources and time.

40.     The Defendants have inflicted and will continue to inflict economic injury on FRER, by engaging in this illegal activity.

41. FRER is directly impaired in its ability to engage in activities that protect domestic and wild horses and has had to cut back on daily operations for its other programs, because of Defendants' policy change.

42. FRER has been, and will continue to be, forced to divert money and resources from other programs and projects in order to engage in activities that would otherwise not be necessary, were it not for Defendants' decision.

43. But for Defendants' conduct challenged here, FRER would have devoted its time, resources, and funds to other organizational projects, such as public educational efforts on wild horse management, including the use of *porcine zona pellucida* (PZP), and the development of other long-term maintenance options for America's wild horses.

44. FRER's injuries will be redressed if it prevails in this action, because if the challenged round-ups do not occur and are enjoined, FRER will not need to continue to monitor this area, or to dedicate its resources towards educating the public about this action specifically.

45. Plaintiff Meg Frederick is a photographer and wild horse advocate who has been photographing wild horses since 2013.

46. In 2011, after a series of traumatic and major medical problems, Ms. Frederick was forced to leave her job of 32 years.

47. In 2013, she was introduced to wild horses on the range in a photography clinic that was part of her rehabilitation process. Ms. Frederick had been experiencing ongoing severe pain, and she realized that spending time with the wild horses was extremely therapeutic; her pain went away when spending time with the wild horses.

48. Since that time, Ms. Frederick spends approximately seven months a year living out with the wild horses on the ranges of Montana, Wyoming, Colorado and Utah. She only leaves

the range because of the harsh winters that make it impractical to be with the horses during that time.

49.     Ms. Frederick is very familiar with many individual horses who are the subject of the BLM's planned actions here, and specifically with identifiable horses in the Salt Wells, Red Desert Complex (part of Great Divide Basin) and Adobe Town HMA.

50.     Ms. Frederick has a strong emotional connection to the horses and has rescued two wild horse family groups from the range who lived outside her trailer when she was out on the range.

51.     All the horses that Ms. Frederick adopted were captured by BLM and transported to a facility with thousands of animals, but Ms. Frederick knew them well enough to pick them out and adopt the ones from the same family, to reconstruct the family that had been together on the range.

52.     With a second wild horse family, Ms. Frederick was also able to identify the family members even in the large corrals and adopt those horses.  She has helped piece together multiple families from the long-term holding corals.

53.     There are still wild horses on the range that Ms. Frederick can identify, including horses in the Wyoming Checkerboard area.

54.     The round-ups of these wild horses have been both personally devastating to Ms. Frederick, because of her connection with the horses, and it has also negatively impacted her ability to photograph the wild horses.  For example, in the Sand Wash Basin, BLM took 850 of 972 wild horses, an action which severely traumatized Ms. Frederick and deprived her of most of her photography opportunities.

55.     Ms. Frederick has visited, and will continue to visit on a regular basis, the Red Desert Complex, including the areas impacted by the BLM's actions challenged by this lawsuit. Specifically, she is familiar with, has visited, and plans to continue to visit the Adobe Town, Salt Wells Creek, and White Mountain HMAs.

56.     In many of the HMAs that she visits, Ms. Frederick can no longer find wild horses or, when she can, they are much harder to locate, and much rarer, than before the BLM began its illegal activities in the Wyoming Checkerboard.

57.     Ms. Frederick has suffered, and will continue to suffer, aesthetic and economic injury because of the BLM's illegal actions in the Wyoming Checkerboard.

58.     But for BLM's illegal actions in the Wyoming Checkerboard, Ms. Frederick would not have suffered these harms.

59.     Ms. Frederick's injuries will be redressed if Plaintiffs prevail in this action, because if the challenged round-ups do not occur and are enjoined, Ms. Frederick will be able to continue her activities in the HMAs in the Wyoming Checkerboard, and will see the return of the horse herds, and the return of her ability to photograph the horses in those HMAs.

60.     Plaintiff Angelique Rea is a resident of Thermopolis, Wyoming.  She has been focused on visiting and observing the wild horses in the Wyoming Checkerboard, and specifically in the HMAs targeted by BLM's illegal actions, for over a decade.

61.     For ten years, Ms. Rea has been documenting and reporting to the public about the wild horses in the Wyoming Checkerboard, describing their daily lives, routines, and family lives. She has been visiting these areas for all that time, and plans on continuing to visit them.

62.     Ms. Rea has been regularly attending the BLM round-ups of wild horses in the Wyoming Checkerboard since 2013.

63.     Ms. Rea is aesthetically injured when she watches the round-ups.  For example, she has watched foals being pushed when they became too exhausted to walk, and then roped and pulled into chutes.  She is aware of at least one foal dying after being run too hard and long during a round-up.

64.     Ms. Rea regularly shares her stories and engages in advocacy and education of the condition of the horses.  She also has taken thousands of pictures of the horses in the Wyoming Checkerboard area, and thousands of people keep track of the wild horses and their stories based on Ms. Rea's publication of this information.

65.     Ms. Rea has visited and plans to continue visiting the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs.

66.     The BLM's proposed actions, if carried out, will be the direct cause of Ms. Rea's further injuries based on the loss of additional wild horses from the Wyoming Checkerboard.

67.     A court order declaring BLM's planned actions illegal would directly redress Ms. Rea's concerns and avoid the harm that will otherwise be caused.

68.     Defendant Deb Haaland is the Secretary of the Department of the Interior, the parent agency for the BLM, and is ultimately responsible for the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs and the Decision that will deplete and harm their wild horse populations.  She is sued in her official capacity.

69.     Defendant Tracy Stone-Manning is the Director of the BLM, and therefore also is responsible for the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs and the Decision that will deplete and harm their wild horse populations.  The BLM is an agency within the United States Department of the Interior.  The BLM, along with the United States Forest Service, is responsible for the protection and management of wild horses under the

Wild Horses Act.  The BLM has jurisdiction over the horses in the Wyoming Checkerboard.  The Wild Horses Act authorizes BLM to maintain ranges on public lands as sanctuaries for the protection and preservation of wild horses and burros.  Director Manning is sued in her official capacity.

70.     Defendant Kimberlee Foster is the Field Manager of the Rock Springs Field Office, which prepared the draft RMP amendment and FEIS and other documentation for the Decision affecting wild horses in the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs.  She is sued in her official capacity.

## LEGAL FRAMEWORK

### *Administrative Procedure Act*

71.     The Administrative Procedure Act (APA) provides for judicial review of final agency action for persons adversely affected or aggrieved by agency action.  5 U.S.C. § 702.

72.     The APA authorizes this reviewing Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (C), and (D).

### *Wild Free-Roaming Horses and Burros Act*

73.     In 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. §§ 1331 *et seq*.

74.     The Wild Horses Act provides, *inter alia*, that viable herds of wild horses should remain on the lands on which they were found at the time that the Wild Horses Act was passed,

"as an integral part of the natural system of the public lands." *Id*. That is, barring compelling reasons to the contrary, wild horses are entitled to stay in their "herd area" – the "geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.05(d).

75.     Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose [of their] management and protection." 16 U.S.C. § 1333(a).

76.     BLM established "Herd Management Areas" (HMAs) – as distinct from "herd areas" – as the geographic areas defined for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. The Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs are such areas defined for the maintenance of wild horses.

77.     Congress requires the agencies involved (BLM and the U.S. Forest Service, where applicable) to preserve and safeguard the horses in a manner that causes the horses the least amount of interference. The Wild Horses Act provides that "[a]ll management activities shall be at the minimal feasible level … in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." *Id*.

78.     BLM's own regulations align with and amplify the statutory requirement that it engage in the least amount of interference with wild horses that is necessary. The regulations mandate that management of the horses "shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

79.     Additionally, BLM agrees that its "[m]anagement activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c).

80.     Moreover, "the Bureau's objective is to use the best available science, husbandry, and handling practices applicable for [wild horses and burros]."   BLM IM 2015-151 Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers (Sept. 25, 2015).

81.     Under the Wild Horses Act, the BLM must maintain a current inventory of wild horses and burros so that it can

> Make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

16 U.S.C. § 1333(b)(1).

82.     If BLM determines, based on *reliable* information, that there is an "overpopulation" of wild horses on public land, and only if the removal of "excess" animals is *necessary*, the BLM is entitled to remove them.  *Id*. § 1332(b)(2).  The agency can only remove animals from the herd who "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  *Id*. § 1332(f) (emphasis added).  The Wild Horses Act does not allow the federal government to treat a wild horse or burro inhumanely or to manage them at other than the minimal feasible alternative.

### Federal Land Policy Management Act

83.     The Federal Land Policy Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1787, is administered by the BLM.  It requires that certain public lands and their resources be "periodically and systematically inventoried and their present and future use [] projected through a land use planning process."  *Id.* § 1701(a)(2).  FLPMA further mandates that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where

appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." *Id.* § 1701(a)(8).

84.     FLPMA requires BLM to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas the use of the public lands." 43 U.S.C. § 1712(a).  BLM does so through developing, maintaining, and revising RMPs—written documents "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2.

85.     Once BLM has issued an RMP governing a particular area of public lands, "[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved [RMP]." *Id.* § 1610.5-3(a).  Any proposed action that "is not in conformance" with the RMP can only be implemented "through a planamendment." *Id.* § 1610.5-3(c).

86.     FLPMA requires the Department of the Interior to develop and maintain RMPs to guide the management of BLM-administered lands.

87.     Part of BLM's management responsibilities, as set out under the FLPMA, includes establishing the AML within each HMA.  The purpose of the AML is to identify a minimum number of wild horses on the range to ensure that the population range of wild horses can be supported by the resources available for the impacted public lands, and that the horses will maintain a healthy genetic viability.

88.     In order for the BLM to adjust an AML, the BLM must amend or revise the controlling RMP.

89.     As part of that process, BLM must evaluate necessary resource monitoring data and

determine whether the land's resources are sufficient to sustain the AML.

90.     Any change to the AML must be evaluated through specific evidence and data and must undergo an extensive notice-and-comment RMP amendment process.

### National Environmental Policy Act

91.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* is intended to ensure federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

92.     In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331.

93.     To carry out the congressional declaration of NEPA's policy, the Federal Government must act continually to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; assure for all Americans safe, healthful, productive, esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without … undesirable and unintended consequences; [and] preserve important, historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and a variety of individual choice." 42 U.S.C. § 4331(b)(1)-(4).

94.     NEPA's purposes encompass promoting "efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and establishing "a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and

recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. §§ 4321, 4342.[2]

95.     The DOI has established "procedures for the Department, and its constituent bureaus, to use for compliance with: (1) [NEPA]; and (2) the [CEQ] regulations for implementing the procedural provisions of NEPA []." 43 C.F.R. § 46.20(a).

96.     The CEQ regulations implementing NEPA mandate that "[f]ederal agencies … use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C.F.R. § 1500.1.

97.     CEQ regulations define the term "major federal action":

"Major federal action" may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, and procedures; and legislative proposals ….

40 C.F.R. § 1508.1(q)(2).

98.     One category of federal action is "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.1(q)(3)(iv).

---

[2] In July 2020, a significant revision was made to the CEQ regulations. *See Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304, 43,375, 2020 WL 4001797 (July 16, 2020). However, the agency has discretion to continue to apply the repealed regulations for all projects, like this one, that "began" before the effective date of the regulation. 40 C.F.R. § 1506.13. It appears from the FEIS that the BLM relied on the old regulations in reaching its Decision (*e.g.* FEIS § 1.3.2 at 11-12), so Plaintiffs cite them where appropriate.

99.     An environmental "effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.1(g).

100.    NEPA requires all federal agencies to prepare a "detailed statement" regarding "all major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is referred to as the FEIS.

101.    An EIS ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information concerning the government action will be made available to all stakeholders.  NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the action already taken.

102.    NEPA procedures ensure that the federal agencies have considered relevant environmental information and that the public has been informed before decisions are made and before actions are taken.  40 C.F.R. § 1500.1.

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS**

***BLM Misinterprets its Obligations Under the Consent Decree***

103.    Throughout its Decision, the BLM attempts to justify its proposed actions by the Consent Decree. (*See, e.g.,* FEIS 11-12; ROD at 5-8.)  However, BLM at best misinterprets, and at worst intentionally distorts, the Consent Decree's plain language in stating that the Decision is necessitated upon the BLM's agreement under the Consent Decree.

104.    In fact, the Consent Decree required BLM to initiate a process to better manage wild horses on the public lands that abut the private lands in the Wyoming Checkerboard area. Specifically, under the Consent Decree, BLM was required to *consider* the environmental effects

of revising the RPMs for the Rock Springs and Rawlins Field Offices, which included *considerations* of (i) changing the Salt Wells Creek and Great Divide Basin HMAs to HAs and managing for zero wild horses; (ii) lowering the Adobe Town AML to 225-450 wild horses; and (iii) managing the White Mountain HMA as a non-reproducing herd with a population not to exceed 205 wild horses.

105.    The Consent Decree did not obligate the BLM to take the actions set out in the Decision.

106.    BLM failed to evaluate meaningfully other reasonable actions that could have provided the RSGA with its requested relief and stabilized, and as needed, responsibly reduced, the wild horse populations.

107.    In its Decision, BLM goes far beyond the edict of the Consent Decree and acts not only to remove wild horses from private lands in the Wyoming Checkerboard area, but also to remove wild horses from the public lands in the same area.

### Converting HMAs to HAs and Zeroing Out Herds Violate the BLM's Statutory Responsibilities

108.    The Decision to revert the Salt Wells Creek, Great Divide Basin, and the Rock Springs portion of the Adobe Town HMAs to HAs would result in the public lands in the Wyoming Checkerboard also no longer being managed to support wild horse populations.  Pursuant to the Decision's underlying FEIS, a total of approximately 2,067,820 acres would no longer be allocated for wild horse use.  This represents a 74% reduction in total acreage allocated for wild horse use. (FEIS at 5, 71).

109.    BLM reasons that full conversion of two and partial conversion of one of the HMAs to HAs is necessary at least in part due to the infeasibility of creating effective barriers between the public and private lands.  (FEIS at 23; ROD at 22-23.)

110.     In so reasoning, BLM reads into its mandate an exemption from performing its obligations based on an unmeasured and undefined perception of difficulty that does not exist in the Wild Horses Act.  BLM cannot fail to meet its statutory obligation to manage wild horses at the minimum feasible level simply because doing so is difficult.

111.     Critically, in reverting the HMAs to HAs with the objective of zeroing out the wild horse populations in these areas, in its Decision, the BLM has provided no alternative lands for the impacted horses.  The Decision results in a net loss of horses overall and a disproportionate gain for other uses, such as livestock grazing.

112.     BLM's own analysis shows that the public portions of these HMAs contain a sufficient quantity of forage, water cover, and space to sustain wild horses.  (FEIS, Appendix A.)

### The Decision Will Reduce the Adobe Town Herd to a Low AML Level Not Based in Any Ecological Reasoning

113.     The Decision ignores how the proposed actions create a high risk of dropping the remaining HMA portion of Adobe Town to a wild horse population at such a low level that it could jeopardize the herd.

114.     The amended Adobe Town AML has been calculated by proportionally adjusting the high AML based on the reduced size of the HMA.  The proportional adjustment is not based on any ecological analysis.

115.     BLM advises that *after* reducing the Adobe Town AML, it will evaluate whether further adjustments need to be made by conducting site specific analysis of rangeland health standards such as grazing utilization and use patterns.  (FEIS at 19.) But BLM must make a data-based determination as to the appropriate AML *before* adopting or implementing the Decision to comply with its statutory obligations.

*The BLM's Proposed Implementation of Permanent Fertility*
*Control Methods Violates BLM's Own Guidance*

116.     Under the Decision, the BLM could implement permanent fertility control methods such as gelding and spaying, sex ratio skewing and other population suppression methods, particularly as it relates to the White Mountain herd, for which it intends systematically to reduce the population growth rate (FEIS at 5, ROD at 11-12.)

117.     Gelding presents risks of complications that include bleeding, swelling, inflammation, edema, infection, peritonitis, hydrocele, penile damage, excessive hemorrhage, and eventration.

118.     It is not possible to predict when postoperative complications may occur after a gelding procedure.

119.     There are few relevant studies concerning the gelding and release back into the wild of wild horses.

120.     The BLM's proposal to surgically sterilize or spay mares also would be unnecessarily harmful to wild horses and medically and scientifically questionable and irresponsible.   Such a procedure would need to be conducted by a board-certified equine veterinarian and during the procedure, the mare would need to be sedated but not fully under anesthesia, a precarious posture for wild horses.

121.     Complications from surgical sterilization could include injuries to the cervix, bladder, or bowels, vaginal adhesions, intra-abdominal hemorrhage, and other pain and discomfort.

122.     There are no substantive studies to evaluate the long-term health impacts of spayed wild mares.

123.     Management by sex ratio skewing is only a temporary solution as populations will return to their normal ratios.  Moreover, adjusting the population to skew for more or less of certain horses will imbalance the herd's natural state.  Such meddling could result in behavior ramifications that BLM has not sufficiently analyzed or planned for.

124.     Safer, non-surgical alternatives (such as PZP vaccinations) exist as effective fertility control methods.  Such methods better align with BLM's mandate to manage horses at the minimum feasible level.  16 U.S.C. § 1333(a).  BLM's decision to authorize gelding and spaying under the Decision in particular must be abandoned.

## CLAIMS FOR RELIEF

### COUNT ONE

(Violation of the Administrative Procedure Act)

125.     Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

126.     By authorizing Alternative D, under which the checkerboard lands would be removed from HMAs and reverted to HAs; the wild horse populations in the Salt Wells Creek, Great Divide Basin, and part of the Adobe Town HMAs would be zeroed out; and the remaining HMA part of the Adobe Town AML would be decreased to 259-536 horses and permanent fertility control methods would be utilized, particularly in the White Mountain HMA, the Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (C), and (D).

127.     Each and every one of these actions and omissions will injure and damage Plaintiffs as set forth above.

## COUNT TWO

(Violation of the Wild Free-Roaming Horses and Burros Act)

128.     Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

129.     Defendants' decisions to zero out the wild horse populations in the Salt Wells Creek, Great Divide Basin, and part of the Adobe Town HMAs, to decrease the remaining HMA portion of the Adobe Town HMA to 259- 536 horses and, to utilize permanent fertility control methods, particularly on the White Mountain herd, violate the Wild Horses Act's requirement that Defendants' management activities "shall be set at the minimal feasible level."  16 U.S.C. § 1333(a).

130.     Defendants' decisions further violate the Wild Horses Act's requirement that "free roaming horses … shall be protected from capture and harassment" and Defendants' own requirement that these wild horses be managed in "self-sustaining populations of healthy animals."

131.     Defendants have failed to meaningfully consider the lasting and potentially devastating impacts of such actions.

132.     Each and every one of these actions and omissions will injure and damage Plaintiffs as set forth above.

## COUNT THREE

(Violation of the Federal Land Policy Management Act)

133.     Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

134.     Defendants' decision to amend the RMP in order to revert the Salt Wells Creek, Great Divide Basin, and part of the Adobe Town HMAs to HAs despite findings that the public

land portions of the HMAs have sufficient natural resources to sustain wild horse populations violates the FLMPA.

135.     Defendants' redistribution of resources for multiple land uses that disproportionately disadvantages the interests of wild horses violates the FLMPA.

136.     Each and every one of these actions and omissions will injure and damage Plaintiffs as set forth above.

## COUNT FOUR

### (Violation of the National Environmental Policy Act)

137.     Plaintiffs hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

138.     The Decision fails to fully analyze or account for all the environmental and other impacts that Defendants are forcing on the wild horse herds in the impacted HMAs with potential for significant consequences.  Without a complete analysis accounting for all potential significant impacts, the FEIS violates NEPA.

139.     By failing to consider the relevant CEQ factors, defendants have failed to take the "hard look" at the impacts of their chosen actions as required by NEPA.  Accordingly, Defendants' actions and omissions have violated their obligations under NEPA.

140.     Each and every one of these actions and omissions will injure and damage Plaintiffs as set forth above.

## RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Honorable Court:

A.     Declare that Defendants have violated APA, Wild Horses Act, FLMPA, and NEPA by authorizing the Decision.

B.      Enjoin Defendants from converting the Salt Wells Creek, Great Divide Basin, and part of the Adobe Town HMAs to HAs.

C.      Enjoin Defendants from decreasing the Adobe Town AML to 225-440 wild horses or lower.

D.      Enjoin Defendants from using permanent fertility control methods such as gelding and spaying in the White Mountain HMA or any other HMA at issue.

E.      Vacate the Proposed Action.

F.      Award Plaintiffs their costs and reasonable attorneys' fees, and

G.      Award Plaintiffs any other relief that is just and proper.

Respectfully submitted May 17, 2023

*/s/ Dawn R. Scott*
Dawn R. Scott
WY Bar No. 6-4008
Attorney at Law
925 Canyon View Avenue
Cody, WY 82414
drscottatty@gmail.com
T: (307) 761-2040 / F: (307) 587-4311

Bruce Wagman *(pro hac vice forthcoming)*
CA Bar No. 159987
RILEY SAFER HOLMES & CANCILA LLP
456 Montgomery St. 16th Fl.
San Francisco, CA 94104
bwagman@rshc-law.com
T: (415) 275-8540 / F: (415) 275-8551

Erin Gasparka *(pro hac vice forthcoming)*
IL Bar No. 6320655
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 200
Chicago, IL 60602
T: (312) 471-8700 / F: (312) 471-8701

*Attorneys for Plaintiffs*

4870-6414-7812, v. 1