TODD KIM
Assistant Attorney General
MAGGIE B. SMITH (WA Bar No. 45628)
KIMBERLY CULLEN (DC Bar No. 888314618)
Trial Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
7600 Sand Point Way, NE
Seattle, WA 98155
Telephone: 202-598-3088/ Fax: 202-305-0275
Email: maggie.smith@usdoj.gov


NICHOLAS VASSALLO
United States Attorney
C. LEVI MARTIN (WY Bar No. 6-3781)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY 82003
Telephone: 307-772-2124
Email: christopher.martin@usdoj.gov

*Attorneys for Respondents*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, et al.,<br><br>                    Petitioners,<br><br>v.<br><br>TRACY STONE-MANNING, et al.,<br><br>                    Respondents,<br><br>and<br><br>STATE OF WYOMING,<br><br>                    Intervenor,<br><br>and<br><br>ROCK SPRINGS GRAZING ASSOCIATION,<br><br>                    Intervenor. | Civil Nos. 2:23-cv-84-KHR (Lead); 2:23-cv-87-KHR (Joined); 2:23-cv-117-KHR (Joined) |

| | |
|---|---|
| RETURN TO FREEDOM, et al.,<br><br>                           Petitioners,<br><br>          v.<br><br>DEB HAALAND, et al.,<br><br>                          Respondents. | |
| FRIENDS OF ANIMALS,<br><br>                           Petitioner,<br><br>          v.<br><br>DEB HAALAND, et al.,<br><br>                        Respondents. | |

**FEDERAL RESPONDENTS' RESPONSE BRIEF**

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ..................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.      Legal Background .......................................................................................... 3

        A.      The Federal Land Policy and Management Act. ............................... 3

        B.      The Wild Free-Roaming Horses and Burros Act. .............................. 4

        C.      The National Environmental Policy Act. ........................................... 7

II.     Factual Background ....................................................................................... 8

        A.      The Wyoming Checkboard. ............................................................... 8

        B.      Wild Horses on the Checkerboard. .................................................... 9

        C.      The Consent Decrees ....................................................................... 12

        D.      The Tenth Circuit Decision.............................................................. 13

        E.      Rock Springs and Rawlins Field Offices' Resource Management Plans
                Amendment ...................................................................................... 15

STANDARD OF REVIEW ..................................................................................... 18

ARGUMENT ........................................................................................................... 20

I.      Petitioners' Claims Are Not Justiciable. ..................................................... 20

        A.      Petitioners' Claims Are Not Ripe for Adjudication......................... 21

        B.      Petitioners Lack Standing. ............................................................... 23

II.     BLM Complied with the Wild Horses Act. ................................................. 24

        A.      BLM's Decision to Convert HMAs to HAs Is Consistent with the Agency's
                Authority Under the Wild Horses Act. ............................................ 25

        B.      BLM's Decision to Convert HMAs to HAs Is Consistent with Its Regulations
                and Handbook. ................................................................................. 30

        C.      BLM's Decision to Convert the HMAs to HAs Was Reasonable and Supported
                by the Record. .................................................................................. 32

D.    BLM Makes its "Excess" Determinations at the Implementation Level and Would Not Make Such a Determination in a High-level Planning Document.......... 35

E.    BLM Reasonably Chose to Manage the HAs for Zero Wild Horses.......................... 36

F.    RTF's Additional Arguments Are Without Merit. ...................................... 37

III.    BLM Complied With FLPMA....................................................................... 39

A.    Any FLPMA Claims Not Raised in Petitioners' Opening Briefs Are Waived.......... 39

B.    RTF's FLPMA Claims Fail. .................................................................... 40

IV.    BLM Complied with NEPA............................................................................ 44

A.    BLM Analyzed a Broad and Legally Sufficient Range of Alternatives. .................. 45

    1.    BLM Properly Defined the Purpose and Need of the RMP Amendment............. 45

    2.    Alternatives Considered......................................................................... 48

        a.    A Land Swap Was Considered and Is Not Reasonable. ................................ 50

        b.    BLM Considered an Alternative of Managing Public Lands for Horses........ 54

        c.    BLM Considered Decreasing Livestock Grazing. ........................................ 55

B.    BLM Took the Required "Hard Look" at the Consequences of the RMP Amendment.......................................................................................... 56

    1.    BLM Considered the Necessary Data Before Amending the RMPs. .................. 57

    2.    BLM Considered the Benefits of Wild Horses and Impacts to Wild Horse Viewing.............................................................................................. 59

    3.    Consideration of Increased Livestock Grazing is Beyond the Scope of the RMP Amendment. .............................................................................. 59

    4.    BLM Responded to Public Comments. ....................................................... 60

CONCLUSION............................................................................................... 61

CERTIFICATE OF COMPLIANCE .................................................................. 63

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,*
   387 U.S. 136 (1967)..................................................................................... 21

*Alaska Survival v. Surface Transp. Bd.,*
   705 F.3d 1073 (9th Cir. 2013) ................................................................ 54, 55

*Already v. Nike,*
   568 U.S. 85 (2013)....................................................................................... 20

*Am. Fed'n of Gov't Emps., Loc. 1592 v. Fed. Lab. Rels. Auth.,*
   836 F.3d 1291 (10th Cir. 2016) ................................................................... 19

*Am. Horse Prot. Ass'n v. Watt,*
   694 F.2d 1310 (D.C. Cir. 1982)............................................................. 4, 5, 6

*Am. Hosp. Ass'n v. Becerra,*
   596 U.S. 724 (2022)..................................................................................... 19

*Am. Wild Horse Campaign v. Bernhardt,*
   442 F. Supp. 3d (D.D.C. 2020)............................................................... 31, 36

*Am. Wild Horse Pres. Campaign v. Jewell,*
   847 F.3d 1174 (10th Cir. 2016) .......................................................... passim

*Am. Wild Horse Pres. Campaign v. Jewell,*
   No. 14-cv-0152-NDF, 2015 WL 11070090 (D. Wyo. Mar. 3, 2015).................... 14

*Animals v. U.S. Dep't of Interior,*
   737 F. Supp. 2d 1125 (E.D. Cal. 2010) ................................................... 27, 28

*Animals v. U.S. Dep't of the Interior,*
   751 F.3d 1054 (9th Cir. 2014) ....................................................................... 4

*Ausmus v. Perdue,*
   908 F.3d 1248 (10th Cir. 2018) ................................................................... 19

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
   462 U.S. 87 (1983)....................................................................................... 19

*Biodiversity Conservation All. v. BLM,*
   608 F.3d 709 (10th Cir. 2010) ................................................................ 52, 53

*Biodiversity Conservation All. v. Jiron,*
   762 F.3d 1036 (10th Cir. 2014) ................................................................... 34

*Biodiversity Conservation All. v. U.S. Forest Serv.,*
   765 F.3d 1264 (10th Cir. 2014) ................................................................... 57

*Camfield v. United States*,
  167 U.S. 518 (1897) ............................................................................ 9

*Chevron v. Natural Resources Defense Council*,
  467 U.S. 837 (1984) .......................................................................... 19

*Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*,
  485 F.3d 1091 (10th Cir. 2007) ........................................................ 57

*Citizens for Const. Integrity v. United States*,
  57 F.4th 750 (10th Cir. 2023) .......................................................... 23

*Citizens' Comm. to Save Our Canyons v. Krueger*,
  513 F.3d 1169 (10th Cir. 2008) ........................................................ 19

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
  297 F.3d 1012 (10th Cir. 2002) ................................................. passim

*Colo. Env't Coal. v. Dombeck*,
  185 F.3d 1162 (10th Cir. 1999) ........................................................ 50

*Colo. Wild Horse v. Jewell*,
  130 F. Supp. 3d 205 (D.D.C. 2015) ............................................. 31, 36

*Colo. Wild, Heartwood v. U.S. Forest Serv.*,
  435 F.3d 1204 (10th Cir. 2006) ....................................................... 7, 8

*Colorado Wild Horse and Burro Coalition v. Salazar*,
  639 F. Supp. 2d 87 (D.D.C. 2009) .................................................... 36

*Custer Cnty. Action Ass'n v. Garvey*,
  256 F.3d 1024 (10th Cir. 2001) .................................................... 8, 50

*Env't Def. Ctr., Inc. v. U.S. EPA*,
  344 F.3d 832 (9th Cir. 2003) ........................................................... 45

*Fallini v. Hodel*,
  783 F.2d 1343 (9th Cir. 1986) ......................................................... 34

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .......................................................................... 29

*Friends of Animals v. BLM*,
  514 F. Supp. 3d 290 (D.D.C. 2021) .................................................. 22

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021) .................................................... 22

*Friends of Animals v. Silvey*,
  353 F. Supp. 3d 991 (D. Nev. 2018) ................................................. 36

*Friends of Animals v. Silvey*,
  820 F. App'x 513 (9th Cir. 2020) ......................................... 36, 37, 38

*Friends of Animals v. Sparks*,
200 F. Supp. 3d 1114 (D. Mont. 2016) ................................................................. 35

*Fund for Animals v. BLM*,
460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 5, 6

*G.W. v. Boulder Valley Sch. Dist.*,
No. 16-cv-00374-PAB-SKC, 2019 WL 4464130 (D. Colo. Sept. 18, 2019) ........... 39

*Lamb v. Thompson*,
265 F.3d 1038 (10th Cir. 2001) ........................................................................ 19

*Lamkin v. Bowen*,
721 F. Supp. 263 (D. Colo. 1989) ..................................................................... 31

*Leo Sheep Co. v. United States*,
440 U.S. 668 (1979) ......................................................................................... 9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ 23

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................ 20

*McGraw v. Barnhart*,
450 F.3d 493 (10th Cir. 2006) ..................................................................... 20, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ..................................................................................... 19, 57

*Mountain States Legal Found. v. Hodel*,
799 F.2d 1423 (10th Cir. 1986) ...................................................................... 8, 12

*N.M. ex rel. Richardson v. BLM*,
565 F.3d 683 (10th Cir. 2009) .............................................................. 41, 46, 53

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) ........................................................................................ 21

*National Parks & Conservation Association v. BLM*,
606 F.3d 1058 (9th Cir. 2010) ...................................................................... 47, 48

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................................................ 4, 40, 57

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ......................................................................... 18, 19, 21, 22

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) .......................................................................... 18

*Rags Over the Arkansas River, Inc. v. BLM.*,
77 F. Supp. 3d 1038 (D. Colo. 2015) ................................................................. 45

*Roaring Springs Assocs. v. Andrus*,
    471 F. Supp. 522 (D. Or. 1978) ................................................................. 7, 26

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .......................................................................... 7, 8, 56

*Rocks Springs Grazing Ass'n v. Salazar*,
    935 F. Supp. 2d 1179 (D. Wyo. 2013) ........................................................ passim

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ...................................................... 20, 21, 23

*Schmier v. U.S. Ct. of Appeals for Ninth Cir.*,
    279 F.3d 817 (9th Cir. 2002) ....................................................................... 23

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ................................................................... 59

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ..................................................................... 56

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .................................................................................... 20

*Texas v. United States*,
    523 U.S. 296 (1998) .................................................................................... 21

*U.S. ex rel. Bergen v. Lawrence*,
    848 F.2d 1502 (10th Cir. 1988) ..................................................................... 9

*United States v. Bass*,
    404 U.S. 336 (1971) .................................................................................... 29

*United States v. Chavez*,
    No. 1:23-CR-1614-WJ, 2024 WL 129115 (D.N.M. Jan. 11, 2024) ...................... 30

*United States v. Walker*,
    918 F.3d 1134 (10th Cir. 2019) ................................................................... 39

*Utahns for Better Transp. v. U.S Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ................................................................... 56

*W. Rangeland Conservation Ass'n v. Zinke*,
    265 F. Supp. 3d 1267 (D. Utah 2017) ........................................................... 6

*W. Watersheds Project v. BLM*,
    721 F.3d 1264 (10th Cir. 2013) ................................................................... 46

*W. Watersheds Project v. Haaland*,
    850 F. App'x 14 (D.C. Cir. 2021) ................................................................. 22

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................... 20

*Wilderness Workshop v. BLM,*
    342 F. Supp. 3d 1145 (D. Colo. 2018).................................................................. 53

*Working for Aurora's Residential Env't v. Colo. Dep't of Transp.,*
    153 F.3d 1122 (10th Cir. 1998) ................................................................. 51, 54

*Wyoming v. Dep't of the Interior,*
    493 F. Supp. 3d 1046 (D. Wyo. 2020)................................................................. 31

*Wyoming v. U.S. Dep't of Agric.,*
    661 F.3d 1209 (10th Cir. 2011) ........................................................ 46, 48, 49

## Statutes

16 U.S.C. § 1331 ............................................................................................ 4, 26

16 U.S.C. § 1331(c) ............................................................................................. 27

16 U.S.C. § 1332(a) .............................................................................................. 5

16 U.S.C. § 1332(c) .............................................................................................. 6

16 U.S.C. § 1333(a) .............................................................................................. 5

16 U.S.C. § 1333(b)(1) .......................................................................................... 6

16 U.S.C. § 1333(b)(2) ..................................................................................... 6, 26

16 U.S.C. § 1334 ........................................................................................... 7, 26

42 U.S.C. § 4332(C)(ii) .......................................................................................... 7

42 U.S.C. § 4332(C)(iii) ....................................................................................... 48

43 U.S.C. § 1701 ................................................................................................. 3

43 U.S.C. § 1711(a) ............................................................................................ 43

43 U.S.C. § 1712(a) .............................................................................................. 4

43 U.S.C. § 1732(a) ....................................................................................... 18, 40

43 U.S.C. § 1732(b) ............................................................................................ 42

43 U.S.C. §§ 1061-65 ........................................................................................... 9

5 U.S.C. §§ 701-706 ............................................................................................ 18

U.S.C. § 1333(b)(1) .............................................................................................. 6

## Rules

Fed. R. Civ. P. 12(h)(3)........................................................................................ 20

## Regulations

40 C.F.R. § 1502.13 (2012) ................................................................ 46

40 C.F.R. § 1506.13 ........................................................................ 8

40 C.F.R. §§1500-08 ........................................................................ 8

43 C.F.R. § 1601.0-2 ........................................................................ 21

43 C.F.R. § 1601.0-5(n) ............................................................ 4, 57, 60

43 C.F.R. § 1610.5-3 ........................................................................ 18

43 C.F.R. § 1610.5-5 ........................................................................ 4

43 C.F.R. § 4700.0-5(d) ..................................................................... 6

43 C.F.R. § 4710.1 ........................................................................... 6

43 C.F.R. § 4710.3-1 ................................................................ 6, 30, 31

43 C.F.R. § 4720.2-1 ................................................................ 7, 51, 52

43 C.F.R. § 4730.1 ........................................................................... 7

43 C.F.R. §§ 1610.5-3(a) ..................................................................... 4

51 Fed. Reg. 7410 ........................................................................... 30

## Other Authorities

1971 U.S. Code Cong. & Ad. News 2159 ................................................ 5

Hearing Before the Subcomm. on Pub. Lands and Res. of the Comm. On Energy and
   Natural Res. of the United States Senate, 95th Cong. 124 (1978) ................. 5

*Animal Prot. Inst.*, 109 IBLA 112 (1989) ....................................... 35, 36

*Kathleen R. Gregg*, 191 IBLA 313, 318 (2017) .................................... 7, 26

## TABLE OF ACRONYMS

| | |
|---|---|
| AML | Appropriate Management Level |
| APA | Administrative Procedure Act |
| AWHC | American Wild Horse Campaign |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FOA | Friends of Animals |
| Handbook | BLM's Wild Horses and Burros Management Handbook |
| HAs | Herd Areas |
| HMAs | Herd Management Areas |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| RSGA | Rock Springs Grazing Association |
| RTF | Return to Freedom |
| TNEB | Thriving Natural and Ecological Balance |
| Wild Horses Act | Wild Free-Roaming Horses and Burros Act of 1971 |

## INTRODUCTION

For more than 40 years the U.S. Bureau of Land Management ("BLM") has been tasked with managing wild horses on Wyoming's high desert steppe, pursuant to the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horses Act"). This area of alternating one-mile square parcels of private and public land—known as the "Checkerboard" because of the pattern it makes on a map—has presented a unique management challenge for the agency. On the public land portions of the Checkerboard, BLM must adhere to Section 3 of the Wild Horses Act, which creates procedural and substantive requirements for wild horse management on public lands. On private lands, BLM must instead adhere to Section 4, which requires BLM to remove wild horses upon request of the landowners. These two provisions come to a head on the Checkerboard, where horses move constantly between public and private land. This leaves BLM with the task of complying with both Sections 3 and 4 of the Wild Horses Act at the same time.

For most of the time that the Wild Horses Act has been in place some of the tension this dual mandate creates was alleviated by agreement. The Rock Springs Grazing Association ("RSGA"), which owns or leases most of the private property in the Checkerboard, allowed BLM to maintain a certain number of wild horses on its private lands. With RSGA's consent, BLM was able to create "herd management areas" that encompassed both private and public lands and relied on the resources available across the entire Checkerboard, rather than just on the public land squares, to determine an appropriate wild horse population. RSGA, however, revoked that consent for three of the four management areas in the Checkerboard, and BLM no longer had permission to rely on privately held resources when determining the boundaries of those management areas. RSGA has also formally requested removal of wild horses from its lands under Section 4. Faced with this challenge, BLM amended the Rawlins and Rock Springs Field Offices' Resource Management Plans, which govern, among other things, wild horse

management in much of the Checkerboard. The amendment to the Resource Management Plans ("RMP Amendment"), which was the result of years of environmental review and public involvement, recognizes that private lands are no longer available for wild horses and appropriately reduces the amount of wild horses BLM will manage on the Checkerboard. Unsatisfied with the decision the agency has made, Petitioners brought this lawsuit to vacate the RMP Amendment.

Although this case is preceded by a lengthy history of legal challenges between BLM, private landowners, and wild horse advocates, it boils down to the question of whether BLM has the discretion under the Wild Horses Act to exclude private lands from the areas it manages for the benefit of wild horses. Petitioners[1] ask this Court to adopt a novel and unsupported reading of the Act in which BLM is obligated to commandeer private land for the benefit of wild horses, must maintain management areas that will result in wild horses using private land, and is left with no reasonable path towards complying with Section 4. Nothing in the Wild Horses Act creates such a mandate and, contrary to Petitioners' broad reading, the statute expressly seeks to maintain wild horses only on public lands, while giving BLM a duty to remove horses from private lands at the owner's request. This Court should decline Petitioners' invitation to expand the scope of the Wild Horses Act and deprive BLM of the flexibility and discretion required to manage wild horses across this complex land ownership pattern.

Petitioners also challenge the process BLM followed to develop the RMP Amendment and argue that the Amendment violates the Federal Land Policy and Management Act

---

[1] This case involves three consolidated petitions for review (ECF No. 33) and each set of Petitioners has filed their own opening brief in this matter: Meg Frederick, Angelique Rea, and Return to Freedom (collectively, "RTF"), ECF No. 49; American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, and Western Watersheds Project (collectively, "AWHC"), ECF No. 51; and Friends of Animals ("FOA"), ECF No. 50.

("FLPMA") and the National Environmental Policy Act ("NEPA"). These challenges amount to nothing more than Petitioners' disagreement with BLM's decision and provide no basis for invalidating the RMP Amendment. The record demonstrates that BLM complied with FLPMA and NEPA because it adopted the RMP Amendment only after taking a hard look at the relevant data and environmental effects, analyzing several reasonable alternatives, and considering the impact the RMP Amendment will have on the health of the Checkerboard range lands. The Court should defer to the agency's expertise and seasoned judgment in exercising its authority to manage wild horses on public lands and should deny the Petition for review.

Finally, even setting aside the substance of Petitioners' challenges, each of the Petitions suffer from an overarching fundamental flaw. Petitioners cannot show that they have standing to challenge this planning-level RMP Amendment, nor can they show that their claims are ripe. Because the RMP Amendment does not authorize the removal of any wild horses, the Petitioners are not currently harmed, and their challenge is premature. Thus, before reaching the merits of their Wild Horses Act, FLPMA, and NEPA claims, this Court should deny the Petitions for lack of subject-matter jurisdiction.

## **BACKGROUND**

**I.    Legal Background**

    A.    The Federal Land Policy and Management Act.

BLM manages the public lands pursuant to FLPMA, 43 U.S.C. § 1701, et seq., which directs the agency to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed by the agency. *Id.* § 1732(a). "Multiple use" is a "deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to,

recreation, range, timber, minerals, watershed, wildlife and fish.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

Under FLPMA, BLM prepares land use plans—also known as resource management plans or "RMPs"—that provide management direction for public lands. 43 C.F.R. § 1601.0-5(n); *see also* 43 U.S.C. § 1712(a). RMPs may be amended for, among other reasons, "a change in circumstances." 43 C.F.R. § 1610.5-5. Amendments are "made through an environmental assessment of the proposed change, or an environmental impact statement, if necessary," and include a public participation requirement. *Id.*; *id.* § 1610.2. Importantly, an RMP "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." *Id.* § 1601.0-5(n); *S. Utah Wilderness All.*, 542 U.S. at 69-71 ("The statute and regulations confirm that a land use plan is not ordinarily the medium for affirmative decisions that implement the agency's 'project[ions]'…. [A land use plan] is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them."). BLM must manage public lands consistent with their respective RMPs. 43 C.F.R. §§ 1610.5-3(a); 4710.1. RMPs do not provide BLM with any authority over adjoining private lands.

B.    The Wild Free-Roaming Horses and Burros Act.

In 1971 Congress passed the Wild Horses Act, 16 U.S.C. § 1331, et seq., to protect wild horses from vanishing from the West. Within only a few years of the Act's passage, the situation had reversed itself "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (quoting H.R. Rep. No. 95-1122, at 23 (1978)). Left unchecked, wild horse populations grow at a rate of roughly 20% per year. *See In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1059 (9th Cir. 2014); RMPA-001229.

In 1978, Congress found that "certain amendments [were] necessary" "to avoid excessive costs in the administration of the Act, and to facilitate the humane adoption or disposal of excess wild free-roaming horses." *Watt*, 694 F.2d at 1310, 1316 (citing Pub. L. 95-514, § 2(a)(6), 92 Stat. 1803, 43 U.S.C. § 1901(a)(6) (Supp. IV 1980)). With the 1978 amendments, "Congress struck a new balance . . . between protecting wild horses and competing interests in the resources of the public ranges" by "cut[ting] back on the protection the Act affords wild horses, and . . . reemphasiz[ing] other uses of the natural resources wild horses consume." *Id*. The amendments made clear that "public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Id*. at 1317.

The Wild Horses Act provides BLM[2] "a high degree of discretionary authority" to manage horses. H.R. Rep. No. 92-681, at 6-7 (1971), 1971 U.S. Code Cong. & Ad. News 2159, 2160; *see* Hearing Before the Subcomm. on Pub. Lands and Res. of the Comm. On Energy and Natural Res. of the United States Senate, 95th Cong. 124 (1978) (the "authority for discretionary management already exists"). The Act dictates that BLM "management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a). The Act also sets forth statutory requirements for managing horses on public and private lands. Unsurprisingly, the different land ownerships give rise to different BLM obligations. As to public lands, Section 3 of the Wild Horses Act directs the Secretary of the Interior to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." *Id*. "The Bureau (as the Secretary's delegate) carries out this function in localized 'herd management areas'[.]" *Fund for Animals v.*

---

[2] BLM acts on behalf of the Secretary of the U.S. Department of the Interior. The statute also grants the Secretary of the U.S. Department of Agriculture parallel authority to manage wild horses on lands under his jurisdiction. 16 U.S.C. § 1332(a).

*BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. BLM

establishes herd management areas ("HMAs") in accordance with broader land use plans. *Fund*

*for Animals*, 460 F.3d at 15; *see also* 43 C.F.R. § 4710.1. In each HMA, BLM officials are

afforded significant discretion to compute "appropriate management levels" ("AMLs") for the

wild horse populations they manage. *Fund for Animals*, 460 F.3d at 16; 16 U.S.C. § 1333(b)(1).

BLM may not include any forage or water on private lands in the calculation of an AML without

the landowner's written permission. RMPA-049480. In contrast to an HMA, "herd areas"

("HAs"), defined as the geographic area used by a "herd as its habitat in 1971" when the Act was

passed, 43 C.F.R. § 4700.0-5(d), are managed with the objective of limiting wild horse and burro

use. *Id.* § 4710.4. BLM manages HAs "at the minimum level necessary to attain the objectives

identified in approved land use plans[.]" *Id.* § 4710.4. Outside the confines of an HMA, the

"AML of a given HA is typically zero." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp.

3d 1267, 1274 n.5 (D. Utah 2017).

     If BLM determines that there is an overpopulation of wild horses on public lands and

action is necessary to remove excess animals, Section 3 requires BLM to "immediately remove

excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2); *Fund for*

*Animals*, 460 F.3d at 16. Under the Act, BLM has broad discretion as to how it manages and

removes wild horses from public lands. *See* 16 U.S.C. § 1333(b)(1); *Watt*, 694 F.2d at 1317-18.

These removal actions are conducted after BLM develops and finalizes a "gather plan," which

sets forth the number of horses to be gathered and the methods by which they will be gathered.

RMPA-001213.

     Section 4 of the Act governs management of horses on privately-owned lands. When

horses "stray from public lands onto privately owned land," Section 4 provides that "the owners

of such land may inform [BLM], who shall arrange to have the animals removed." 16 U.S.C. § 1334. After receiving such a request from a private landowner, BLM retains significant discretion in how and when to remove the horses, though the applicable regulations direct BLM to "remove stray wild horses [] from private lands as soon as practicable." 43 C.F.R. § 4720.2-1. However, BLM does have a nondiscretionary duty to remove horses at the request of private landowners. *Kathleen R. Gregg*, 191 IBLA 313, 318 (2017). Horses cannot be removed or destroyed by private persons and the Act subjects such actions to criminal penalties. 43 C.F.R. § 4730.1; 16 U.S.C. §§ 1334, 1338. A removal request under Section 4 is the only relief available to private landowners. This provision "works to the benefit of the public," "[b]ecause the landowner has an easy and cost-free way to remove the animals," and thus "will not be tempted to shoot or otherwise harm them." *Roaring Springs Assocs. v. Andrus*, 471 F. Supp. 522, 526 (D. Or. 1978). Nothing in the statute or regulations requires BLM to relocate horses it removes from private lands onto public lands.

      C.     The National Environmental Policy Act.

     NEPA requires federal agencies to prepare environmental impact statements ("EIS") to analyze the environmental impacts of major federal actions expected to "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C)(ii). NEPA was enacted "to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006). NEPA establishes the procedures by which federal agencies must consider the environmental impacts of their actions, but it does not dictate the substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The court's "objective is not to 'fly speck' the [EIS], but rather, to make a pragmatic judgment whether the [EIS]'s form, content and preparation foster both informed decision-making and

informed public participation." *Custer Cnty. Action Ass'n v. Garvey,* 256 F.3d 1024, 1035 (10th Cir. 2001) (internal quotation marks and citation omitted)

The Council on Environmental Quality ("CEQ") administers NEPA and promulgates regulations that are binding on federal agencies. *Colo. Wild*, 435 F.3d at 1209. These regulations, 40 C.F.R. §§1500-08,[3] provide guidance on the implementation of NEPA, and are entitled to substantial deference. *Robertson*, 490 U.S. at 355-56.

## II.        Factual Background

### A.        The Wyoming Checkboard.

The facts underlying this case are well-known to this Court. *See RSGA v. Salazar*, 935 F. Supp. 2d 1179, 1182 (D. Wyo. 2013). The Union Pacific Act of 1862 awarded alternating one-mile square sections of land to the Union Pacific Railroad company and most of those squares were surrounded on four sides by land retained by the government. *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1179 (10th Cir. 2016). This created a "checkerboard" pattern of federally-owned lands interspersed with private or state-owned lands for twenty miles on either side of the railroad right-of-way. RMPA-001307; *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1424 n.1 (10th Cir. 1986). More than one million acres of high desert land in southwestern Wyoming are held in this unique ownership pattern. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179. The federally-owned portions of the Checkerboard are primarily managed by the Rock Springs Field Office of the Wyoming BLM, with some land managed by the Rawlins and Kemmerer Field Offices. RMPA-001193; RMPA-001182.

---

[3] In 2020, the CEQ promulgated new regulations that govern "any NEPA process begun after September 14, 2020." *See* 40 C.F.R. § 1506.13 (effective Sept. 14, 2020). Because BLM began the process for amending its RMPs prior to the effective date of those new regulations, the regulations in effect prior to September 14, 2020, apply here. RMPA-001181. A copy of the prior regulations is attached to AWHC's Opening Brief as Exhibit C. ECF No. 51-3.

For more than a century, this unique pattern of intermingled ownership has given rise to many disputes concerning the scope of the government's authority and the rights of private landowners in the Checkerboard. In 1885, in response to cattlemen constructing fences along the borders of their private property in Checkerboard lands and effectively fencing in public rangeland, Congress passed the Unlawful Inclosures Act to prohibit enclosures of federal lands. 43 U.S.C. §§ 1061-65; *see Camfield v. United States*, 167 U.S. 518 (1897). Almost a century later, the Tenth Circuit, relying on *Camfield*, declared a landowner's wildlife-excluding fence in the Checkerboard unlawful because it had the effect of obstructing passage over public lands. *U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1505 (10th Cir. 1988). At the same time, however, courts have acknowledged the rights of private landowners in the Checkerboard. For example, the Supreme Court held that the government did not have an easement to clear a road through Checkerboard lands to create public access to hunting and fishing at the Seminoe Reservoir. *Leo Sheep Co. v. United States*, 440 U.S. 668, 682, 687-88 (1979).

B.    <u>Wild Horses on the Checkerboard</u>.

Wild horses have documented home ranges anywhere between 4.2 to 117 square miles and they can travel between 5 and 17.5 miles in a day. RMPA-001361. These large ranges, combined with the one-square-mile pattern of ownership in the Checkerboard means that wild horses move frequently between public and private land. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179; RMPA-001228. That private land is, in large part, owned or leased by RSGA. RMPA-001190. In 1977, almost immediately upon passage of the Wild Horses Act, RSGA invoked its rights under Section 4 of the Act and asked BLM to remove wild horses from its private lands within the Checkerboard. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1179. In January of 1979, following negotiations with wild horse advocacy groups, RSGA ultimately consented to "tolerate" the presence of 500 wild horses on the Checkerboard lands and 1,500

wild horses within the entire Rock Springs District.[4] *Id*.; RMPA-001190. By September of that same year, RSGA filed a lawsuit in this district seeking an order compelling BLM to remove all horses in excess of the agreed-upon level of 500. RMPA-001191. In 1981, the court ultimately found in RSGA's favor and ordered BLM to "remove all wild horses from the checkerboard grazing lands in the Rock Springs District except that number which the [RSGA] voluntarily agrees to leave in said area[.]" RMPA-048356.

With the consent of RSGA, BLM designated four HMAs for the Rock Springs District ("Checkerboard HMAs") and set the AMLs as follows:

- ■  Great Divide Basin HMA: 415-600 horses

- ■  White Mountain HMA: 205-300 horses

- ■  Salt Wells Creek HMA: 251-365 horses

- ■  Adobe Town HMA (Rock Springs Field Office portion): 165-235 horses.[5]

RMPA-001228.

BLM established these HMAs and associated AMLs in reliance on RSGA's consent to utilize its private land within the Checkerboard. *Id*.; RMPA-001662. Because any horses present on the Checkerboard (or in the adjacent federally-owned solid block of public lands) would necessarily use RSGA's land, BLM required RSGA's permission to establish these HMAs and associated AMLs. These HMAs, and the checkerboard pattern of land ownership, are pictured in the following map:

---

[4] BLM inventoried 2,364 wild horses in the Rock Springs area in 1972. RMPA-048356. By 1979, the same area had 6,129 wild horses. *Id*.
[5] The other portion of the Adobe Town HMA is managed by the Rawlins District. RMPA-001228.



**Map ES-1: Planning Area
Resource Management Plan
Amendment for Wild Horse Management**

RMPA-001182.

11

C.    <u>The Consent Decrees</u>

RSGA's 1979 agreement to allow limited use of its private lands for wild horses did not stop the litigation regarding wild horse management on the Checkerboard. In 1985, RSGA moved to enforce the court's 1981 order. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1180. RSGA also sought a writ of mandamus asking the district court to compel BLM to remove wild horses from its lands, to reduce the size of the wild horse herds on adjacent public lands, and to award damages under the Fifth Amendment for the alleged uncompensated taking of its lands. *See Mountain States Legal Found.*, 799 F.2d at 1424. On appeal, the Tenth Circuit held that the presence of wild horses on private land does not constitute a taking. *Id.*[6]

In 2003, the State of Wyoming sued BLM to force the agency to conduct gathers to achieve AML for each of the four Checkerboard HMAs. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1180-81. As a result of that litigation, Wyoming and BLM entered into a consent decree that required BLM to remove excess horses under Section 3 within a limited period and to gather horses in each of the Checkerboard's HMAs every three years to the lower level of the HMAs' AMLs. *Id.* Though BLM initially gathered and removed horses under the 2003 consent decree, a lack of funding in 2009 and 2010 slowed these efforts. *Id.* Unsatisfied with these removal efforts, and reporting that the number of horses in the area greatly exceeded the number it had previously agreed upon, as well as the AMLs, in 2010, RSGA requested that BLM remove all horses from its lands under Section 4. *Id.* Following this 2010 request, BLM no longer had RSGA's permission to maintain any wild horses on its privately held lands. BLM acknowledged the request and the previous litigation but explained that it lacked funds to gather horses in 2011 and that it would prioritize the requested gather in 2012. *Id.*

---

[6] Only the Fifth Amendment claim was appealed, and thus was the only issue addressed by the Tenth Circuit. *Id.*

RSGA filed suit in July 2011. *Id*. BLM and RSGA ultimately negotiated a compromise embodied in a 2013 consent decree ("2013 Consent Decree"). *Id*. The 2013 Consent Decree provided that, among other things, BLM would remove all wild horses located on RSGA's private lands, but permitted a certain number of horses to remain on the HMAs before BLM had an obligation to gather them. *Id*. Three intervenors, including AWHC, which is a party here, objected to the entry of the 2013 Consent Decree in district court. *RSGA*, 935 F. Supp. 2d at 1181, 1185. The district court approved the 2013 Consent Decree, noting that:

> While the Court fully appreciates the land management challenges presented by checkerboard ownership, those problems do not deprive RSGA of its rights as a private landowner under Section 4 of the Wild Horses Act, nor the deference due the BLM as the agency with substantial expertise in the management of the HMAs. The BLM is statutorily obligated to manage wild horses in this area consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented.

*Id*. at 1187-88 (footnote omitted).

BLM conducted a gather in 2013 that brought the Salt Wells Creek and Adobe Town HMAs to low AML levels. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1181. RSGA and Wyoming objected to BLM leaving any horses in the Checkerboard, and BLM agreed that it should have removed all of the horses. *Id*. at 1182. Pursuant to its gather plan, BLM then conducted a gather in 2014 that removed 1,263 wild horses from the Checkerboard in the Great Divide Basin, Adobe Town, and Salt Wells HMAs. *Id*. This brought the total number of horses in each HMA well below the applicable AMLs. *Id*. These gathers—which took place on both public and private lands—were conducted pursuant to Section 4 of the Wild Horses Act. *Id*. at 1186.

D.      The Tenth Circuit Decision

In 2014, a group of wild horse advocates, including some of the Petitioners in this case, filed suit alleging that BLM's removal of wild horses during the 2014 gather violated the Wild Horses Act, FLPMA, NEPA, and BLM's RMPs. *Id*. This court upheld BLM's actions under the

Wild Horses Act and FLPMA but remanded the decision to BLM for further consideration under NEPA. *Am. Wild Horse Pres. Campaign v. Jewell*, No. 14-cv-0152-NDF, 2015 WL 11070090, at *11 (D. Wyo. Mar. 3, 2015). In reaching its holding, the court found that "the record reflects that RSGA has made a clear, certain and adequate demand under Section 4, triggering a positive, ministerial duty to remove the stray horses." *Id*. at *8. The court upheld BLM's use of its authority under Section 4 to conduct the 2014 gather because "Section 4's unqualified mandate is the removal of free-roaming horses that stray from public lands onto privately owned lands, not the movement of horses from private lands to adjacent public lands. BLM's interpretation of Section 4 is reasonable to avoid intensive management of horses and afford a meaningful removal remedy to protect private property." *Id.*

The petitioners appealed. The Tenth Circuit acknowledged that "the relatively small size of the public and private parcels within the Checkerboard, their proximity to each other, and the lack of fencing mean that there will be a constant influx and outflux of wild horses in a particular parcel, whether public or private. And, in turn, it renders BLM's Section 4 gathering activities ineffective to some degree." *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1188. It agreed that, "[b]y the time that BLM can mount its resources to perform a Section 4 gather in response to a private landowner's complaint, the offending wild horses are likely to have moved on to different public or private parcels of land." *Id*. However, it concluded that the Wild Horses Act unambiguously required BLM to comply with Section 3 before it could conduct any gather activities on public land. *Id*. at 1189.

In reaching its conclusions, the Tenth Circuit acknowledged the need for "a workable solution to the problems imposed by the Checkerboard." *Id*. at 1189 n.8. It appealed to Congress "to specifically address the seemingly unworkable requirements Section 3 and 4 place upon

BLM in its management of this unique area." *Id*. It did not, however, suggest that Congressional action was the only solution. Instead, the Tenth Circuit suggested that "[p]erhaps the solution can come in the form of amendments to the areas designated as HMAs." *Id*. It pointed to language in the 2013 Consent Decree in which BLM agreed that it "would consider changing the Salt Wells and Great Divide Basin HMAs to 'Herd Areas,' which would be managed for zero wild horses." *Id*. In a concurrence, Judge McKay emphasized this point. *Id*. at 1191. Judge McKay explained that "the only way" BLM could meet its obligations under both Section 3 and Section 4 "is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands." *Id*.

      E.     <u>Rock Springs and Rawlins Field Offices' Resource Management Plans Amendment</u>

As agreed to in the 2013 Consent Decree, BLM began a process to "resolve the issues associated with managing wild horses on checkerboard land without the permissive use of private land[.]" RMPA-001191; *see RSGA*, 935 F. Supp. 2d at 1193. In accordance with the requirements of FLPMA, BLM initiated a planning effort to amend the Rock Springs and Rawlins Field Offices' RMPs for the management of wild horses. RMPA-001181. The purpose of the planning effort was "to identify and select, consistent with applicable law, a plan for wild horse management, including AML, on the current HMAs that include checkerboard land, in the Rock Springs Field Office and a portion of the Rawlins Field Office." RMPA-001193. The need for the amendment was "driven by the checkerboard pattern of public and private land ownership within the HMAs, the requirements of the [Wild Horses Act], [and] RSGA's withdrawal of consent to maintain wild horses on privately-owned lands[.]" *Id*. To meet this purpose and need, and to comply with the requirements of the Wild Horses Act and the Tenth Circuit's ruling,

BLM considered amendments to the RMPs that would allow it to decide regarding which lands within current HMAs should continue to be managed as HMAs. *Id.*

Consistent with FLPMA's and NEPA's requirements, BLM prepared an EIS for its proposed RMP amendment. The draft RMP Amendment and EIS were made available for public comment in January 2020. RMPA-001007. After considering and responding to public comment, the proposed RMP Amendment and Final EIS were published in March 2022. RMPA-001178.

As part of its environmental review, BLM considered four alternatives in detail:

- **Alternative A (No Action)**: This alternative would maintain the existing HMA boundaries and AMLs. RMPA-001184. Alternative A continues to include private lands in its assessment of available forage and AML. *See* RMPA-001202 ("Because BLM no longer has consent for wild horses to use private land in most of the checkerboard, Alternative A is no longer a feasible alternative.").

- **Alternative B**: Under this alternative, all Checkerboard lands within the Adobe Town, Great Divide Basin and Salt Wells Creek HMAs would revert to HA status and be managed for zero wild horses. However, the same number of wild horses would be maintained within the Great Divide Basin and Salt Wells Creek HMAs, concentrated into a smaller area of solid-block public land. AMLs for the Adobe Town and White Mountain HMAs would be reduced. RMPA-001184. All wild horse herds would be managed as non-reproducing. RMPA-001185. Further, BLM would reduce the amount of forage allocated to livestock within the solid block portions of the Great Divide Basin and Salt Wells Creek HMAs "by a total of 6,876 Animal Unit Months (AUMs) to accommodate the existing number of wild horses (1,620 at high AML)[.]" RMPA-001200.

- **Alternative C**: All wild horses would be removed from the planning area, and the HMAs would revert to HA status and be managed for zero wild horses. RMPA-001185.

- **Alternative D**: The entire Great Divide Basin and Salt Wells Creek HMAs would revert to HA status and be managed for zero wild horses. RMPA-001185. All areas of the Adobe Town HMA north of the Corson Springs southern allotment boundary fence (which includes all Checkerboard lands) would revert to HA status and be managed for zero wild horses; the area south of the fence would retain its status as an HMA with an AML of 259-536. RMPA-001185. The White Mountain HMA would be maintained as a producing herd with an AML of 205-300. RMPA-001185.

BLM selected Alternative D as the proposed RMP Amendment. RMPA-001202; RMPA-001667. On May 8, 2023, BLM published its Record of Decision ("ROD") enacting the RMP Amendment. RMPA-001659. BLM explained that Alternative D represented the best option to meet the purpose and need, address wild horse management issues in the Checkerboard after the revocation of permission from the private landowners, maintain wild horses within the planning area, and minimize impacts to other wildlife. RMPA-001202; RMPA-001677. BLM recognized that horses would stray onto and utilize privately-held Checkerboard lands in the absence of boundaries (either natural or fencing). RMPA-001202. Therefore, it would serve little purpose to manage just the Checkerboard portion of the Rock Springs and Rawlins lands as an HA without any impediment to recolonization of those areas by wild horses. *Id*. The only exception to this was in the Adobe Town area, which contains the Corson Springs southern allotment boundary fence and allows BLM to maintain part of the Adobe Town HMA and manage it for wild horses. RMPA-001678. In other areas, however, no such barriers exists. Accordingly, the Great Divide Basin and Salt Wells Creek HMAs entirely reverted to HA status because there was no reasonable possibility of creating an effective barrier between Checkerboard and solid block federal lands to prevent wild horses from returning to the Checkerboard. RMPA-001678-79. No changes were made to the boundaries of the White Mountain HMA or its AML because, at the time of the RMP Amendment's publication, RSGA stated publicly that it still consented to wild horses on its lands within that HMA. RMPA-043810.

BLM also explained in the ROD why the other alternatives were not selected. Alternative A, which relied on the use of private lands, was not feasible without landowner consent, which did not exist (other than for White Mountain HMA). RMPA-001680. Alternative B would have required construction of over 100 miles of fences that would have negative effects on big game

migration and the Greater Sage-grouse. *Id*. And Alternative C, which would remove all horses from the Checkerboard HMAs, would not have best balanced multiple resource values when it was feasible to keep wild horses on a portion of the planning area. *Id*. As a result, BLM approved the selection of Alternative D and amended the RMPs. RMPA-001659.

Despite establishing a management direction, however, the RMP Amendment does not itself authorize BLM to take any on-the-ground management actions. Instead, before taking any on-the-ground steps to implement the RMP Amendment (*i.e.*, remove horses from the HAs), BLM must "[p]repare gather plans for removal of excess wild horses from inside and outside the wild horse HMAs." RMPA-001213. These project-level gather plans will require their own evaluations under NEPA, including a decision record. RMPA-049461. It is at the gather plan stage that BLM would make a decision as to whether, or how many, horses are "excess" and must therefore be removed. RMPA-049432; RMPA-049464. Project-level decisions must be consistent with the RMP Amendment and comply with NEPA and other applicable laws. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *see also* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3.

## STANDARD OF REVIEW

Petitioners challenge BLM's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The APA authorizes a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706; *see Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574-76 (10th Cir. 1994). In the Tenth Circuit, "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." *Olenhouse*, 42 F.3d at 1580.

The APA's standard of review is "highly deferential." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). A court may not vacate an agency's decision unless the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Deference to agency expertise is especially merited where, as here, a court is reviewing scientific judgments and technical analyses within the agency's expertise. *Id.* at 824; *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

In resolving a challenge to an agency's interpretation of a statute, the Court should examine "the statute's text, structure, purpose, history, and relationship to other statutes." *Am. Fed'n of Gov't Emps., Loc. 1592 v. Fed. Lab. Rels. Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016). In doing so courts may look broadly to the "text and structure of the statute," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 736 (2022), as well as "the traditional canons of statutory construction," *Lamb v. Thompson*, 265 F.3d 1038, 1051 (10th Cir. 2001). If the Court cannot readily divine Congress' clear intent, it defers to the agency's interpretation of the statute so long as it is "based on a permissible construction of the statute." *Ausmus v. Perdue*, 908 F.3d 1248, 1253 (10th Cir. 2018) (quoting *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984)). "[T]he weight to be given the agency's practice in particular circumstances depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade....'"

*McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## ARGUMENT

### I.        Petitioners' Claims Are Not Justiciable.

Petitioners challenge the RMP Amendment because they argue it violates the Wild Horses Act, NEPA, and FLPMA by authorizing removal of horses from federal lands. Petitioners' argument ignores, however, that the RMP Amendment is a policy-level management plan that does not authorize the actual removal of wild horses from federal lands. This Court should decline to review the pending Petitions because they are not ripe and do not allege actual or imminent harm.

Federal courts are only authorized to adjudicate "cases" and "controversies." *See Already v. Nike*, 568 U.S. 85, 90 (2013). Subject matter jurisdiction must exist "not only at the time the complaint is filed, but through all stages of the litigation." *Id.* at 91 (cleaned up and citation omitted); *see also* Fed. R. Civ. P. 12(h)(3). A plaintiff seeking APA review of agency action bears the burden of satisfying jurisdictional requirements. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990). These considerations are often evaluated through the doctrines of standing and ripeness, which may "substantially overlap in many cases" as both involve the question of "whether the harm asserted had matured sufficiently to warrant judicial intervention." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013) (*quoting Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). However, the analyses for each are analytically distinct with standing focusing on "the qualitative sufficiency of the injury" and ripeness considering "whether this is the correct *time* for the complainant to bring the action." *Id.* (quotation omitted).

A.    Petitioners' Claims Are Not Ripe for Adjudication.

Ripeness turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n*, 523 U.S. at 733 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967)); *see also Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 810-12 (2003). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). "The doctrine of ripeness prevents courts from entangling themselves in abstract disagreements over administrative policies, while also protecting the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *S. Utah Wilderness All.*, 707 F.3d at 1158 (cleaned up and citation omitted). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 809 (citation omitted).

The RMP Amendment challenged here does not authorize the gather or removal of any horses, nor does it represent the final step in the agency's decision-making process to remove horses. 43 C.F.R. § 1601.0-2. ("[RMPs] are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses."); RMPA-001213 (explaining that BLM will "[p]repare gather plans for removal of excess wild horses from inside and outside the wild horse HMAs"). To be sure, the RMP Amendment is an important and necessary step towards gathers of wild horses on the Checkerboard, but it is not the final decision to gather horses and Petitioners' challenge to the

Amendment—which merely allows for potential gathers in the future—is not ripe for review.[7] *See Ohio Forestry Ass'n*, 523 U.S. at 729-30. For example, in a similar situation the Supreme Court held that a land-use plan amendment that made "logging more likely in that it is a logging precondition; in its absence logging could not take place" still was not ripe for review unless and until logging was actually authorized. *Id.*

Multiple courts have confirmed that amendments to RMPs governing wild horses are not ripe for review until they are implemented. The D.C. Circuit explained that while an RMP amendment was a final agency action, any challenge to that amendment did not ripen until BLM "began to implement its resource management plan by taking the formal steps required for a roundup" and therefore the "statute-of-limitations clock started with the first roundup." *W. Watersheds Project v. Haaland*, 850 F. App'x 14, 15 (D.C. Cir. 2021) (relying on *Ohio Forestry Association, Inc*., 523 U.S. at 732-37). On two occasions, the D.C. District Court has even withheld review of gather plans under certain conditions in which the plans "contemplate future, discrete agency actions—administering contraceptives to horses or removing them through future gathers—over the course of ten years. But when and under what circumstances those actions will occur remains to be determined." *Friends of Animals v. BLM*, 514 F. Supp. 3d 290, 302 (D.D.C. 2021); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 61 (D.D.C. 2021).

The reasoning behind these cases applies with equal force here where Petitioners argue that BLM has failed to make certain findings (*e.g.*, a determination that horses to be removed are "excess"), that Petitioners allege are mandatory, but that would not be made unless and until

---

[7] As explained in Federal Respondents' brief in the related case, BLM has placed gathers for these newly-created HAs on the national priority list and such gathers may occur as early as FY2025. *RSGA v. Dep't of Interior*, 2:23-cv-48 (March 27, 2023), ECF No. 58. That does not mean, however, that the decision-making necessary to conduct those gathers is complete. BLM still needs to issue a gather plan prior to removing horses from the HAs.

BLM makes a final decision to remove horses and prepares a gather plan. Opening Brief of FOA ("FOA Br."), ECF No. 50 at 26; Opening Brief of RTF ("RTF Br."), ECF No. 49 at 30; Opening Br. of AWHC ("AWHC Br."), ECF No. 51 at 29. The Tenth Circuit held that where "there has not been a consummation of the agency's decisionmaking process sufficient to support litigation of the issue [plaintiffs] seeks to raise," the decision is not ripe for review. *S. Utah Wilderness All.*, 707 F.3d at 1159. In this case, Petitioners seek to litigate whether BLM was required to make an "'excess' determination" and whether such a decision should be upheld. FOA Br. at 26; RTF Br. at 30; AWHC Br. at 29. But this claim is simply premature as BLM has not yet issued the decision to remove horses. *See* RMPA-001213. Nor would Petitioners be harmed by withholding review at this time. As explained above, any gather would be pursuant to a gather plan authorized through a separate, subsequent decision. RMPA-049461. Petitioners would have an opportunity to seek review of that decision when it is issued.

  B. <u>Petitioners Lack Standing.</u>

  To satisfy the "injury in fact" element of standing, a plaintiff must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted); *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 94 (2023). This "injury must have actually occurred or must occur imminently; hypothetical, speculative or other possible future injuries do not count in the standings calculus." *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002) (internal quotation marks and citation omitted).

  Petitioners offered numerous declarations to support their standing to bring this case. ECF Nos. 49, 50, and 51. Yet the declarations make clear that all the alleged injuries plainly stem from harms that would be incurred by a future gather and there is no actual or imminent

harm from the approval of the planning-level RMP Amendment. For example, an FOA declarant alleges that he suffers "great distress and sadness" because horses "*could* be rounded up and removed permanently from the wild under BLM's RMP Amendment." ECF No 50-1 (emphasis added). Similarly, AWHC's declarant, Carol Walker, lists harms that she will allegedly experience due to "roundups." ECF No. 51, Exhibit A ¶¶ 9-15. Ms. Walker claims that the RMP Amendment will impair her interest in preserving and protecting horses, but she does not (and cannot) articulate an injury that would occur absent the actual removal of wild horses from these areas, which the RMP Amendment does not authorize. *Id*. ¶ 16. AWHC's other declarant, Suzanne Roy, makes clear that the injuries to AWHC arise from actual implementation or gathers. *Id.*, Ex. B, ¶ 7 ("AWHC maintains that, *if implemented*, the BLM decisions challenged in this case . . . will substantially impair its interests . . . ." (emphasis added)). Petitioners simply are not injured by the issuance of the RMP Amendment, and Petitioners cannot satisfy the standing requirements absent such actual or imminent harm.

Accordingly, each and every one of Petitioners' claims under the Wild Horses Act, NEPA, and FLPMA are not justiciable absent an actual implementation decision and this Court should deny their petitions for review.

## II.      BLM Complied with the Wild Horses Act.

The Court should uphold BLM's reasonable exercise of its discretion to exclude private lands from HMAs. BLM's decision provides a cohesive and coherent interpretation of the Wild Horses Act and a path toward compliance with both Section 3 and Section 4 of the Act. Congress provided BLM with sufficient discretion to decide where horses could be managed on the landscape. Since passage of the Act, BLM has used this discretion to ensure that wild horses remain an integral part of the natural systems on public lands, while managing them in areas that

are appropriate for wild horses and where BLM can satisfy the other statutory mandates to which it is subject.

The core of Petitioners' complaint is that BLM violated the Wild Horses Act because it did not limit its decision to convert HMAs to HAs to an analysis of the "thriving natural ecological balance" ("TNEB") and instead based its decision on the lack of permission to use private lands for the maintenance of wild horses. FOA Br. at 34-35; RTF Br. at 5, 25; AWHC Br. at 29. According to Petitioners, unless and until BLM makes a TNEB finding, it must maintain every HMA indefinitely, regardless of whether private landowners revoke permission for the use of their land. Their argument is based on a cramped reading of the Wild Horses Act under which BLM has no discretion to manage the landscape in ways that allow it to meet multiple mandates. Moreover, Petitioners' arguments ignore BLM's purpose and need for undertaking this RMP Amendment, which included "RSGA's withdrawal of consent to maintain wild horses on privately-owned lands[.]" RMPA-001193. Without permission to maintain wild horses on RSGA's land, BLM could not reaffirm the existing HMAs. Its decision to convert them to HAs was consistent with the plain language of the Act, BLM's longstanding implementation of the Act, and Tenth Circuit precedent.

A.   <u>BLM's Decision to Convert HMAs to HAs Is Consistent with the Agency's Authority Under the Wild Horses Act.</u>

BLM's decision to convert the Checkerboard HMAs to HAs is consistent with the Wild Horses Act. Under the Wild Horses Act, private lands may not be relied on by BLM to maintain wild horses (*i.e.*, included in an HMA) without the consent of a landowner. This interpretation is consistent with both Sections 3 and 4 of the Act. Petitioners' interpretation ignores Section 4 and Section 3's limitation to public lands.

First, Section 3 is limited to the management of *public* lands. The Wild Horses Act sets forth Congress' policy that wild horses "are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. In furtherance of this purpose, the Secretary of the Interior—and, by delegation, BLM—must "protect and manage" wild horses "as components of the *public lands*," and "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the *public lands*." *Id.* § 1333(a) (emphasis added).

Section 4 also supports BLM's interpretation of the Wild Horses Act, one in which the government cannot maintain wild horses on private land without consent from the landowner. BLM is required by Section 4 to "arrange" to have wild horses removed from private lands at the request of the landowner. 16 U.S.C. § 1334. The courts have been clear that this provision creates "a duty on the government to remove the animals from private lands." *Roaring Springs Assocs.*, 471 F. Supp. at 525. Although BLM has considerable discretion as to when and how to remove wild horses from private lands, at bottom it also has a "ministerial duty" to remove wild horses and burros from private lands at the request of a private landowner. *Id.* at 526-27; *Kathleen R. Gregg*, 191 IBLA at 318. Yet, on the Checkerboard, "[b]y the time that BLM can mount its resources to perform a Section 4 gather in response to a private landowner's complaint, the offending wild horses are likely to have moved on to different public or private parcels of land." *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1188. It would be internally inconsistent for the Wild Horses Act to require the inclusion of private lands within the boundaries of HMAs, while also requiring the removal of wild horses from that same land.

Petitioners offer a narrow reading of the Wild Horses Act, one that would ignore Section 4 and strip BLM of its discretion to make rational decisions in the management of wild horses

and replace it with a requirement to keep horses present on every acre of public land where they were found in 1971. AWHC Br. at 23-24. But, for the Checkerboard lands, this interpretation would *require* BLM to maintain HMAs that rely on the use of private land, even when private landowners have refused to grant permission for their property to be used for the maintenance of wild horses and have requested removal of wild horses under Section 4. Such an interpretation is at odds with Congress's focus in Section 3 of the Act on BLM's maintenance of wild horses on public lands, as discussed above, and cannot be reconciled with BLM's obligations under Section 4.

If Congress had meant to leave BLM with no discretion in where and how to manage wild horses, it certainly could have done so. Instead, Congress recognized private landowners' rights, provided BLM with broad guidance, and left the details of the program to the agency. *In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125, 1133 (E.D. Cal. 2010) ("[A]n agency like BLM has considerable discretion on how to carry out the directives of the [Wild Horses] Act."). For example, Congress provided BLM with the authority to establish "range[s]," which are areas "devoted principally but not necessarily exclusively to their welfare in keeping with the multiple-use management concept for the public lands." Id.; 16 U.S.C. § 1331(c). The establishment of these "ranges" demonstrates that Congress did not intend the rest of the public lands to be "devoted principally" to the maintenance of wild horses, but instead managed as *a* component, subject to BLM's multiple-use mandate and the other limitations in the Act. *See In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d at 1135 ("The Act should consequently not be viewed as requiring that the BLM increase the numbers of horses, or give wild horses priority over other users.").

The Tenth Circuit recognized "the seemingly unworkable requirements Section 3 and 4 place upon BLM in its management of this unique area." *Id*. at 1189 n.8. And, while it suggested that an ultimate solution should come from Congress, the court acknowledged that BLM had authority to change the Salt Wells and Great Divide Basin HMAs to "Herd Areas" and to lower the Adobe Town AML. *Id*. This action, taken in the form of amendments to the RMP, the Court suggested, would perhaps provide a solution to this longstanding and intractable problem.[8] *Id*. The concurrence went even further. Judge McKay wrote separately to emphasize BLM's "broad discretion in applying its expertise in" administering the Wild Horses Act. *Id*. at 1191. Judge McKay explained:

> The problem that keeps bringing this matter to the court arises from the one section of the act which is clear, unmistakable, mandatory, and non-discretionary: Section 4. Under this section, private landowners have the absolute right to exclude wild horses and burros from their land. If they do not consent, then by definition, their lands with their corresponding forage may not be included in the decision about herd size or at the primary decision level which is the designation of herd management areas (HMAs). It seems to me that the only way the BLM can ultimately lawfully achieve its Section 3 duty to maintain wild herds and prevent destruction of viability caused by over grazing on public lands is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands.

---

[8] The Court speculated that these "potential adjustments" "may have little effect." *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1189 n.8. However, the court did not explain why it believed these adjustments would have "little effect" and the best inference is that the court was not convinced that even managing the area for zero horses would result in the effective removal of the horses presently in the area. Petitioners maintain that this statement should be interpreted as a lack of confidence in BLM's authority to make these adjustments, FOA Br. at 32, but that reading is not consistent with language of the footnote, which at no point suggests that the Tenth Circuit had concerns about the legality of the adjustments it proposed.

*Id.* Accordingly, the views of the Tenth Circuit were made clear: BLM's path forward for compliance with both Section 3 and Section 4 of the Act was to amend the RMPs to eliminate the non-permissive use of private lands.[9]

Petitioners' interpretation of the Act would provide BLM with no meaningful way to carry out its duties under Section 4. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1192 (McKay, concurring). Indeed, Petitioners do not contest that, under their view of the statute, horses on the Checkerboard will continue to use private lands without permission and that BLM will not be able to remove them.[10] *See, e.g.*, AWHC Br. at 24 (arguing that the existing HMAs are "achieving TNEB" without acknowledging that this is only because the HMAs include resources on private land). A statutory interpretation that makes it impossible for BLM to comply with all provisions of the statute should be rejected. The Supreme Court has explained that, "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *United States v. Bass*, 404 U.S. 336, 344 (1971) (recognizing that "courts should interpret a statute with an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant

---

[9] Petitioners repeatedly fault BLM for reaching a decision that produces results similar to those of the gather decision in 2014 and imply that, because the practical result is similar, the legal outcome would also be similar. *See, e.g.*, AWHC Br. at 26. But this argument cannot be reconciled with the Tenth Circuit's decision, which did not hold that horses must remain on the Checkerboard, but only instructed BLM to go back and amend the RMPs in order to satisfy Section 3's requirements before removing horses from the Checkerboard to comply with a Section 4 request. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1189.

[10] At least one Petitioner—AWHC—has been forthright about the inevitability of horses present on the Checkerboard using private lands, noting that it is impossible to differentiate between horses on private and public lands because they are constantly moving between the two, often within the same day. *RSGA v. Dept. of Interior*, No. 2:11-cv-263 (D. Wyo. July 11, 2011), ECF No. 86-1 at 7-8.

provisions"). Thus, a statute should be read "together and in harmony," rather than in a

piecemeal fashion. *United States v. Chavez*, No. 1:23-CR-1614-WJ, 2024 WL 129115, at *4

(D.N.M. Jan. 11, 2024) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The

Interpretation of Legal Texts 174-183 (1st ed. 2012)). So too here, the best interpretation of the

statute is one that looks at the entirety of the Wild Horses Act and permits the agency to comply

with all its provisions.

  B. <u>BLM's Decision to Convert HMAs to HAs Is Consistent with Its Regulations and Handbook.</u>

  BLM's interpretation of the Wild Horses Act is consistent with its administration of the

Act from the time it was passed. This should be given weight as a factor that gives BLM's

interpretation the "power to persuade." *See McGraw*, 450 F.3d at 501. Both BLM's regulations

and its handbook expressly instruct BLM to consider private lands when determining HMA

boundaries. BLM's regulations provide that "[i]n delineating each herd management area, the

authorized officer shall consider the appropriate management level for the herd, the habitat

requirements of the animals, the relationships with other uses of the public *and adjacent private

lands*, and the constraints contained in § 4710.4." 43 C.F.R. § 4710.3-1 (emphasis added);

Revision of Existing Regulations on Protection, Management, and Control of Wild Free-

Roaming Horses and Burros, 51 Fed. Reg. 7410, 7412 (March 3, 1986). Similarly, BLM's Wild

Horses and Burros Management Handbook ("Handbook") provides two examples of situations in

which a land use plan may include a decision not to manage all or part of an HA for wild horses

and burros. RMPA-049421. The first is when an HA lacks necessary habitat components to

support healthy wild horses, burros, and rangeland over the long term. *Id*. The second situation is

the exact situation BLM faces here: "intermingled and unfenced private lands within HAs where

the landowners are unwilling to make them available for [wild horse and burro] use[.]" *Id*. In

addition, the Handbook directs BLM to acquire written permission from private landowners before determining adequate habitat for wild horses within an HMA. RMPA-001654; RMPA-049480.

BLM's original decision to create an HMA is not set in stone and may be revisited when circumstances change. For example, in 2008, BLM converted several HMAs to HAs (managed for zero horses) in the Caliente complex in Nevada because the land was not suitable for wild horses. *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d at 127, 141-42 (D.D.C. 2020). This conversion "set an effective AML of zero for the entire Complex." *Id*. Similarly, BLM concluded that the West Douglas HA in northwest Colorado "could not sustain a healthy wild-horse population consistent with BLM's duty to preserve ecological balance and multipurpose land use" and that the area should be managed for zero horses." *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 210 (D.D.C. 2015).

When interpreting a statute, "the historic practice of the agency that was created to help implement that statute can shed light on its meaning." *Wyoming v. Dep't of the Interior*, 493 F. Supp. 3d 1046, 1074 (D. Wyo. 2020) (alteration and quotation omitted). BLM's interpretation of the Wild Horses Act—from its first enactment—provided for the creation of HAs to account for impacts to private lands. 43 C.F.R. § 4710.3-1. "Persuasive weight is due to an agency's contemporaneous construction of applicable law and subsequent consistent interpretation." *Wyoming*, 493 F. Supp. 3d at 1074 (cleaned up); *Lamkin v. Bowen*, 721 F. Supp. 263, 266 (D. Colo. 1989) ("In particular, courts will rely more heavily on an agency's ruling when the agency is charged with interpreting the statute in question, when its interpretation is contemporaneous with the statute's enactment, and when the interpretation has been consistently adhered to by the

agency for a long period of time."). BLM's consistent and longstanding interpretation provides that persuasive weight here.

C.   BLM's Decision to Convert the HMAs to HAs Was Reasonable and Supported by the Record.

BLM has followed the Tenth Circuit's guidance, its implementing regulations, and its Handbook when carrying out the RMP Amendment. BLM went "back to step one" and made "appropriate judgments by redetermining the HMAs without the non-permissive use of private lands." *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1192 (McKay, concurring). It did so by initiating a planning effort to amend the 1997 Green River RMP and 2008 Rawlins RMP, both of which include Checkerboard land within their planning area. RMPA-001190. The Amendment process accounted for all relevant information, reached rational conclusions, and ultimately constituted an important step towards allowing BLM to meet its obligations under both Section 3 and Section 4 of the Wild Horses Act. RMPA-001202.

BLM could not maintain existing Checkerboard HMAs because they were established based on the permissive use of private land in the Checkerboard.[11] RMPA-001190; RMPA-001660. When RSGA revoked its permission for wild horses to use these lands in 2010, the rationale and justification for the HMAs as established no longer existed. *Id*. BLM included Alternative A as a "no action" alternative in its analysis, but it could not have selected this Alternative because it relied on the permissive use of private land as a justification for the HMA boundaries and AMLs. RMPA-001202. Although adequate forage, water, cover, and space

---

[11] Petitioners cite BLM's Handbook for the proposition that BLM only considered the public lands components of the Checkerboard when determining there was adequate essential habitat components under Alternative A (no action). AWHC Br. at 30. However, Alternative A would have maintained the HMAs as they were constituted, which included resources on private lands based on RSGA's consent at the time the HMAs were created. RMPA-001228.

existed in the HMAs if the use of private land was included, "[b]ecause BLM no longer has consent for wild horses to use private land in most of the checkerboard, Alternative A is no longer a feasible alternative." *Id*. Petitioners repeatedly assert that BLM "explicitly found" that adequate forage exists in this area. AWHC Br. at 29; FOA Br. at 35. But these conclusions all relate to Alternative A, which assumed private landowners' permission for wild horses to use their property. RMPA-001317.

Accordingly, BLM was required to make changes to the existing HMAs and associated AMLs. It chose to reclassify the Great Divide Basin HMA, Salt Wells Creek HMA, and a portion of the Adobe Town HMA to HAs, and manage them for zero horses.[12] In its ROD, BLM explained its rationale for its decision. As explained by BLM, "it is not feasible to maintain a herd in the checkerboard, without private landowner consent." RMPA-001680. "In the checkerboard landownership pattern . . . wild horses constantly move on and off of private land. It would not be feasible to ensure that wild horses remain on only the BLM managed sections in this area." RMPA-001204. There is no dispute that if wild horses are present on the Checkerboard, they will use the private land and will do so in such a way that it will be impossible for BLM to remove them under Section 4. *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1188.

For each Checkerboard HMA, BLM considered how the areas could be configured to avoid the non-permissive use of private land for wild horses. Great Divide Basin is 48% Checkerboard lands, but there are no natural barriers between the remaining solid-block public lands and the Checkerboard. RMPA-001678-79. Similarly, Salt Wells Creek is 72%

---

[12] In the EIS, BLM also considered making changes to the White Mountain HMA, but chose the "no action" alternative and did not change the boundaries of the HMA or the AML. RMPA-001679-80.

Checkerboard lands, but there is no barrier (and no feasible way to create a barrier) between the Checkerboard and the solid-block federal lands. RMPA-001679. In both cases, BLM rationally concluded that its reclassification of these HMAs to HAs would be ineffective unless the solid-block lands were included. Horses would certainly drift from the solid-block portions of the area to the Checkboard absent some sort of barrier. *Id*. Construction of barriers was not feasible— both for practical construction reasons and because of the impact of a fence on other wildlife species. *Id*.; RMPA-001680.

Petitioners point out that BLM has "no duty" to "'prevent straying' of wild horses onto private lands." AWHC Br. at 8-9; FOA Br. at 30 (citing *Fallini v. Hodel*, 783 F.2d 1343, 1346 (9th Cir. 1986). BLM, however, determined that this general proposition did not fully address the facts at hand:

> While courts have held that the BLM is not required to prevent wild horses from straying onto private lands (*Fallini v. Hodel*, 783 F.2d 1343 (9th Cir. 1986)), it would not be reasonable to maintain an HMA in a location where the constant straying of wild horses onto private land is expected, the owner of the private lands does not consent to wild horse presence on private land, and the owner of the private lands is expected to exercise its right to demand BLM remove wild horses from private lands pursuant to Section 4 of the [Wild Horses Act].

RMPA-001204. There is a fundamental difference between whether BLM has an affirmative duty to "prevent straying" and whether BLM can establish HMAs that necessarily rely on the use of private land. These determinations were rational, supported by the record, and entitled to deference. *See Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) (explaining that the Court's "deferential review is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." (internal quotation marks and citation omitted)).

D.      BLM Makes its "Excess" Determinations at the Implementation Level and Would Not Make Such a Determination in a High-level Planning Document.

The decision challenged here is to change the administrative classification of these areas from HMAs to HAs, and adjust an AML. RMPA-001667. While this step is a predicate to removing wild horses from the Checkerboard, the ROD does not authorize any gathers or removals. As previously explained, BLM must separately analyze and authorize actual gathers and removals before they may occur. RMPA-001213. It is at that step in the process—which is accompanied by a separate decision that is subject to challenge—where BLM would make an excess determination. RMPA-049432; RMPA-049464.

Nevertheless, Petitioners' challenge to the RMP Amendment makes numerous arguments related to BLM's supposed failure to make an excess determination or provide a justification for removing horses. *See* AWHC Br. at 26 & 28-29; FOA Br. at 26. Petitioners fault BLM because it has not made an excess determination, which they maintain is a "statutory prerequisite to removal." AWHC Br. at 29. Yet they never offer any explanation for why BLM was required to make this determination before amending the RMPs, as opposed to when it subsequently authorizes a gather. Petitioners' interpretation would create a novel requirement for land use plans, one that has not previously existed and that is not required by the plain language of the Wild Horses Act or FLPMA.

The cases Petitioners rely on drive home this point. AWHC Br. at 31. Each of these cases involved a situation in which BLM had issued an implementation-level gather plan. *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1120-21 (D. Mont. 2016) (reviewing a plan to gather 15-20 horses); *Animal Prot. Inst.*, 109 IBLA 112 (1989) (reviewing "final plans for removal of

excess wild horses").[13] In particular, Petitioners rely heavily on *Colorado Wild Horse and Burro Coalition v. Salazar*, 639 F. Supp. 2d 87, 95-98 (D.D.C. 2009), but that case does not suggest that BLM must make an excess determination prior to amending an RMP. AWHC Br. at 31. In *Colorado Wild Horse*, plaintiffs challenged a gather plan that would remove all horses from the West Douglas herd area. *Id.* at 90. The court concluded that BLM could not remove the horses without making an excess determination and "set aside" the gather plan. *Id.* at 98. On remand, BLM issued a new gather plan with an associated excess determination. *Colo. Wild Horse*, 130 F. Supp. 3d at 210. That gather plan was also challenged by the same plaintiffs, and the court affirmed BLM's decision to proceed with the gather. *Id.* These cases do not involve a court's review of RMP Amendments in the absence of an implementation decision, do not suggest that an excess determination is needed before amending an RMP, and do not support Petitioners' argument.

E.   BLM Reasonably Chose to Manage the HAs for Zero Wild Horses.

Finally, Petitioners object to BLM's decision to manage the newly created HAs for zero wild horses, which is the functional equivalent of setting AML at zero. AWHC Br. at 33. Petitioners point to many examples where BLM sets an AML at the number of horses needed to achieve TNEB, based on the availability of adequate forage. *Id.* at 34. RTF also points to language in the Handbook that discusses setting AML to avoid a deterioration of the range.[14]

---

[13] In *Animal Protection Institute of America*, 109 IBLA 112 (1989), the Interior Board of Land Appeals overturned BLM's decision to remove horses when based on outdated information, but upheld BLM's decision to "remove wild horses from a designated horse-free area in the Egan Resource Area and from outside designated HMA's in the Caliente Resource Area, including certain 'problem animals' intruding on private property in the Clover Creek and Little Mountain HMA's." *Id.* at 127.

[14] The Handbook does not have the force of law. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1005 (D. Nev. 2018), aff'd, 820 F. App'x 513 (9th Cir. 2020).

RTF Br. at 23-24. To be sure, in nearly every instance BLM looks to TNEB and resource allocation to determine an appropriate management level. This is because in most instances, the availability of resources and the condition of the rangeland is the limiting factor in managing horses as a component of the public lands. But the Handbook also makes clear that its discussion of AMLs applies to "[t]he number of adult horses or burros (expressed as a range with an upper and lower limit) to be managed within an HMA." RMPA-049469. The Handbook's AML methodologies are not meant to apply when BLM is converting an HMA to an HA, which is managed for zero horses.

As discussed above, BLM's decision to convert these HMAs to HAs and manage them for zero horses is reasonable and supported by the record. In the Checkerboard region, public land is interspersed with private land in such a way that horses cannot access and use the resources on public land, without traversing and using the resources on private lands. The private landowner (RSGA) has revoked any permission for wild horses to use its land and BLM has a "ministerial duty" to remove any wild horses that do access the private land. Any horses that remained in the area would inevitably use private land and BLM would be without any effective way to carry out its duty to remove them. It was therefore reasonable for BLM to conclude that the Checkerboard HMAs should be converted to HAs and managed for zero horses.

F.     RTF's Additional Arguments Are Without Merit.

RTF makes several additional arguments, none of which withstand scrutiny. First, RTF makes a cursory argument that the Adobe Town HMA AML is arbitrary because it represents a proportional adjustment. RTF Br. at 24. Notably, RTF does not argue that the AML was set too low or that BLM's decision was substantively incorrect. It only argues that the information BLM relied on was insufficient. *Id*. But, as BLM explained, there were significant data gaps that could

not be resolved in a timely manner. RMPA-001320. Therefore, BLM "focus[ed] on forage needs as proposed in each alternative, and the anticipated stocking rates relative to other nearby grazing allotments within these field offices that contain similar vegetation communities." *Id*.; RMPA-001324 ("Considering all factors (including the condition of the rangeland, forage needs at the proposed AML and estimated available forage) the AML of 259–536 wild horses under this alternative is appropriate for this HMA."). This approach used the best available information and was a reasonable method for making an AML determination for Adobe Town.

Next, RTF argues that BLM's removal decision is not at the "minimal feasible level of management[.]" RTF Br. at 33. The argument misrepresents the record and the law. First, the RMP Amendment does not itself authorize any management actions. *Supra* I.A. There is no requirement for BLM to make an explicit "minimal feasible" finding before amending its RMP, as RTF implies. RTF Br. at 34. RTF ignores the purpose and need of this action—removing private land from the HMAs. And it misrepresents the record with respect to its argument that the Salt Wells Creek HMA is being managed differently than the Adobe Town HMA. *Id*. BLM explained that it was able to maintain a portion of the Adobe Town HMA because of the existence of a boundary fence that would keep wild horses away from the Checkerboard portions of the Adobe Town HA. RMPA-001185. Salt Wells Creek lacked such a fence, which necessitated the conversion of the entire HMA to an HA. *Id*. RTF asserts that BLM was required to consider highly intensive fertility control methods, but these would not have addressed the purpose and need of the action, which was to remove private lands from the HMAs.

RTF claims that BLM's "no action" decision for the White Mountain HMA is a concession that wild horses can legally stay on private land in the Checkerboard. RTF Br. at 29-

30. This fundamentally misses the critical point that the consent of private landowners is required for BLM to include private lands in an HMA. At the time BLM issued its ROD, BLM had the landowners' consent for those horses to use their private land in the White Mountain HMA. This is the crucial difference and the revocation of consent for the other three HMAs was the purpose of undertaking this RMP Amendment process.

Finally, RTF argues that BLM did not rely on adequate information in assessing the "genetic diversity risks" for the White Mountain HMA when "reducing the applicable AML." RTF Br. at 35. But BLM did not change the AML for the White Mountain HMA, which would continue to be managed for an AML of 205-300 wild horses. RMPA-001209-10 (compare White Mountain AMLs for Alternative A and Alternative D). In addition, RTF never explains what legal requirement BLM has supposedly violated with respect to the White Mountain HMA, and it cites no statutory or regulatory provision in support of its argument. The Handbook recommends a population size of 150-200 animals to maintain genetic diversity, which the previously established AML already provides. RMPA-049487.

## III.     BLM Complied With FLPMA.

### A.     Any FLPMA Claims Not Raised in Petitioners' Opening Briefs Are Waived.

In their Petitions for Review, Petitioners AWHC and RTF each brought claims under FLPMA. ECF No. 1 ¶¶ 133-36 in No. 2:23-cv-87 (RTF Petition); ECF No. 1 ¶¶ 82-87 in No. 2:23-cv-84 (AWHC Petition), yet only RTF raised any FLPMA claims in its opening brief. Accordingly, all other FLPMA claims are waived for failure to raise them in the opening brief. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived."); *G.W. v. Boulder Valley Sch. Dist.*, No. 16-cv-00374-PAB-SKC, 2019 WL 4464130, at *19 (D. Colo.

Sept. 18, 2019) (finding waiver in an administrative record case where party failed to raise arguments pertaining to claims in their opening brief).

      B.     <u>RTF's FLPMA Claims Fail.</u>

RTF asserts that BLM failed to comply with FLPMA because: (1) the RMP Amendment "sacrificed 'multiple use' for private demands"; (2) BLM did not carry out a required inventory prior to issuing the RMP Amendment; and (3) BLM did not assess whether its selected alternative, Alternative D, causes unnecessary or undue degradation of public lands. RTF Br. at 38-40. RTF provides only a cursory explanation of its FLPMA claims and, at bottom, they lack any legal or factual support in the record. This Court should deny RTF's petition as to these claims.

First, RTF's claim that BLM "sacrificed" multiple use is unexplained and unsupported, and therefore must be rejected. FLPMA requires BLM to manage public lands under principles of multiple use, 43 U.S.C. § 1732(a), which is defined as:

> the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

*Id.* § 1702(c). It "is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put." *S. Utah Wilderness All.*, 542 U.S. at 58. Multiple use does not require BLM to prioritize one type of use,

such as wild horse management, over another. *See N.M. ex rel. Richardson v. BLM*, 565 F.3d

683, 710 (10th Cir. 2009) (FLPMA "does not mandate that every use be accommodated on every

piece of land; rather, delicate balancing is required. . . . It is past doubt that the principle of

multiple use does not require BLM to prioritize development over other uses").

Citing to no case law in support, RTF argues the RMP Amendment violates FLPMA

because "wild horses will be lost from their home ranges forever, to satisfy a small set of private

landowners today," and therefore it does not meet the present and future needs of the American

people. RTF Br. at 38. Although not clear, RTF appears to suggest that this conclusory sentence

is sufficient to find that the RMP Amendment does not adhere to the principle of "multiple use."

This is belied by the record, which explains that BLM selected Alternative D because it "best

addresses the Purpose and Need for the plan amendment, is technically capable of

implementation, and accomplishes a balance of *multiple-use* values by maintaining a wild horse

herd in a portion of the planning area." RMPA-001677 (emphasis added). BLM also noted that

Alternative D "provides the greatest overall benefit to resource values." *Id.* For each alternative it

considered, BLM examined how the alternative impacted the following different resources and

uses: wild horses, water, soil, vegetation, wildlife and fisheries, special-status species, wildland

fires, cultural resources, paleontological resources, livestock grazing, recreation, and

social/economic values. RMPA-001245-84. BLM explained how each alternative it considered

would impact different aspects of the resource or use within the Checkerboard. *Id.* For example,

when analyzing the impacts to water resources, BLM considered the frequency of and methods

used in gathers, as well as the effects of maintaining or decreasing wild horse numbers. RMPA-

001258-60. Further, when rejecting Alternative C, BLM recognized that it would "have removed

all wild horses from the planning area" and "[t]his did not represent the best balance of multiple

resource values, where other options were available." RMPA-001680. The principle of "multiple use," (*i.e.*, "striking a balance among the many competing uses to which land can be put") was at the forefront of BLM's decision-making process, and BLM was under no obligation to prioritize wild horse usage over other resources. Petitioners fail to establish otherwise.

Second, FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Although RTF points to no evidence that the RMP Amendment will actually lead to undue or unnecessary degradation of rangeland, it argues that BLM did not consider undue or unnecessary degradation in its analysis of alternatives, and therefore BLM violated FLPMA. RTF Br. at 39. This argument boils down to the following: because the specific words "unnecessary or undue degradation" were not used in the ROD or Final EIS, the RMP Amendment violates FLPMA. While BLM may not have used the magic words RTF looked for, the record shows that the agency performed the analysis RTF claims is absent. RTF ignores that: (1) one of the goals BLM analyzed across all alternatives in the Final EIS was to "[m]onitor wild horse populations and rangeland conditions to inform wild horse management decisions[,]" or, in other words, to consider the impacts that the alternative would have on the quality of the rangeland, RMPA-001207; and (2) when analyzing the impacts of potential alternatives, BLM explicitly considered the impacts to wild horses and many other resources including, but not limited to, soil, water, vegetation, wildlife and fisheries, special-status species, and wildland fire, RMPA-001245-84. BLM considered how resources and overall rangeland health would be affected under each alternative and selected its alternative with the benefit of its analysis. RMPA-001677-80 (providing rationale for selecting Alternative D). BLM did consider unnecessary and undue degradation of public land and selected an alternative with that consideration in mind.

Finally, RTF argues that the RMP Amendment violates FLPMA because BLM did not undertake a comprehensive survey of resources and prepare an inventory prior to amending the RMPs. RTF Br. at 40. RTF relies on 43 U.S.C. § 1711(a), which says that BLM "shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values....This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." RTF does not acknowledge, let alone grapple with, the fact that the next sentence of the same statute says, "[t]he preparation and maintenance of such inventory or the identification of such areas *shall not*, of itself, change or prevent change of the management or use of public lands." *Id.* (emphasis added). Thus, under the plain language of the statute, whether or not an inventory existed or was sufficiently current is not a basis for preventing an amendment to an RMP.

Further, as discussed above, because the RMP Amendment is a planning-level determination, additional environmental data, including site-specific horse population numbers and rangeland conditions (forage, water, etc.), are not a necessary consideration at this stage and, if required, will occur before any implementation of the RMP Amendment (*i.e.*, a gather). *See* RMPA-001372 ("Additional information about existing range conditions is not needed in order to analyze the effects of the four planning alternatives on wild horses, other resources, and resource uses, and to make reasoned decisions about which [C]heckerboard areas, if any, should be designated for wild horse use."); RMPA-001635 (Protest Report stating that the RMP Amendment "does not authorize any specific action to control herd size or population growth. Implementation of any herd-reduction or population-growth suppression tool would be performed through a separate decision following further analysis of a proposed site-specific activity plan and alternatives"); RMPA-001213 (noting that BLM will "[p]repare gather plans for

removal of excess wild horses from inside and outside the wild horse HMAs"). Regardless, even though that data was not necessary at this stage of the planning process, the Final EIS does include an inventory of rangeland conditions that BLM considered in Appendix A. *See* RMPA-001316-37 (analyzing available forage, water, cover and space in each Checkerboard HMA and alternative); RMPA-001335-36 (example of table demonstrating whether "Wyoming Rangeland Health Standards" are met in various allotments in Checkerboard HMAs). In response to comments and in Appendix A of the Final EIS, BLM also explained that it relied on the best available data regarding population and rangeland conditions to make its decision but acknowledged that data had limitations. *E.g.*, RMPA-001370; RMPA-001377 ("However, the BLM is using the best available data (including the most recent Standards for Healthy Rangelands assessments) as required by NEPA."); RMPA-001319 (describing limitations on forage data and reasons for those limits). Given the purpose and need before the agency, BLM relied on the necessary, relevant information when amending the RMP and did not violate FLPMA's inventory provision.

## IV.        BLM Complied with NEPA.

Petitioners' NEPA claims fall into two categories. First, they assert that BLM failed to consider all reasonable alternatives, in part because it allegedly crafted an unreasonably narrow purpose and need statement that made its chosen alternative a foregone conclusion. Second, they contend that BLM failed to take a "hard look" at relevant data and public comments, and therefore its RMP Amendment was not the product of reasoned decision making. As set forth below, BLM complied with its obligations under NEPA and neither argument provides a basis for invalidating the RMP Amendment.

A.    BLM Analyzed a Broad and Legally Sufficient Range of Alternatives.

Collectively, Petitioners argue that BLM failed to consider three alternatives: (1) swapping hundreds of thousands of acres of private land with public lands to eliminate the checkerboard pattern of ownership; (2) managing only the public lands within the Checkerboard for wild horses; and (3) maintaining or increasing wild horse AMLs and also reducing livestock grazing. *See* AWHC Br. at 37-42; RTF Br. at 45-47; FOA Br. at 36-48. An examination of the record makes clear that BLM did in fact consider all three of these alternatives, and that Petitioners' true argument is that they disagree with BLM's conclusions and the overall purpose of the RMP Amendment. But Petitioners' agreement is not a requirement of NEPA, and it is inappropriate for Petitioners to attempt to substitute their judgment for that of the agency's. *Env't Def. Ctr., Inc. v. U.S. EPA,* 344 F.3d 832, 858 n.36 (9th Cir. 2003) (reviewing court may not substitute its judgment for that of the agency); *Rags Over the Arkansas River, Inc. v. BLM*., 77 F. Supp. 3d 1038, 1045 (D. Colo. 2015) ("[A] court may not substitute its judgment for that of the agency nor set aside the decision merely because it disagrees with the result."). As set forth below, BLM fully satisfied its obligation to consider reasonable alternatives and this argument provides no basis for vacating or remanding the RMP Amendment.

*1.  BLM Properly Defined the Purpose and Need of the RMP Amendment.*

Aside from the specific alternatives Petitioners highlight, Petitioner RTF contends that, in general, BLM's consideration of alternatives could not and did not satisfy NEPA because BLM "preordained the outcome of its analysis." RTF Br. at 45. The crux of this argument is that BLM unduly restricted the purpose of the RMP Amendment in order to "primarily serv[e] the wishes of RSGA" and the "whole [Final EIS] is built around justifying" BLM's pre-chosen alternative. RTF at 45-46. Similarly, Petitioner FOA argues that, due to the now-expired 2013 Consent Decree, BLM had no other choice but to select Alternative D and that its outcome was

predetermined before the RMP Amendment process even began. FOA Br. at 41 (noting BLM's

"predetermined path to follow the 2013 Consent Decree").[15] These arguments are unsupported

by the record. Instead, the RMP Amendment's purpose and need was reasonably crafted to

address BLM's management of a complex land ownership pattern in the Checkerboard.

A statement of purpose and need must "briefly specify the underlying purpose and need

to which the agency is responding in proposing the alternatives including the proposed action."

40 C.F.R. § 1502.13 (2012). An agency has "considerable discretion to define" the purpose and

need of its action. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011). "A

court may *not* reject BLM's stated objectives unless they are defined so narrowly as to foreclose

reasonable options." *W. Watersheds Project v. BLM*, 721 F.3d 1264, 1276 (10th Cir. 2013)

(emphasis added) (citing *N.M. ex. rel. Richardson,* 565 F.3d at 709). "In determining whether an

agency considered reasonable alternatives, courts look closely at the objectives identified in an

EIS's purpose and needs statement." *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.,*

297 F.3d 1012, 1030 (10th Cir. 2002).

As stated in the Final EIS, the purpose of the planning effort was "to identify and select,

consistent with applicable law, a plan for wild horse management, including AML, on the

current HMAs that include checkerboard land, in the Rock Springs Field Office and a portion of

---

[15] Though Petitioners claim that the 2013 Consent Decree eliminated BLM's choices, the chosen
alternative, Alternative D, does not incorporate every element from the 2013 Consent Decree. In
fact, none of the alternatives BLM considered in detail in the Final EIS exactly track the
provisions of the 2013 Consent Decree which further undermines the argument that the RMP
Amendment is simply a pretext for complying with the 2013 Consent Decree. *Compare* RMPA-
000891-92 (describing the notice of scoping that BLM would publish on the Federal Register
regarding certain proposed modifications to the Checkerboard HMAs based on the 2013 Consent
Decree), *with* RMPA-001199-204 (alternatives considered in Final EIS). Most notably, the
Consent Decree directed BLM to consider managing the White Mountain herd as a non-
producing herd, while Alternative D manages White Mountain as a producing herd with an AML
of 205-300 horses.

the Rawlins Field Office." RMPA-001193. The need for the amendment was "driven by the checkerboard pattern of public and private land ownership within the HMAs, the requirements of the [Wild Horses Act], [and] RSGA's withdrawal of consent to maintain wild horses on privately-owned lands." *Id*. In arguing that BLM erred in considering private landowners, Petitioners ignore the reality on the ground within the Checkerboard and that BLM is required, under FLPMA and the Wild Horses Act, to balance the interests of many other resources and entities beyond wild horses. Although BLM attempted over many years to reach consensus with RSGA, RSGA has revoked its consent, as it is permitted to do under law. RMPA-001680. The Final EIS also recognizes that no other private landowner within the Checkerboard has ever given BLM their consent to use private land for wild horse management. RMPA-001190. As a result, with the exception of the White Mountain HMA, BLM can no longer consider private lands when determining the best management plan for the Checkerboard area. The purpose and need of the RMP Amendment reasonably reflect this fact. RMPA-001228 ("[S]ince private land was included when the underlying HAs were evaluated as HMAs, and AML was established, this removal of consent required BLM to reassess if these HAs were still appropriate to manage as HMAs, and if so, what the corresponding AML should be.").

Pointing to nothing in the record to support its statement that BLM did not "seriously consider[]" alternatives due to a purportedly narrowly crafted purpose statement, RTF attempts to analogize this case to the decision in *National Parks & Conservation Association v. BLM*, 606 F.3d 1058 (9th Cir. 2010). RTF Br. at 46. The facts of that case are readily distinguishable, and its analysis is not instructive here. In *National Parks & Conservation Association*, the Ninth Circuit held that BLM did not comply with NEPA because the stated purpose and need of BLM's approval of a landfill included three goals that could "hardly be characterized as BLM

needs." *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1071. Those goals included a need to "[1] to provide a longterm income source from a landfill; … [2] to find a viable use for mine byproducts; and…[3] to develop long-term development plans for the Townsite." *Id.* The Ninth Circuit found that a private company, Kaiser, not BLM, was the only entity that would see any profit from the landfill, was the only entity that needed to find a use for mine byproducts, and was the only entity that operated the Townsite (which was a Kaiser development that housed workers and support personnel). *Id.* The purpose and need statement in *National Parks & Conservation Association* was explicitly fashioned to meet the financial goals of another entity. Here, the RMP Amendment's purpose and need statement considers different competing users of and resources on BLM lands, and does not single out any one private user as a recipient of any benefits from the RMP Amendment. It is a far cry from the explicit benefit Kaiser would receive in *National Parks & Conservation Association*.

Accordingly, this Court should reject any argument that BLM's purpose and need statement is crafted so narrowly as to make its chosen alternative a foregone conclusion.

### 2.    *Alternatives Considered.*

BLM fulfilled NEPA's requirements "by analyzing a full range of reasonable alternatives that would satisfy" its stated purpose and need. *Wyoming*, 661 F.3d at 1243. NEPA requires a federal agency to give a "detailed statement . . . on . . . alternatives to the proposed agency action" and to "study, develop, and describe appropriate alternatives." 42 U.S.C. § 4332(C)(iii), (H). NEPA does not require, however, that agencies consider every conceivable alternative during the EIS process. Rather, "an agency is only required to consider 'reasonable alternatives.'" *Canyons*, 297 F.3d at 1030 (quoting 40 C.F.R. § 1502.14). An agency's decision to examine a particular alternative and its discussion of alternatives need only be "sufficient to permit a reasoned choice among the options." *Wyoming*, 661 F.3d at 1243-44 (internal quotation

marks and citation omitted). As with other aspects of NEPA, the "rule of reason" guides both the choice of alternatives as well as the extent to which the EIS must discuss each alternative. *Id.* The Tenth Circuit has made clear that "[o]nce an agency appropriately defines the objectives of an action, NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Id.* (internal quotation marks and citation omitted). "That is, once an agency establishes the objective of the proposed action—which it has considerable discretion to define— the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'" *Id.* at 1244 (quoting *Canyons*, 297 F.3d at 1031) (internal quotation marks and citation omitted).

As set forth above, in the Final EIS, BLM considered four alternatives in detail.

- **Alternative A (No Action)**: This alternative, which includes private lands in its calculus, would maintain the existing HMA boundaries and AMLs. RMPA-001184.
- **Alternative B**: Under this alternative all Checkerboard lands within the Adobe Town, Great Divide Basin, and Salt Wells Creek HMAs would revert to HA status and be managed for zero wild horses. However, the same number of wild horses would be maintained within the Great Divide Basin and Salt Wells Creek HMAs, concentrated into a smaller area of solid-block public lands. AMLs for the Adobe Town and White Mountain HMAs would be reduced. RMPA-001184-85. All wild horse herds would be managed as non-reproducing. RMPA-001185.
- **Alternative C**: All wild horses would be removed from the planning area, and the HMAs would revert to HA status and be managed for zero wild horses. *Id.*
- **Alternative D**: The entire Great Divide Basin and Salt Wells Creek HMAs would revert to HA status and be managed for zero wild horses. *Id.* All areas of the Adobe Town HMA north of the Corson Springs southern allotment boundary fence (which includes all of its Checkerboard lands) would revert to HA status and be managed for zero wild horses; the area south of the fence would retain its status as an HMA with an AML of 259-536. *Id.* The White Mountain HMA would be maintained with an AML of 205-300. *Id.*

In addition to those four alternatives analyzed in detail, BLM also considered six other alternatives but eliminated them from further analysis: (1) removing private lands from the

HMAs and managing the remaining public lands for wild horses; (2) increasing wild horse

AMLs on the solid public-land block portions of the HMAs and only allowing livestock on the

checkboard portions; (3) managing the solid-block portion of the White Mountain HMA as part

of the Little Colorado HMA, which does not contain any Checkerboard lands; (4) conducting

land exchanges to address issues with the checkerboard land ownership pattern; (5) reducing the

amount of livestock AUMs proportionate with wild horse AUM reductions; and (6) introducing

natural predators, such as wolves, as a means of population control. RMPA-001204-06. For each

of these six alternatives, BLM explained why they were eliminated. *See id.*[16]

Despite this fulsome analysis, Petitioners argue that the RMP Amendment should be

vacated for failing to consider: (1) swapping hundreds of thousands of acres of private land with

public lands to eliminate the checkerboard pattern of ownership; (2) managing the public lands

within the Checkerboard for wild horses; (3) and reducing livestock grazing and increasing or

maintaining wild horse AMLs in the Checkerboard HMAs. Each of these alternatives, and the

reasons Petitioners' arguments fail, is discussed in turn below.

a.  A Land Swap Was Considered and Is Not Reasonable.

Petitioners argue that BLM failed to consider the "mid-range" alternative of a land swap

that would theoretically eliminate the checkerboard pattern by exchanging hundreds of thousands

of acres of private land in the Checkboard for public land elsewhere. AWHC Br. at 37-42; FOA

---

[16] Petitioners also frame BLM's analysis as "just" or "only" four alternatives, FOA Br. at 38, but
NEPA does not set a threshold number of alternatives to be considered and agency actions have
passed muster under NEPA when the agency considered fewer (or the same number of)
alternatives. *See, e.g., Custer Cnty. Action Ass'n*, 256 F.3d at 1040-41 (finding detailed study of
three alternatives sufficient under NEPA); *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1176
(10th Cir. 1999) (finding detailed study of four alternatives sufficient under NEPA); *Canyons,*
297 F.3d at 1031-32 (same).

Br. at 38-42; RTF Br. at 46 n.16; RMPA-001228-29 (showing 891,087 acres of land within the Checkerboard are not owned by BLM). There are several flaws in this argument.

First and foremost, BLM did explicitly consider a land swap within the Checkerboard in the Final EIS. RMPA-001205 ("Under this alternative, the BLM and private landowners would conduct a land exchange to extend the 'solid block' portion of public land and remove the issues associated with the checkerboard land ownership pattern."). Although considered, BLM eliminated the land swap from detailed analysis and gave its reasoning for doing so. *Id.* This is entirely consistent with BLM's obligations under NEPA because "[f]or those alternatives considered but eliminated from detailed analysis," an agency is "required only to 'briefly discuss the reasons for their having been eliminated'" and "an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends." *Assocs. Working for Aurora's Residential Env't v. Colo. Dep't of Transp.,* 153 F.3d 1122, 1130 (10th Cir. 1998) (quoting 40 C.F.R. § 1502.14(a)).

BLM properly eliminated the land swap from further analysis because it determined it was an "ineffective means to achieving the desired ends," *Id.* at 1130, of the RMP Amendment's purpose. BLM recognized that, given the scale of the land swap necessary to eliminate the checkerboard pattern, it would take multiple years to carry out. RMPA-001205. A multi-year land swap project is plainly inconsistent with BLM's need to manage the Checkboard consistent with applicable statutes, namely the Wild Horses Act, which includes not just requirements for management of public lands, but also binding regulations for private lands, including removal of wild horses "as soon as practicable" after receiving a request. 43 C.F.R. § 4720.2-1.

Petitioners focus on the Final EIS's use of "near term" in its land swap analysis to suggest that BLM's reasoning for eliminating the land swap was improper. AWHC Br. at 41;

FOA Br. at 40. Under this argument, BLM acted arbitrarily because the purpose and need statement does not also use the phrase "near term." *Id.* While the exact phrase "near term" is not used in the purpose and need statement, the purpose of the RMP Amendment clearly contemplates addressing the management issues in the Checkerboard as soon as practicable. As noted above, the purpose of the RMP Amendment stems from BLM's need to address the fact that it no longer has the right to use private lands within the Checkerboard due to RSGA's revoked consent. Searching for a near-term solution in the face of Section 4's requirements that wild horses be removed "as soon as practicable," 43 C.F.R. § 4720.2-1, is consistent with the RMP Amendment's purpose and need.

Further, even if the land swap would carry out the purpose and need of the RMP Amendment, it is not "reasonable." *Canyons*, 297 F.3d at 1031. This Court should give no weight to Petitioners' portrayal of a land swap as a "mid-range" solution. To the contrary, it is impractical and speculative. *Biodiversity Conservation All. v. BLM*, 608 F.3d 709, 714-15 (10th Cir. 2010) (an agency can "eliminate alternatives that are too remote, speculative, impractical, or ineffective" (internal quotation marks and citation omitted)). The land swap Petitioners envision would involve millions of acres of land. At the time of the RMP Amendment (and currently), BLM had no willing participants for a land exchange. RMPA-001205. This is significant because, under BLM's land exchange guidelines, "[a]cquisitions of private lands will only be pursued with willing landowners." RMPA-000496; RMPA-049773. Accordingly, BLM's ability to carry out the massive land exchange Petitioners envision was purely theoretical and was reasonably eliminated from analysis.

Even if there was potential interest from a willing landowner, the land swap would still not be reasonable because the Checkerboard lands are not just habitats for wild horses. They also

host other types of resources (*e.g.*, mineral, cultural, hazardous materials, etc.) that would need to be thoroughly surveyed prior to any exchange. RMPA-001205. BLM estimated that undertaking only the necessary surveying would take years to complete and an intensive amount of agency resources. *Id.* It is not viable and it is impractical.

Petitioner FOA analogizes this case to the Tenth Circuit's decision in *New Mexico ex. rel. Richardson*. In that case, the purpose of BLM's action was to "identify[] lands suitable for fluid minerals development," but BLM completely failed to consider an alternative that would have closed the most environmentally sensitive habitat, the Otero Mesa, from development. *N.M. ex. rel. Richardson*, 565 F.3d at 710-11. The Tenth Circuit held this alternative should have been considered and failure to do so violated NEPA. *Id.* What Petitioners ignore, however, is that in the *New Mexico* case BLM had considered another alternative that closed the entirety of the plan area (*i.e.*, an area broader than the Otero Mesa), but it was excluded from detailed analysis. *Id.* at 711 n.32. Contrary to Petitioner's assertions, the Tenth Circuit did not find that the "full closure" alternative was insufficiently analyzed simply because it was excluded from detailed consideration. *See id.* ("[T]he alternative of closing only the Mesa—which represents a small portion of the overall plan area—differs significantly from full closure"); *see also Wilderness Workshop v. BLM*, 342 F. Supp. 3d 1145, 1166 (D. Colo. 2018) (interpreting the holding of *New Mexico* as "[t]he court found that the defendant's justification—that it reasonably had analyzed an alternative of no development in the plan area *as a whole*—was in fact different than analyzing an alternative of no development for the specific portion of land at issue"). Thus, the land swap alternative in this case is not, as Petitioners suggest, akin to the completely unconsidered Otero Mesa closing alternative in *New Mexico*. Rather, it is analogous to the "full closure" alternative, which was considered but excluded from additional analysis.

Finally, Petitioners disregard the agency's analysis of its own ability to allocate its limited resources and insist, without support, that "[s]uch an alternative, if seriously considered by BLM, could have taken place in the ten years that expired from initial scoping to the issuance of the [RMP Amendment]." FOA Br. at 41. Petitioners point to nothing to show that a complex land exchange could be accomplished that quickly. *See Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013) (finding that, in a case where plaintiffs argued that the agency should have considered elevating railroad tracks to avoid wetland impacts, the court "cannot say that failure to consider [an] alternative is improper without evidence showing the feasibility of the alternative"). Whether Petitioners think a land exchange could be carried out more quickly is not relevant. The purpose of NEPA is not to substitute Petitioners' judgment for that of BLM. It is to ensure that the agency considers reasonable alternatives. Here, BLM explicitly concluded that a land exchange would be technically infeasible, in part because it would involve thousands of acres of land with various resource interests, and that it would not satisfy the purpose and need of the RMP Amendment. RMPA-001205. Nothing further was needed to satisfy BLM's NEPA obligations.

      b.    <u>BLM Considered an Alternative of Managing Public Lands for Horses.</u>

Petitioner FOA argues that BLM did not consider "in detail" an alternative that would maintain wild horses on the public portions of the Checkerboard. FOA Br. at 42-43. First, BLM did explicitly consider this alternative in the Final EIS. RMPA-001204. BLM determined it would be technically infeasible and would not respond to the purpose of the RMP Amendment because there would be no meaningful way to keep horses within the public portions of the Checkerboard and off private lands. *Id.* As with the land exchange alternative, after reasonably determining it would be impractical and unresponsive to the need, this alternative was eliminated from further consideration. This satisfies BLM's obligations. *AWARE,* 153 F.3d at 1130.

Second, FOA's assertion that maintaining wild horses in the public portion of the HMAs is a feasible alternative, FOA Br. at 42-43, ignores that landowner consent to use private land has been revoked and management of the area in accordance with Section 4 has been unsuccessful, RMPA-001204. It is also premised on an argument that there is "no concrete deadline for BLM to respond to removal requests." FOA Br. at 42-43. Although BLM is not bound by a precise deadline, it cannot ignore its statutory obligations under Section 4. *See Am. Wild Horse Pres. Campaign*, 847 F.3d at 1191 (concurrence explaining that Section 4 obligation is "clear, unmistakable, mandatory, and non-discretionary"). Thus, Petitioners present nothing to suggest this is a reasonable and feasible alternative. *See Alaska Survival,* 705 F.3d at 1088.

      c.      <u>BLM Considered Decreasing Livestock Grazing.</u>

Petitioner FOA also asserts that BLM did not "seriously consider" an alternative that would maintain or increase wild horse numbers and also reduce livestock grazing on public lands. FOA Br. at 45-48. BLM did consider in detail an alternative that reduced livestock grazing. Alternative B contemplated maintaining wild horses on the solid-block portions of the HMAs (while also eliminating the checkboard portion) and reducing livestock forage allocation "by a total of 6,876 [AUMs] to accommodate the existing number of wild horses (1,620 at high AML) being concentrated in smaller HMAs." RMPA-001199-200. With the exception of a relatively small reduction in AML for White Mountain and Adobe Town HMAs, Alternative B would maintain the existing wild horse AMLs. *Id.* Though the herds in Alternative B would be managed as non-reproducing, BLM would supplement herd numbers "with additional wild horses from other HMAs to help maintain AMLs following natural attrition or to help preserve adequate genetic diversity." RMPA-001248. And Alternative A, the no action alternative, also maintained the AMLs for wild horses in the HMAs. RMPA-001199.

Even though alternatives that largely align with what they describe were considered, Petitioners highlight that the number of livestock AUMs in Alternative B would still be higher than the AUMs set aside for wild horses. FOA Br. at 47. FOA points to nothing in the statute or regulations that requires BLM to maintain parity between wild horse and livestock AUMs. Again, though FOA disagrees with the number of grazing permits BLM issues, there can be no violation of NEPA where the agency explicitly considered an alternative that reduced livestock AUMs.

B.    BLM Took the Required "Hard Look" at the Consequences of the RMP Amendment.

Petitioners also contend that BLM did not take a hard look at the relevant environmental data, impacts to wild horse viewing opportunities, impacts to herd genetic diversity, impacts of increased livestock grazing, or the positive impacts of wild horses before approving the RMP Amendment. RTF Br. at 40-44, 48-51; FOA Br. at 49-58. The Final EIS demonstrates that BLM adequately considered the information relevant to its high-level planning decision, including many of the specific issues Petitioners raise in their briefing.

Under NEPA, agencies must take a "hard look" at the environmental consequences of their actions. *Robertson*, 490 U.S. at 350 (citation omitted). An agency takes the requisite "hard look" where its NEPA documents "reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project…[and] provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006) (citation omitted). Courts apply "a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment." *Utahns for Better Transp. v. U.S Dep't of*

56

*Transp.,* 305 F.3d 1152, 1163 (citation omitted). In determining whether the agency took the requisite hard look, courts should consider "whether the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]'" *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1271 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43), and, otherwise, "the court will not second-guess the wisdom of the ultimate decision." C*itizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 U.S. 1091, 1098 (10th Cir. 2007) (citation omitted).

    *1.    BLM Considered the Necessary Data Before Amending the RMPs.*

    Petitioner RTF argues that BLM could not take the requisite "hard look" because it did not have the relevant data before it at the time of the RMP Amendment. RTF Br. at 40. Principally, RTF asserts that BLM lacked data regarding genetic diversity, range conditions, and population numbers, and, without this data, BLM could not have made a reasoned decision. This argument demonstrates why Petitioners' challenges are premature and do not support a finding that BLM violated NEPA. The RMP Amendment is a programmatic-level decision. It is a planning document for overall wild horse management within the Rawlins and Rock Springs areas, but it does not make site-specific determinations on how to implement the plan. 43 C.F.R. § 1601.0-5(n); *S. Utah Wilderness All.*, 542 U.S. at 69. In other words, the RMP Amendment does not authorize the removal of any horses or direct how any future removals may be carried out. As BLM explained, additional NEPA analysis is forthcoming before any horse removal will occur and detailed analyses of population numbers and genetic diversity were not required at this stage. RMPA-001213; RMPA-001573; RMPA-001366; RMPA-049432; RMPA-049464. Thus, data about the current wild horse population numbers, specific rangeland conditions, or effects

on genetic diversity were outside the scope of this high-level planning document that does not authorize the removal of any horses.

Notwithstanding the purpose of the RMP Amendment, the Final EIS does consider genetic diversity of herds and the potential diversity impacts caused by a change in AMLs. In Appendix A, BLM considered guidance from its Handbook that "to avoid inbreeding depression in wild horse populations, a minimum herd size of 50 effective breeding animals (a total population size of about 150–200 animals) is recommended." RMPA-001324. BLM then reviewed each alternative and considered how the AMLs in the remaining HMAs would compare with this metric. *E.g.*, RMPA-001324-25. For those HMAs converted to HAs and managed for zero wild horses, genetic diversity is not a relevant consideration because BLM will no longer be managing herds in those areas. For those areas that will remain HMAs, BLM determined that under all alternatives, the remaining herds would have more than 150 individual horses, as recommended by its Handbook. RMPA-001324-25; RMPA-001329; RMPA-001333; RMPA-001337.[17] Appendix A also discusses the range conditions in each of the Checkerboard HMAs and considers whether they would have adequate forage, water, space, and cover to support the proposed AMLs. RMPA-001316-37. BLM explains that it considered all of the relevant data available to it but notes that comprehensive data on forage levels in the Checkerboard is not available, and a survey is underway. *E.g.*, RMPA-001370; RMPA-001319 (describing limitations on forage data and reasons for those limits).

---

[17] The only exception is under Alternative B in the situation of low AML of the White Mountain HMA but, as BLM explained, "under this alternative this herd would be managed as nonreproducing, so the genetic diversity of the herd would not be relevant to their management." RMPA-001337.

In sum, although not a necessary consideration at this stage, BLM did examine data regarding genetic diversity and environmental conditions, which supports its RMP Amendment and does not provide a basis for a NEPA violation.

       2.     *BLM Considered the Benefits of Wild Horses and Impacts to Wild Horse Viewing.*

FOA contends that BLM ignored evidence that wild horses have a positive impact on the environment. FOA Br. at 49-54. The record shows the opposite. In response to public comment, BLM considered the benefits of wild horses, RMPA-001254, and it also necessarily considered the negative impacts of wild horses, RMPA-001254, which are also documented in the literature, RMPA-044619. Rather than identifying an area where BLM's analysis "undermine[d] informed public comment and informed decisionmaking[,]" *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017), FOA's critiques are based on their mere disagreement with BLM's conclusion. BLM's analysis of wild horse impacts, both positive and negative, did not violate NEPA.

RTF also argues that BLM did not consider the potentially "drastic impacts to wild horse viewing opportunities." RTF Br. at 44. Like the issue of the positive impacts of wild horses, RTF merely disagrees with BLM's conclusion. BLM explicitly considered wild horse viewing impacts in Section 4.2.11 of the Final EIS and recognized that there could be a negative impact to individuals "whose recreational experience would be enhanced by the presence of wild horses." RMPA-001281. Accordingly, the impact to viewing opportunities was part of BLM's consideration of alternatives and its conclusion was reasonable given the evidence before it.

       3.     *Consideration of Increased Livestock Grazing is Beyond the Scope of the RMP Amendment.*

FOA also asserts that BLM violated NEPA by failing to consider the impact of reallocating wild horse AUMs to livestock grazing. FOA Br. at 54-57. The RMP Amendment

does not increase permitted livestock AUMs and instead explicitly says that reallocation of AUMs to livestock grazing, if it ever happens, would happen only "through future decision-making, based on further NEPA analysis including an in-depth review of intensive monitoring data including: grazing utilization, use patterns, Standards for Healthy Rangelands, trend monitoring, actual use and climate data." RMPA-001667. Thus, at this programmatic plan revision stage, any future decision to reallocate AUMs to livestock is not "reasonably foreseeable." The speculative harm of allocating additional AUMs to livestock on the Checkerboard is not within the scope of the RMP Amendment, which is limited to wild horse management. BLM had no obligation to consider the impact of increased livestock grazing in the RMP Amendment.

### 4. *BLM Responded to Public Comments.*

Although RTF alleges that, as a general matter, BLM did not respond to public comment, the only example it points to is that the RMP Amendment does not state the specific population management tools BLM will use in the future or "substantively" respond to comments on this issue.[18] RTF Br. at 48-51. In its response to comments and in the Final EIS, BLM explains that "[d]ecisions on which specific population growth suppression strategies are utilized in a specific scenario are beyond the scope of this EIS, and potential impacts would be discussed in detail in a site specific NEPA analysis." RMPA-001505; RMPA-001510. This explanation tracks with BLM's land planning process, which is expressly contemplated in BLM's regulations. *See* 43 C.F.R. § 1601.0-5(n) (defining an RMP as "not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and

---

[18] Appendix C of the Final EIS contains BLM's detailed responses to the public comments it received. RMPA-001365-1619.

regulations"). The RMP Amendment is a programmatic level document that leaves flexibility for any later implementation decisions. Regardless, the record is not silent on this issue, and Appendix B of the Final EIS lists the type of population control techniques that may be implemented in the future. RMPA-001339. In responding to comments on this issue, BLM explained that Appendix B "describes and analyzes effects of these types of strategies that are reasonably foreseeable at the planning scale." *E.g.*, RMPA-001499.

Petitioners wrongly argue that this is just BLM "kicking the can" down the road. Instead, BLM's analysis and responses in the RMP Amendment are consistent with the fact that BLM makes both programmatic and implementation level decisions. The specific population control methods that BLM will use, like any other decision to implement horse management on the range, will be addressed in detail when site-specific decisions are made. Petitioners can bring their specific challenges to implementation decisions at that time.

In sum, BLM took the requisite hard look at the environmental consequences of its actions and properly responded to public comment. Petitioners' NEPA claims should be denied.

## **CONCLUSION**

For the foregoing reasons, the petitions for review should be denied.


Dated: March 29, 2024


Respectfully submitted,                          TODD KIM
                                                 Assistant Attorney General
                                                 U.S. Department of Justice
                                                 Environment & Natural Resources Division
                                                 S. JAY GOVINDAN, Section Chief
                                                 Wildlife & Marine Resources Section
                                                 BRIDGET MCNEIL, Assistant Section
                                                 Chief

*/s/ Maggie Baker Smith*
MAGGIE BAKER SMITH, Trial Attorney
(WA Bar No. 42658)
Wildlife & Marine Resources Section
7600 Sand Point Way, NE
Seattle, Washington 98155
Telephone: 202-598-3088
Email: Maggie.Smith@usdoj.gov


*/s/ Kimberly A. Cullen*
KIMBERLY A. CULLEN
(DC Bar No. 888314618)
Trial Attorney, Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Telephone: 202-305-0503
Fax: 202-305-0275
Email: kimberly.cullen@usdoj.gov


NICHOLAS VASSALLO
United States Attorney

*/s/ C. Levi Martin*
C. LEVI MARTIN
Civil Chief
(WY Bar No. 6-3781)
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Email: christopher.martin@usdoj.gov


*Attorneys for Federal Respondents*

## CERTIFICATE OF COMPLIANCE

In accordance with the Court's Order setting a word limit of 39,000 words for the Federal

Respondents consolidated response brief (ECF No. 38), I hereby certify that this brief is 19,710

words.


*/s/ Maggie Baker Smith*
Maggie Baker Smith