Travis Jordan, WSB No. 7-5721
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Ph: 307-777-7895
travis.jordan@wyo.gov

*Attorney for Intervenor-Respondent*
*State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, *et al.*, | |
| Petitioners, | Case No. 2:23-cv-00084-KHR (Lead) |
| v. | |
| TRACY STONE-MANNING, *et al.*, | |
| Respondents, | STATE OF WYOMING'S RESPONSE BRIEF |
| and, | |
| STATE OF WYOMING, | |
| Intervenor-Respondent. | |

RETURN TO FREEDOM, *et al.,*

       Petitioners,

    v.

DEB HAALAND, *et al.,*

       Respondents.

Case No. 23-cv-00087-KHR
(Joined)

FRIENDS OF ANIMALS*,*

       Petitioners,

    v.

DEB HAALAND, *et al.,*

       Respondents.

Case No. 23-cv-00117-KHR
(Joined)

# TABLE OF CONTENTS

GLOSSARY.......................................................................................................... iii

TABLE OF AUTHORITIES……………………………………………………...…iv

INTRODUCTION ....................................................................................................1

LEGAL BACKGROUND .........................................................................................2

FACTUAL BACKGROUND......................................................................................2

STANDARD OF REVIEW ........................................................................................2

ARGUMENT .............................................................................................................3

     I.     The Bureau's RMP Amendment did not violate the Act. ....................3

          A.     The Bureau has discretion to determine wild horse range..........3

          B.     Petitioners deceptively argue that the RMP Amendment removes wild horses from the planning area. ............................3

          C.     Petitioners' plain language arguments do not consider the plain language of the Act. ..........................................................6

          D.     Case law does not support Petitioners' interpretation of the Act. ........................................................................................10

          E.     Petitioners' interpretation ignores Section 3(b)(2) and makes the Act incompatible.....................................................14

          F.     The structure and history of the Act support the Bureau's decision to reorganize HMAs through the land use planning process....................................................................................17

          G.     The Bureau's AML determinations were not arbitrary. ...........21

     II.     The Bureau fulfilled its obligations under FLPMA. ...........................26

          A.     The RMP Amendment embraced multiple use principles........26

B.      The RMP Amendment protects public lands from
        unnecessary and undue degradation. ........................................28

C.      The Bureau's HMA designation was consistent with
        FLPMA. .................................................................................32

III.    The RMP Amendment complied with NEPA .....................................33

A.      The Bureau's range of alternatives was reasonable.................34

B.      The Bureau took a hard look at the impacts of the RMP
        Amendment. ...........................................................................40

CONCLUSION ............................................................................................44

CERTIFICATE OF COMPLIANCE ........................................................46

CERTIFICATE OF SERVICE .................................................................47

# GLOSSARY

American Wild Horse Campaign…………………………………………Campaign

Animal Management Level……………………………………………..·AML

Bureau of Land Management…………………………………………...Bureau

Federal Land Policy and Management Act…………………………….FLPMA

Final Environmental Impact Statement……………………………...·..FEIS

Friends of Animals………………………………………………..·……Friends

Herd Management Area………………………………………….…HMA

National Environmental Policy Act…………………………...·……NEPA

Record of Decision………………………………………………………..ROD

Resource Management Plan……………………………………...·…..RMP

Return to Freedom…………………………………………………....RTF

Rock Springs and Rawlins Wild Horse Management Plan
Amendment and FEIS………………………………………RMP Amendment

Wild and Free-Roaming Horses and Burros Act…………………………..·the Act

Wyoming Game and Fish Department……………………………….·WGFD

# TABLE OF AUTHORITIES

## Cases

*Airport Neighbors All. v. United States,*
  90 F.3d 426 (10th Cir. 1996) ...................................................................40

*Am. Horse Prot. Ass'n, Inc. v. Watt,*
  694 F.2d 1310 (D.C. Cir. 1982)..............................................................18

*Am. Wild Horse Campaign v. Bernhardt,*
  442 F.Supp.3d 127 (D.D.C. 2020)...........................................................17

*Am. Wild Horse Pres. Campaign v. Jewell,*
  847 F.3d 1174 (10th Cir. 2016) ...................................................... 3, 6, 13

*Ariz. Pub. Serv. Co. v. EPA,*
  562 F.3d 1116 (10th Cir. 2009) ..............................................................24

*BioDiversity Conservation All. v. BLM,*
  Case No. 09-CV-08-J, 2010 WL 3209444 (D. Wyo. June 10, 2010) ........... 26, 28

*Borden v. United States,*
  593 U.S. 420 (2021)..............................................................................10

*Cloud Found., Inc. v. Salazar,*
  999 F.Supp.2d 117 (D.D.C. 2013)...........................................................20

*Colo. Env't Coal. v. Dombeck,*
  185 F.3d 1162 (10th Cir. 1999) ..............................................................34

*Colo. Wild Horse & Burro Coal., Inc. v. Salazar,*
  639 F.Supp.2d 87 (D.D.C. 2009)....................................................... 10, 11, 12

*Colo. Wild Horse & Burro Coal., Inc. v. Salazar,*
  Case No. 1:06-CV-01609 (D.D.C. March 24, 2009)...........................................12

*Forest Guardians v. U.S. Fish & Wildlife Serv.,*
  611 F.3d 692 (10th Cir. 2010) ..................................................... 41, 42, 44

*Friends of Animals v. BLM,*
  232 F.Supp.3d 53 (D.D.C. 2017)...........................................................12

iv

*Friends of Animals v. BLM*,
    Case No. 2:16-CV-1670-SI, 2018 WL 1612836 (D. Ore. Apr. 2, 2018) ...........15

*Friends of Animals v. BLM*,
    548 F.Supp.3d 39 (D.D.C. 2021) ...........................................................................15

*Friends of Animals v. BLM*,
    Case No. 16-CV-0199, 2017 WL 5247929 (D. Wyo. March 20, 2017) ..............4

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006)................................................................................21

*Gardner v. BLM*,
    638 F.3d 1217 (9th Cir. 2011) ..............................................................................32

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561 (1995)...............................................................................................16

*Habitat for Horses v. Salazar*,
    745 F.Supp.2d 438 (S.D.N.Y. 2010) ....................................................................15

*In Defense of Animals v. Dep't of Interior*,
    737 F.Supp.2d 1125 (E.D. Cal. 2010) ........................................................... 21, 33

*In re Kunz*,
    489 F.3d 1072 (10th Cir. 2007) ..............................................................................9

*Jones v. Hendrix*,
    599 U.S. 465 (2023)...............................................................................................16

*Lamb v. Thompson*,
    265 F.3d 1038 (10th Cir. 2001) ............................................................................19

*N.M. ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ..............................................................................34

*New Mexico v. Dep't of Interior*,
    854 F.3d 1207 (10th Cir. 2017) ............................................................................17

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004).............................................................................................4, 33

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) ...............................................................6

*Ore. Nat'l Desert Ass'n v. Gammon*,
  Case No. 06-CV-523-HO, 2007 WL 9809179 (D. Ore. June 28, 2007) .............30

*Return to Freedom v. Haaland*,
  Case No. 2:23-CV-00087 (D. Wyo. May 17, 2023)............................................29

*Rocky Mountain Oil and Gas Ass'n v. Watt*,
  696 F.2d 734 (10th Cir. 1982) ...............................................................26

*Soda Mountain Wilderness Council v. Norton*,
  424 F.Supp.2d 1241 (E.D. Cal. 2006) ...................................................29

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  605 F.Supp.2d 263 (D.D.C. 2009)................................................... 27, 28

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) ...............................................................28

*United States v. Sturm*,
  Nos. 09-1386, 09-5022, 2011 WL 6261657 (10th Cir. Apr. 4, 2011)...................7

*Utah Env't Cong. v. Bosworth*,
  443 F.3d 732 (10th Cir. 2006) ...............................................................24

*Utah Shared Access All. v. Carpenter*,
  463 F.3d 1125 (10th Cir. 2006) ...............................................................35

*W. Expl., LLC v. U.S. Dep't of the Interior*,
  250 F.Supp.3d 718 (D. Nev. 2017)................................................... 30, 31

*W. Watersheds Project v. BLM*,
  76 F.4th 1286 (10th Cir. 2023) ...............................................................44

*W. Watersheds Project v. Haaland*,
  850 F.App'x. 14 (D.C. Cir. 2021)...........................................................5

*WildEarth Guardians v. Nat'l Park Serv.*,
  703 F.3d 1178 (10th Cir. 2013................................................... 34, 37

*Wyoming v. U.S. Dep't of Agric.*,
 661 F.3d 1209 (10th Cir. 2011) ............................................................41

*Wyoming v. U.S. Dep't of Interior*,
 839 F.3d 938 (10th Cir. 2016) ...................................................... passim

**Statutes**

16 U.S.C. § 1331 ...............................................................................6, 7

16 U.S.C. § 1332 ...................................................................................26

16 U.S.C. § 1333 ......................................................................... passim

42 U.S.C. § 4332 ........................................................................... 34, 41

43 U.S.C. § 1701 ...................................................................................26

43 U.S.C. § 1702 ...................................................................................26

43 U.S.C. § 1712 ............................................................... 4, 14, 15, 26

43 U.S.C. § 1715 ...................................................................................39

43 U.S.C. § 1716 ...................................................................................39

43 U.S.C. § 1732 ......................................................................... passim

Act of 1890 § 5, 26 Stat. 664 ................................................................39

**Regulations**

40 C.F.R. § 1502.14 ........................................................................ 34, 35

43 C.F.R. § 1610.5-3 ............................................................................35

43 C.F.R. § 2200.0-6 .................................................................. 37, 38, 39

43 C.F.R. § 2201.1-1 .................................................................... 37, 38

43 C.F.R. § 4700.0-6 ............................................................................19

43 C.F.R. § 4710.1 ................................................................ 5, 11, 19

43 C.F.R. § 4710.3-1 ............................................................. 20, 27

**Other Authorities**

Federal Land Policy and Management Act,
    Pub. L. 94-579, 90 Stat. 2743 (Oct. 21, 1976) ........................................ 19

H.R. Rep. No. 95-1122 (1978) ................................................................. 18

Public Rangelands Improvement Act of 1978,
    Pub. L. 95-514, 92 Stat. 1803 (Oct. 25, 1978) ....................................... 18

Wild Free-Roaming Horses and Burros Act,
    Pub. L. 92-195, 85 Stat. 649 (Dec. 15, 1971) ........................................ 19

## INTRODUCTION

All three Petitioners claim that the Bureau unlawfully adopted the RMP Amendment because it did not determine that excess wild horses exist on public lands. But the Act imposes no such requirement for land use planning. In fact, Petitioners' entire case rests on paying lip service to the "plain language" of the Act while mischaracterizing the RMP Amendment as a decision to remove wild horses.

This Court should reject Petitioners' effort to hobble the Bureau's well-established authority to adopt wild horse management objectives through the land use planning process. The Act and its implementing regulations make clear that the Bureau has discretion to designate wild horse HMAs. The Act also provides that the Bureau's subsequent removal decisions will consider the objectives in the RMP Amendment, not the other way around as Petitioners argue.

The Bureau's decision to reorganize wild horse HMAs also complied with the statutory mandates under FLPMA and NEPA. The HMA decision provided a balanced, multiple use approach and addressed competition between wild horses and wildlife for habitat. The Bureau also adequately explained why a land exchange alternative, across a million acres of checkerboard with no willing parties, was not feasible. Accordingly, the State respectfully asks this Court to affirm the Bureau's decision in the RMP Amendment and its accompanying analysis.

## LEGAL BACKGROUND

The State, incorporates by reference the Federal Respondents' summary of the applicable provisions of the Act, FLPMA, and NEPA. (ECF_54 at 14-19).[1]

## FACTUAL BACKGROUND

The RMP Amendment realigns wild horse HMAs within a portion of the checkerboard region of Wyoming and establishes new AML objectives. (RMPA001667). The State holds title to tens of thousands of acres of state trust land within the planning area that are directly impacted by wild horses. (*See* RMPA045884; RMPA001665). The State also manages wildlife and water resources across all classes of land under the RMP Amendment. (RMPA001236; RMPA001233). Accordingly, the Governor and six state agencies participated as cooperating agencies in developing the RMP Amendment. (RMPA001288).

To avoid repetition, the State adopts and incorporates by reference the factual background presented by the Federal Respondents regarding the components of the RMP Amendment. (ECF_54 at 19-29).

## STANDARD OF REVIEW

The State adopts and incorporates by reference the standard of review provided by Federal Respondents.  (ECF_54 at 29-31).

---

[1] Pincites to the briefs and previously docketed materials are to the page numbers assigned by the CM/ECF system at the top of each page.

## ARGUMENT

### I.    The Bureau's RMP Amendment did not violate the Act.

A plain language argument should not require a court to insert words into a statute, erase provisions that actually do exist, and arrive at nonsensical outcomes. Yet, Petitioners do just that by asking this Court to read the words "only if" into the Act while simultaneously ignoring relevant provisions of Section 3(b)(2). (*See* ECF_49 at 39; ECF_50 at 33; ECF_51 at 35). This Court should reject Petitioners' novel suggestion that the Bureau was required to make an excess animal finding before it adopted new wild horse management criteria in the RMP Amendment.

#### A.    The Bureau has discretion to determine wild horse range.

As an initial matter, the Bureau has discretion to establish and maintain HMAs through its land use planning process. *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016) ("HMAs and their boundaries are established by BLM in Resource Management Plans"). Petitioners lead this Court to believe that the Bureau does not have this authority. (*See* ECF_49 at 39; ECF_50 at 33; ECF_51 at 9, 35). To avoid repetition, the State incorporates Federal Respondents' arguments summarizing the Bureau's discretion under the Act. (ECF_54 at 16-18, 35-39).

#### B.    Petitioners deceptively argue that the RMP Amendment removes wild horses from the planning area.

Although Petitioners unquestionably challenge the RMP Amendment, they characterize the agency action as a decision to remove wild horses. (ECF_49 at 39-

3

41; ECF_50 at 31-36; ECF_51 at 30-35, 38-39). Petitioners are fully aware that adopting management objectives in a land use plan is not the same decision as implementing removals under those objectives. (RMPA001757) (the Campaign stating, "[t]he BLM makes site specific round-up and removal determinations based on the directives laid out in the applicable RMP") (alterations added). Nonetheless, they now depict the RMP Amendment as a removal because Petitioners do not want this Court to confront the elements of the Act that require the Bureau to manage wild horses through land use planning. 16 U.S.C. § 1333(b)(2)(ii) (requiring the Bureau to consider "information contained in any land use planning" before a removal).

The law is clear that land use plans — such as the RMP Amendment challenged in this case — are only the "preliminary step in the overall process of managing public lands[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) (alteration added). The Bureau's land use planning authority provides that "a land use plan is not ordinarily the medium for affirmative decisions that implement the agency's project[ions]." *Id.* (alteration in original) (internal quotation marks omitted); *see also* 43 U.S.C. § 1712(e).

In the wild horse context, this Court has acknowledged the distinction between setting management objectives in an RMP and implementing those goals. *See Friends of Animals v. BLM*, Case No. 16-CV-0199, 2017 WL 5247929, at *1-2 (D. Wyo. March 20, 2017) (stating removals are conducted "as specified in the

applicable [RMPs]" and discussing how removals "implement the planning decisions") (alteration added). The Bureau's wild horse regulations similarly recognize that its subsequent management activities "shall be in accordance with approved land use plans[.]" 43 C.F.R. § 4710.1 (alteration added).

Petitioners paint themselves into a corner by insisting that the RMP Amendment is a removal determination. If so, then their claims are not ripe, as the Bureau has not conducted any gathers under the new management objectives. (ECF_54 at 32-34); (*see also* RMPA001635) (stating that the RMP Amendment "does not authorize any specific action to control herd size or population growth" and that any implementing actions will require further analysis); *see also W. Watersheds Project v. Haaland*, 850 F.App'x. 14, at \*15-16 (D.C. Cir. June 18, 2021) (unpublished) (discussing ripeness in the context of a wild horse gather under an RMP). On the other hand, if they concede the obvious — that this case challenges the management objectives adopted in the RMP — Petitioners immediately distinguish this case from the body of case law they rely on that reviews the Bureau's obligations with respect to site-specific removals that implement RMP objectives.

Petitioners know all too well that the RMP Amendment at question is not a self-executing removal. The Campaign acknowledged in this planning process that "[t]he [Bureau] makes site specific round-up and removal determinations based on directives laid out in the applicable RMP." (RMPA001757) (alterations added). Yet,

in litigation, Petitioners ask this Court to review the RMP Amendment as if it were a site-specific gather decision.  (ECF_49 at 41; ECF_50 at 33-34; ECF_51 at 38).

This Court should reject Petitioners' effort to mischaracterize the RMP Amendment as a removal decision. As Federal Respondents explained, the distinction matters because the Tenth Circuit did not foreclose the Bureau's ability to reorganize HMA boundaries through the land use planning process. (ECF_54 at 24-26, 39-40) (discussing *Am. Wild Horse Pres. Campaign*, 847 F.3d at 1174). Importantly, the Act anticipates that the Bureau will establish wild horse management objectives in its RMPs. (*See* Argument I.E).

### C.    Petitioners' plain language arguments do not consider the plain language of the Act.

Each Petitioner makes a plain language argument about the Act. (ECF_49 at 39-41; ECF_50 at 31-36; ECF_51 at 34-40). However, their arguments ignore large swaths of language in the statute and disregard conventional canons of statutory construction. This Court should reject their interpretation because they do not identify any statutory text that expressly states the Bureau must make an excess animal determination **before** amending HMAs in a land use plan.

The Campaign and Friends both argue the Bureau's decision violated Section 3 by citing Section 1 of the Act. (ECF_50 at 31; ECF_51 at 34) (citing 16 U.S.C. § 1331). Section 1, however, are the Act's congressional findings which are not conclusive. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389

F.3d 973, 1021 (10th Cir. 2004) (en banc) (McConnell, J. concurring) (stating "[c]ongressional findings are entitled to respect, but they cannot be conclusive") (alteration added). Petitioners' decision to initiate their plain language argument with congressional findings also undercuts their claim that the Act is "unambiguous" because courts typically look to the congressional findings **after** concluding that the terms of the statute are ambiguous. (ECF_50 at 32; ECF_51 at 34); *see United States v. Sturm*, Nos. 09-1386, 09-5022, 2011 WL 6261657, at *29 (10th Cir. Apr. 4, 2011) (turning to congressional findings after concluding the ordinary text of the statute was ambiguous). This Court should decline Petitioners' invitation to interpret the plain meaning of Section 3 by starting with Section 1.

Petitioners' plain language argument then turns to several isolated terms in Section 3(b)(1). (ECF_49 at 39; ECF_50 at 33; ECF_51 at 35). Each Petitioner contends that the RMP amendment was unlawful because the Bureau can act "only if" it makes an excess animal determination. (*Id.*). Petitioners, however, do not identify any language from the Act, or from Section 3, that expressly states that the Bureau must make an excess animal determination before amending an RMP.

For example, the Campaign culls the words "a current inventory," "an overpopulation exists" and "to remove excess animals" from Section 3(b)(1) to prop up their plain language argument. (ECF_51 at 36) (citing 16 U.S.C. § 1333(b)). But these ten words, cultivated from an entire paragraph, make no sense without adding

words into Section 3 that do not exist – including the absent phrase **only if**.  Friends'

plain language argument makes the same mistake by focusing exclusively on similar

language that the Campaign isolated. (ECF_50 at 33). RTF simply declares what the

statute supposedly says without identifying any text from Section 3. (ECF_49 at 39).

Petitioners' plain language argument strings together language from multiple

sentences and overlooks entire clauses of Section 3(b)(1). For example, the

provision, with the Campaign's selective terms in bold, in its entirety reads:

> The Secretary shall maintain **a current inventory** of wild free-roaming
> horses and burros on given areas of the public lands. The purpose of
> such inventory shall be to: make determinations as to whether and
> where **an overpopulation exists** and whether action should be taken **to
> remove excess animals**; determine appropriate management levels of
> wild free-roaming horses and burros on these areas of the public lands;
> and determine whether appropriate management levels should be
> achieved by the removal or destruction of excess animals, or other
> options (such as sterilization, or natural controls on population levels).
> In making such determinations the Secretary shall consult with the
> United States Fish and Wildlife Service, wildlife agencies of the State
> or States wherein wild free-roaming horses and burros are located, such
> individuals independent of Federal and State government as have been
> recommended by the National Academy of Sciences, and such other
> individuals whom he determines have scientific expertise and special
> knowledge of wild horse and burro protection, wildlife management
> and animal husbandry as related to rangeland management.

16 U.S.C. § 1333(b)(1) (the Campaign's quoted language in bold); (ECF_51 at 35).

A complete reading of Section 3(b)(1) reveals the skewed nature of

Petitioners' interpretation. The words "a current inventory" came from an

independent sentence which requires the Bureau to maintain an inventory of wild

horses on public lands. 16 U.S.C. § 1333(b)(1) (stating: "The Secretary shall maintain **a current inventory** of wild free-roaming horses and burros on given areas of the public lands.") (emphasis added). The remainder of Petitioners' terms were plucked from a dependent clause, where Congress described the purpose for wild horse inventories. (*Id.*) (stating: "The purpose of such inventory shall be to: make determinations as to whether and where **an overpopulation exists** and whether action should be taken **to remove excess animals**") (emphasis added). Basically, Petitioners' construction inappropriately conceals important context in the Act. *See In re Kunz*, 489 F.3d 1072, 1077 (10th Cir. 2007) (stating that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citation omitted) (alteration added).

Section 3(b)(1), in fact, directs the Bureau to use the inventory for reasons other than removal decisions. The Act allows the Bureau to use the inventory to "determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands" and to "determine whether appropriate management levels should be achieved by the removal or destruction of animals." 16 U.S.C. § 1333(b)(1). The Act's plain language does not require the Bureau to condition its general management decisions on an overpopulation or excess finding.

(*See* ECF_51 at 35) (arguing the Bureau does not have discretion under Section 3 without making prerequisite findings); (ECF_50 at 33) (same).

In short, Petitioners' interpretation requires the Court to rewrite Section 3(b)(1) and read the words "only if" into the Act at the expense of language actually in the statute. This Court should reject Petitioners' plain language argument because statutory construction does not allow a court to "to delete inconvenient language and insert convenient language to yield to the court's preferred meaning." *Borden v. United States*, 593 U.S. 420, 436 (2021).

### D.   Case law does not support Petitioners' interpretation of the Act.

Although Petitioners claim that the plain language in the Act is "unambiguous" they attempt to cite case law to support their tortured interpretation. (ECF_50 at 32; ECF_51 at 34). This Court should let the language of the Act speak for itself. Nonetheless, case law reviewing the Bureau's implementation decisions carries little weight in the land use planning context.

Petitioners argue that *Colorado Wild Horse Coalition* is directly on point. (ECF_50 at 33-34; ECF_51 at 38) (citing *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F.Supp.2d 87 (D.D.C. 2009)). Specifically, the Campaign contends that case applies because the Bureau made "a planning-level decision" that removed wild horses from an HMA. (*Id.*). Petitioner's characterization and comparison to *Colorado Wild Horse Coalition* is misleading for three reasons.

First, the mere fact that the Bureau previously "made a planning-level decision" in *Colorado Wild Horse Coalition* does not, in and of itself, make that case applicable here. The Bureau is required to manage all wild horse activities "in accordance with approved land use plans[.]" 43 C.F.R. § 4710.1. The Act also requires the Bureau to make wild horse decisions based on "information contained in any land use plan" under FLPMA. 16 U.S.C. § 1333(b)(2)(ii). Therefore, a "directly on point" case will involve a legal challenge to the RMP amendment, not an implementing decision that removes wild horses under those planning objectives.

Second, *Colorado Wild Horse Coalition* is not directly on point because the challenged agency action was an implementing decision. The plaintiffs in that case challenged the "Removal Final Decision Record and Environmental Assessment." *Colo. Wild Horse & Burro Coal.*, 639 F.Supp.2d at 90. That court labeled the challenged action as the "2008 Gather Plan," but made clear that it was a "decision to implement [the proposal alternative], removing all wild horses" from the planning area. *Id.* (alteration added).

In *Colorado Wild Horse Coalition,* the Bureau adopted its "zero" wild horse land use plan objective in 1997, nearly a decade before it acted to remove the wild horses. *Colo. Wild Horse & Burro Coal.*, 639 F.Supp.2d at 89. The plaintiffs filed suit in 2006 and ultimately directed their claims at the removal decision, not the Bureau's adoption of its 1997 land use plan objective that zeroed out wild horse

numbers. *See Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, Case No. 1:06-CV-01609 (D.D.C. March 24, 2009) (Third Am. Compl.) (ECF_1 at ¶93) (alleging the challenged removal "implements" the RMP Amendment). Thus, the agency action at issue in *Colorado Wild Horse Coalition* was not the zeroed out management objective from 1997 but the Bureau's decision to follow through with its goal by removing the wild horses.

Finally, the court itself stated that its holding in *Colorado Wild Horse Coalition* was limited to the Bureau's gather decision. That court found that the Bureau exceeded its authority because the removal decision did not make the prerequisite removal findings under the Act. *Colo. Wild Horse & Burro Coal.*, 639 F.Supp.2d at 98. However, the court did not review the Bureau's zero wild horse objective in its land use plan. *Id.* To make itself abundantly clear, that court stated it: "expresses no opinion on the lawfulness of any other [Bureau] action challenged by the Plaintiffs. Nor does the Court opine on whether the [Bureau] violated the National Environmental Policy Act, [ ] or the Federal Land Policy Management Act[.]" *Id.* at 98 n.20 (alterations added).

Petitioners overstate the applicability of *Colorado Wild Horse Coalition*. (*See* ECF_51 at 38-39). At least one court has read that case similarly and recognized that case does not apply to other forms of management. *Friends of Animals v. BLM*, 232 F.Supp.3d 53, 64 (D.D.C. 2017) (stating that *Colorado Wild Horse Coalition*

"addresses excess determinations only in the context of *removal*, not other forms of population management") (emphasis in original). The same reasoning thwarts Petitioners' attempts to analogize the Bureau's RMP Amendment with the Tenth Circuit's most recent ruling. (ECF_49 at 46; ECF_50 at 36-38; ECF_51 at 31) (citing *Am. Wild Horse Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016)). In *American Wild Horse Campaign,* the Tenth Circuit only reviewed the Bureau's gather decision and even suggested that the Bureau could pursue a land use plan amendment as a potential solution. *See Am. Wild Horse Campaign*, 847 F.3d at 1189, n.8 (suggesting that "[p]erhaps the solution can come in the form of amendments to the areas designated as HMAs, and/or to the AMLs applicable to the HMAs at issue") (alteration added).

Petitioners are attempting to force a square peg into a round hole by analogizing the present case, involving an RMP amendment, with cases that reviewed the Bureau's subsequent removal decisions. A closer look at cases like *Colorado Wild Horse Coalition* reveals that Petitioners are actually asking this Court to go where no court has gone before. Therefore, this Court should find that the removal cases that the Petitioners rely on are not on point because the RMP Amendment is not self-executing.

**E.    Petitioners' interpretation ignores Section 3(b)(2) and makes the Act incompatible.**

The Act requires the Bureau to consider land use planning criteria in its removal decisions. 16 U.S.C. § 1333(b)(2)(ii). Petitioners completely overlook this language in the statute. (*See* ECF_49 at 41; ECF_50 at 33; ECF_51 at 35, 38). Their argument that the Bureau must first make an excess determination before adopting a land use plan amendment also turns the Act on its head. (ECF_51 at 36) (arguing the RMP Amendment "cannot pass muster" because the Bureau did not make an excess determination); (ECF_49 at 39-40) (same).

Section 3(b)(2) outlines four factors the Bureau must consider when making an excess animal determination, including land use plan criteria:

> Where the Secretary determines on the basis of (i) the current inventory of lands within [her] jurisdiction; (ii) **information contained in any land use planning completed pursuant to section 1712 of title 43** [FLPMA]; (iii) information contained in court ordered environmental impact statements as defined in section 1902 of title 43; and (iv) such additional information as becomes available to [her] from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to [her], that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [s]he shall immediately remove excess animals from the range so as to achieve appropriate management levels. Such action shall be taken, in the following order and priority, until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation.

14

16 U.S.C. § 1333(b)(2) (alteration and emphasis added). The Act directly cites the land use planning section of FLPMA. *Id.* (citing 43 U.S.C. § 1712). And the Act's plain language clearly requires the Bureau to consider "information contained in any land use plan" in its excess animal determination. *Id.*

Petitioners do not grapple with the land use plan language in their "plain language" arguments. (ECF_50 at 33; ECF_51 at 35, 38). The Campaign recklessly skips past the Section 3(b)(2)(i)-(iv) factors and broadly declares that there are "certain limited circumstances" where the Bureau can remove horses. (*See* ECF_51 at 35). Friends make the same mistake but then misstate the law claiming that Section 3(b)(2), "clarifies that excess animals can only be removed 'so as to restore a thriving natural ecological balance to the range and protect the range from the deterioration associated with overpopulation.'" (ECF_50 at 33) (citation omitted).

Several courts have recognized that the four factors in Section 3(b)(2) are mandatory elements that govern the Bureau's removal determinations. *See Friends of Animals v. BLM*, 548 F.Supp.3d 39, 46-47 (D.D.C. 2021) (identifying "information contained in any land use plan" as a "nondiscretionary parameter" governing the removal of wild horses); *Friends of Animals v. BLM*, Case No. 2:16-CV-1670-SI, 2018 WL 1612836, at *16 (D. Ore. Apr. 2, 2018) (same); *Habitat for Horses v. Salazar*, 745 F.Supp.2d 438, 452 (S.D.N.Y. 2010) (discussing the Section 3(b)(2) factors and denying preliminary injunction). Although Petitioners go to great

lengths to compare the present case with cases involving removals, conspicuously, Petitioners do not cite any of the cases that analyze Section 3(b)(2).

Petitioners also cannot harmonize their construction with the four factors in Section 3(b)(2). They argue that the Bureau acted unlawfully because it did not make an overpopulation or excess animal finding before adopting the RMP Amendment. (ECF_50 at 34; ECF_51 at 36). But Section 3(b)(2) requires the Bureau to do the opposite — it must consider the information in an RMP as a required factor in an excess animal determination. 16 U.S.C. § 1333(b)(2)(ii). Logic then dictates that, if the Act requires Bureau officials to consider land use plan criteria when making an excess animal determination, an excess animal determination cannot inversely dictate the terms of a land use plan.

Petitioners' plain language argument impermissibly asks this Court to ignore entire portions of the Act, including the factors in Section 3(b)(2). *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 568 (1995) (stating courts "construe statutes, not isolated provisions"). Their construction of the Act also does not make sense in practice. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023) (stating the basic principles of statutory interpretation require court to construe statutes "in harmony"). This Court should reject Petitioners' interpretation because it effectively strikes the phrase "information contained in any land use planning completed pursuant to section 1712 of title 43" from the Act.

**F.     The structure and history of the Act support the Bureau's decision to reorganize HMAs through the land use planning process.**

To the extent that this Court explores any ambiguity in the statute, the structure, history, and application of the Act refute Petitioners' argument that the Bureau must condition the RMP Amendment on an excess animal determination. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1223-24 (10th Cir. 2017) (stating courts can look to the structure, purpose, and history of the statute when traditional tools of statutory interpretation fail).

The Act provides the Bureau with the authority to "designate and maintain specific ranges" for wild horses. 16 U.S.C. § 1333(a). Petitioners contend that Section 3(a) carries a "duty to protect" wild horses that takes precedence over the Bureau's obligation to also manage those wild horses. (*See* ECF_50 at 31-33). But the structure of the Act does not make the "protection" of wild horses mutually exclusive from the "management" of wild horses. Section 3(a) expressly gives the Secretary jurisdiction over wild horses "for the purpose of management and protection." 16 U.S.C. § 1333(a). Courts have recognized the same and acknowledged that the designation of HMAs through the RMP process is a component of the Bureau's Section 3 obligations. *See Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 940 (10th Cir. 2016) (discussing the Bureau's management obligations under 16 U.S.C. § 1333(a)); *see also Am. Wild Horse Campaign v. Bernhardt*, 442 F.Supp.3d 127, 138 (D.D.C. 2020) (same).

17

The history of the Act reinforces that Congress recognized that active wild horse management actually protects wild horses. *See Wyoming,* 839 F.3d at 940 (discussing the need for Congress to amend the Act because the original wild horse protections "proved almost too effective" as excess wild horses started to pose a risk to their own habitat). Congress amended the Act in 1978, in part, because the original wild horse protections adopted in 1971 did not work as intended. (*see id.*); *see also* H.R. Rep. No. 95-1122, at 21 (1978) (stating "populations of horses [] have been so well protected by the law that their numbers now exceed the carrying capacity of the range. Excess numbers of horses [] pose a threat to wildlife, livestock, the improvement of range conditions, and ultimately, to their own survival"). The Public Rangelands Improvement Act of 1978, which amended the Act, "struck a new balance … between protecting wild horses and competing interests in the resources of the public range." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982).

The balance that Congress struck in 1978 rewrote Section 3(b) and added the four factors that must inform the Bureau's removal decisions, including "information contained in any land use planning completed pursuant to [FLPMA]." Public Rangelands Improvement Act of 1978, Pub. L. 95-514, 92 Stat. 1803, 1809 (Oct. 25, 1978) (alteration added). Congress had just recently enacted land use planning requirements in FLPMA and the 1978 amendments are understood to have

given the Bureau "greater authority" to manage wild horses. *See* Federal Land Policy and Management Act, Pub. L. 94-579, 90 Stat. 2743 (Oct. 21, 1976); *Wyoming*, 839 F.3d at 940.

Petitioners' interpretation of the Act resembles the version of Section 3(b) that existed **prior** to the enactment of the Public Rangelands Improvement Act of 1978. (*Compare* ECF_50 at 33; ECF_51 at 35 (describing the "limited circumstances" where the Bureau can remove wild horses) *with* Wild Free-Roaming Horses and Burros Act, Pub. L. 92-195, 85 Stat. 649, 650 (Dec. 15, 1971)). This Court should reject their effort to eviscerate what Congress duly enacted in 1978. *See Lamb v. Thompson*, 265 F.3d 1038, 1051 (10th Cir. 2001) (stating it is the court's duty to "give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section") (citation omitted).

Finally, the Bureau's implementation of the Act is consistent with the understanding that RMPs are a factor in removal decisions. Bureau regulations confirm that the objectives in a RMP are designed to inform site-specific wild horse decisions. *See* 43 C.F.R. § 4700.0-6 (stating it is Bureau policy to consider wild horses comparably with other resource values in land use plans). Specifically, the regulations provide that wild horse management activities, "including the establishment of herd management areas" shall be in accordance with land use plans. 43 C.F.R. § 4710.1; *see also Wyoming*, 839 F.3d at 940 (stating "HMAs and their

boundaries are established by BLM in Resource Management Plans"). Regulations also require the Bureau to consider "the relationships with other uses of the public and adjacent private lands" while delineating HMAs. 43 C.F.R. § 4710.3-1.

Above all, longstanding guidance recognizes the Bureau can reorganize HMAs through the land use planning process when wild horses cause "unacceptable impacts to other resource values, or conditions change and one or more of the four essential habitat components are not present in sufficient quantities to sustain" the animals over the long term. (RMPA049421) (Handbook Section 2.1.5). Here, the Bureau explained that changed conditions supported its decision because the Bureau "no longer has permission for wild horse use of private land" in the planning area. (RMPA001636); (*see also* RMPA001190; RMPA001661).

The structure and history of the Act support the Bureau's decision to reorganize HMAs through the land use planning process. The RMP Amendment was lawful because the Bureau acted consistently with the Act, federal regulations, and Bureau guidance. *See, e.g., Cloud Found., Inc. v. Salazar*, 999 F.Supp.2d 117, 125 (D.D.C. 2013) (finding the designation of wild horse territory is a land use decision and discussing how agencies make those determinations based on the agency's implementing authorities).

G.    **The Bureau's AML determinations were not arbitrary.**

Petitioners also argue that the Bureau arbitrarily calculated AML in the RMP Amendment. (*See* ECF_49 at 32-34; ECF_50 at 41-43; ECF_51 at 40-44). However, the Bureau explained its AML calculations for each alternative and each HMA. (RMPA001635) (citing AML analysis in Appendix A); (RMPA001316-37) (Appendix A). It also explained that AML will be evaluated and adjusted in approximately five years after it collects additional data. (RMPA001667).

The Act authorizes the Bureau to "determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands[.]" 16 U.S.C. § 1333(b)(1). The Act does not define AML, but the Bureau has defined it "as a population range within which [wild horses and burros] can be managed for the long term." (RMPA049430) (Handbook Section 4.2.1); *see also Wyoming*, 839 F.3d at 940. As the Federal Respondents explain, the Bureau has significant discretion to determine AML for each herd that it manages. (ECF_54 at 16-18, 47-48); *see also Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 16 (D.C. Cir. 2006) (stating the Bureau has significant discretion in computing AML); *In Defense of Animals v. Dep't of Interior*, 737 F.Supp.2d 1125, 1134 (E.D. Cal. 2010) (same).

Petitioners' interpretation of the Bureau's AML obligations also relies on piecemeal constructions of the Act that again require this Court to add language to the statute. For example, the Campaign contends "it is clear from the Act's language

21

that Congress intended for each AML to be determined by the ecological integrity and carrying capacity of the range — nothing else." (ECF_51 at 41) (citing 16 U.S.C. § 1333(b)(1)). But the language "ecological integrity" and "carrying capacity" appear nowhere in the Act, let alone in the provision cited by the Campaign. *See* 16 U.S.C. § 1333(b)(1). Friends claim that "clear statutory language" indicates the Bureau "cannot set the AML below the optimal number of wild horses that will achieve a thriving natural ecological balance" but fails to cite any specific language in the Act that would support its position. (ECF_50 at 41). Both constructions skew the Act and seek to condition AML determinations on factors that do not exist.

Regardless, this Court does not need to entangle itself in textual acrobatics to determine whether the Bureau properly established AML for any particular HMA in the planning area. Bureau guidance outlines the factors it considers when establishing AML. (RMPA049430-31) (Handbook Section 4.2.1 referencing Appendix 3); (RMPA049480-88) (Handbook Appendix 3). The Bureau conducted a three-tiered analysis which considers: (1) the essential components (forage, water, cover and space) to support healthy wild horse populations and rangelands; (2) the amount of sustainable forage for wild horse use; and (3) whether the projected herd size maintains genetic diversity. (RMPA049480).

The Bureau's supporting analysis meticulously walked through each of the three tiers for its decision and each of the alternatives. (RMPA001316-37).

Petitioners do not directly challenge the Bureau's findings under its three-tiered analysis. (ECF_49 at 32-34; ECF_50 at 41-43; ECF_51 at 40-44). They also do not argue that the Bureau failed to consider the relevant factors for calculating AML outlined in the Handbook. (*Id.*).

Instead, Friends and RTF take issue with the Bureau's genuine acknowledgment that it lacked reliable forage production and mapping utilization data. (ECF_49 at 33; ECF_50 at 42). But even here, the Bureau adhered to its Handbook. The Bureau collects use mapping data through annual monitoring. (RMPA0049444) (Handbook Section 5.1.1). The Handbook explains "[i]f mapping utilization of the HMA on an annual basis isn't possible, focus monitoring on measuring utilization at key areas used by [wild horses] within the HMA on an annual and continuing basis." (*Id.*) (alterations added). When the Bureau reorganizes an HMA, naturally, it will not have utilization data from the previous year for that specific area. After acknowledging that the data was not available, the Bureau's decision explained that it will collect that data and use it to inform whether AML adjustments are needed within five years. (RMPA001667).

Forage production data is similarly collected through annual monitoring. (RMPA049444). In its AML calculations, the Bureau explained what forage production data it has, what information it does not have, ongoing efforts by the Bureau and other agencies to collect current forage production data, and its decision

to focus on forage needs using the information at its disposal. (RMPA001319-20); (RMPA001647-48). The Bureau explained its methodology for calculating AML in the HMAs for each alternative. (RMPA001317). It also explained that proportional adjustments were necessary due to the differences in the land ownership patterns between the various alternatives. (*Id.*).

The Bureau was not arbitrary and capricious because it followed the process outlined in its Handbook and explained its AML calculations. *See Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 744 (10th Cir. 2006) (finding Forest Service decision was not arbitrary and capricious because it exhibited "no clear error of judgment in its factual determinations" under the Forest Service Handbook); *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) (stating under the arbitrary and capricious standard the court determines "whether the agency considered the relevant data and rationally explained its decision") (citation omitted).

Petitioners' arguments that the Bureau improperly relied on outside factors are unavailing. (*See* ECF_49 at 32-33; ECF_50 at 41; ECF_51 at 42-43). RTF and the Campaign contend that the Bureau calculated AMLs out of "administrative convenience" and supposedly prioritized reducing "administrative burdens." (ECF_49 at 32-33; ECF_51 at 42). The Bureau does not state in the AML calculations that any of its determinations were based on administrative convenience. (RMPA001316-37). Meanwhile, the Campaign's argument that the

Bureau prioritized reducing administrative burdens openly admits that it has nothing to do with the criteria that the Bureau used to calculate AML. (*See* ECF_51 at 42-43) (arguing that the Bureau prioritized reducing administrative burdens in establishing "the boundaries for each HMA").

Petitioners have much to gain by blurring the line between the Bureau's decision to adopt HMA boundaries and its AML calculations. To this end, they ask this Court to read the words "ecological integrity" and "carrying capacity" into the Act. (ECF_51 at 42-43). But, as Federal Respondents explained, AML determinations come after the establishment of HMAs as a matter of necessity. (ECF_54 at 46-48); *see Wyoming*, 839 F.3d at 940 (stating the Bureau "determines the appropriate management level (AML) of wild horses that each HMA can sustain"). In this case, the AML determinations in the RMP Amendment were not arbitrary and capricious because the Bureau considered the relevant factors for calculating AML, adhered to its Handbook, and explained its decision. (*See* RMPA049480-88; RMPA001316-37).

In sum, Petitioners' case against the Bureau rests on their own misinterpretation of the Act. Petitioners' construction rests on selective snippets of the statute that overlook relevant provisions, lack context, ignore the structure of the Act, and ultimately create an unworkable management regime for the Bureau. This Court should determine that the RMP Amendment did not violate the Act.

II.     **The Bureau fulfilled its obligations under FLPMA.**

A.      **The RMP Amendment embraced multiple use principles.**

RTF argues that the Bureau violated FLPMA because it supposedly "sacrificed 'multiple use' for private demands." (ECF_49 at 47). Their argument does not cite the administrative record and relies on no case law. (*Id.*). It only relies on three sections of FLPMA which make up the Bureau's multiple use mandate. (*Id.*) (citing 43 U.S.C. §§ 1701(a)(8), 1702(c), 1732(a)).

FLPMA requires the Bureau to "recognize competing values." *Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982). Under its multiple use mandate, "the Bureau need not permit all resource uses on a given parcel of land." *Id.* (citing 43 U.S.C. §§ 1701(a), 1702(c), 1732(a)). A district court will find that the Bureau complied with its multiple use mandate when the decision balances resource use. *See BioDiversity Conservation All. v. BLM*, Case No. 09-CV-08-J, 2010 WL 3209444, at *20-21 (D. Wyo. June 10, 2010) (stating "balancing is required" and finding the Bureau complied with its multiple use mandate).

Here, the Bureau explained that its decision "applies only to the BLM-administered public lands within the planning area." (RMPA001667). The Bureau's focus on public lands in the RMP Amendment was consistent with FLPMA and the Act. *See* 43 U.S.C. § 1702(e) (defining "public lands" in FLPMA); 16 U.S.C. § 1332(e) (defining "public land" similarly in the Act). The Bureau also evaluated

competing resource values across the planning area and selected the proposed alternative because "it provides the greatest overall benefit to resource values." (RMPA001677); (*see also* RMPA001219-26) (tables summarizing impacts by resource). For example, the Bureau considered how wild horses compete directly with wildlife and sensitive species for forage, water, and cover under various alternatives. (*See* RMPA001185-86; RMPA001263; RMPA001270). It then concluded that its decision "accomplishes a balance of multiple-use values by maintaining a wild horse herd in a portion of the planning area." (RMPA001677).

Even so, the Bureau's acknowledgement that the RMP Amendment responded to changed conditions within checkerboard did not frustrate its multiple use mission. (*See* RMPA001183). As a practical matter, the Bureau's implementing regulations require it to consider "the relationships with other uses of the public and adjacent private lands" when adopting an HMA. 43 C.F.R. § 4710.3-1. But that awareness of the checkerboard pattern did not prevent the Bureau from seeking a balanced solution for wild horse management which accommodated other values including wildlife, vegetation, and water. (*See* RMPA001667; RMPA001185-86).

RTF has not demonstrated that the RMP Amendment was inconsistent with the Bureau's multiple use mandate and this Court should reject their argument. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F.Supp.2d 263, 282

(D.D.C. 2009) (rejecting argument that the Bureau contravened its multiple use mandate because the decision clearly sought to balance "competing objectives").

**B.    The RMP Amendment protects public lands from unnecessary and undue degradation.**

Although fashioned as a NEPA argument, RTF argues that the Bureau did not analyze whether the preferred alternative "causes any unnecessary degradation of public lands, which it is required to do." (ECF_49 at 48) (arguing the RMP Amendment violated FLPMA because the Bureau did not analyze certain impacts in its NEPA analysis). Nonetheless, the Bureau fulfilled its obligations under both statutes because it explained that the RMP Amendment improves conditions on public lands and the accompanying NEPA analysis reinforces that conclusion.

In managing public lands, FLPMA requires that the Bureau, "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). When evaluating whether the Bureau addressed unnecessary or undue degradation, this Court looks to the administrative record to see if the Bureau "properly attempted to balance various interests consistent with its multiple use mandate." *Biodiversity Conservation All.*, 2010 WL 3209444, at *27-28 (unpublished).  The Bureau "will often, if not always" fulfill FLPMA's requirement that it prevent degradation by following its multiple use mandate. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011).

RTF does not explain what discrete action the Bureau authorized that would potentially result in unnecessary and undue degradation to public lands. (ECF_49 at 48). RTF's Complaint similarly does not identify what action in the RMP Amendment triggered the Bureau's need to prevent undue degradation. *Return to Freedom v. Haaland*, Case No. 2:23-CV-00087 (D. Wyo. May 17, 2023) (Complaint) (ECF_1 at ¶¶83-90, 133-136) (FLPMA allegations with no reference to 43 U.S.C. § 1732 or "unnecessary and undue degradation"). And the present case is distinguishable from *Soda Mountain Wilderness Council* because RTF points to no action authorized by the RMP Amendment that will result in unnecessary and undue degradation. *See Soda Mountain Wilderness Council v. Norton*, 424 F.Supp.2d 1241, 1269-70 (E.D. Cal. 2006) (discussing plaintiffs' concerns with the proposed action allowing livestock grazing in new sections of a wildlife area).

The RMP Amendment challenged in this case only addresses wild horse management objectives and does not change livestock grazing objectives. (RMPA001667). Therefore, wild horses are the only source of potential unnecessary and undue degradation that the Bureau would need to mitigate.

The RMP Amendment, however, alleviates demand for natural resources within the planning area by reducing wild horse AMLs. (RMPA001667; RMPA001677). The Bureau explained that its decision "represents the environmentally preferable alternative, because it provides the greatest overall

benefit to resource values." (RMPA001677). For example, the Bureau concluded that the new management objective for the Adobe Town HMA falls below historic management levels which had previously met all land health standards:

> The combined forage needs of livestock and wild horses within the new HMA boundary would be lower, compared to historic management. Furthermore, all grazing allotments within this portion of the HMA are currently meeting all land health standards. Since these allotments were able to meet these standards at historic livestock and wild horse numbers, it is expected that the lower overall forage needs under this RMP Amendment would continue to support rangeland health standards in this area.

(RMPA001678). The Bureau provided a similar justification for the White Mountain HMA where AML will remain the same. (RMPA001679). Meanwhile, the Bureau eliminated Alterative B from consideration because it "would likely have undesirable impacts on other resource values" including wildlife habitat. (RMPA001680).

RTF does not dispute that the RMP Amendment reduces the impact that wild horses will have on the landscape. (*See* ECF_49 at 48). At least one district court has rejected an undue degradation argument on similar grounds. *See Ore. Nat. Desert Ass'n v. Gammon*, Case No. 06-CV-523-HO, 2007 WL 9809179, at *5 (D. Ore. June 28, 2007) (rejecting plaintiffs' argument that the Bureau violated FLPMA in a decision where grazing levels were reduced). And the unnecessary and undue degradation standard in FLPMA does not preclude the Bureau from adopting a more protective decision. *See* 43 U.S.C. § 1732(b); *see also W. Expl., LLC v. U.S. Dep't*

*of the Interior*, 250 F.Supp.3d 718, 747 (D. Nev. 2017) (finding no violation of FLPMA where federal agency argued that the unnecessary and undue degradation standard does not preclude the Bureau from adopting "improvements in land conditions that go beyond the status quo") (internal quotation marks omitted).

RTF also contends that the FEIS did not explain why Alternative D is the environmentally preferred alternative. (ECF_49 at 48). They are mistaken. Maintaining AML unquestionably reduces competition for resources and prevents habitat degradation. (RMPA001245). The Bureau explained that Alternative D, which plans for reducing 1,229 wild horses from the range, will improve forage condition and health for the remaining wild horses. (RMPA001252). The FEIS also states how Alternative D will improve soil conditions, water resources, vegetation, habitat for wildlife, and conditions for sensitive species. (RMPA001255; RMPA001259; RMPA001262; RMPA001267; RMPA001272).

The Bureau explained in a recent implementing decision, "[w]hen managed within AML, wild horses are not expected to cause undue impacts to vegetation resources, soils, or sensitive plant species." (RMPA048048) (alteration added). The RMP Amendment embraced that same reasoning because the environmentally preferred alternative will benefit public lands and the wild horses in the planning area. (*See* RMPA001677).

The Bureau has a "great deal of discretion" in determining how to achieve the broad objectives of preventing unnecessary and undue degradation of public lands. *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011). RTF has not identified what, if any, action under the RMP Amendment triggered the need for the Bureau to prevent unnecessary and undue degradation of public lands. (ECF_49 at 48). Furthermore, this Court can reject RTF's argument because the record does not indicate the decision will cause undue degradation or that the Bureau compromised its multiple use mandate in the RMP Amendment. *See Gardner*, 638 F.3d at 1222-23 (finding there was no record evidence that the area suffered unnecessary and undue degradation or that the Bureau did not meet its broad mandates).

## C.     The Bureau's HMA designation was consistent with FLPMA.

Two Petitioners noticeably avoid discussing the Bureau's obligations under FLPMA even though their case challenges the adoption of a land use plan. (*See* ECF_50; ECF_51). But this case is just as much about the Bureau's authority under FLPMA as it is about the Act.[2] (*See* RMPA001196-97).

FLPMA directs the Bureau to "manage public lands under principles of multiple use and sustained yield" which also requires it to develop comprehensive

---

[2] As the Campaign previously stated before the Tenth Circuit, "BLM designates HMA boundaries in RMPs, which are prepared through a land-use planning process conducted pursuant to FLPMA." Appellant's Opening Brief, *Am. Wild Horse Pres. Campaign v. Jewell*, Case No. 15-4043, at 21 (10th Cir. Nov. 20, 2015) (Document: 01019527691).

resource inventories and prepare land use plans for public lands. 43 U.S.C. § 1732(a); *Norton*, 542 U.S. at 58 (discussing the "dual regime of inventory and planning" in FLPMA). As one court recognized, wild horse management is steadfastly aligned with FLPMA stating "[a]ny challenge to how range use is allocated must be made pursuant to the Federal Land Policy and Management Act [], and not through the Wild Free-Roaming Horses and Burros Act." *In Defense of Animals*, 737 F.Supp.2d at 1134 (alterations added).

Here, the Bureau fulfilled its obligations under FLPMA by managing the planning area for a variety of resources and selecting the management option that had the most environmental benefits. (RMPA001677). The State joins, and incorporates by reference, the remainder of Federal Respondents' FLPMA arguments and their request for this Court to find that the Bureau lawfully adopted the RMP Amendment. (ECF_54 at 50-55).

## III.   The RMP Amendment complied with NEPA

Petitioners argue that the RMP Amendment violated the procedural requirements of NEPA. (ECF_49 at 49-60; ECF_50 at 43-65; ECF_51 at 44-49). To avoid duplication, the State joins and incorporates by reference Section IV from the Federal Respondents' brief. (ECF_54 at 55-72).

### A.    The Bureau's range of alternatives was reasonable.

Petitioners contend that the FEIS considered an unreasonable range of alternatives. (ECF_49 at 54-56; ECF_50 at 43-49; ECF_51 at 44-49). In particular, the Campaign and Friends contend that the Bureau should have considered an alternative to exchange non-Federal lands within the checkerboard. (ECF_50 at 45-49; ECF_51 at ECF_51 at 44-49). The Bureau's decision to eliminate a land exchange alternative from detailed analysis was reasonable because the Bureau lacked willing landowners, making an exchange infeasible. (*See* RMPA001675).

Agencies must consider alternatives to any project that might have a significant effect on the quality of the human environment. 42 U.S.C. § 4332(C)(iii). But agencies need not consider every possible alternative to a proposed action, only "reasonable" alternatives. *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) (citing 40 C.F.R. § 1502.14(a)). This Court judges the reasonableness of the alternatives measured against two guideposts: (1) "the agency's statutory mandate" and (2) the "agency's objectives for a particular project." *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 709 (10th Cir. 2009). However, NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or … impractical or ineffective." *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (citation omitted) (ellipsis in original).

The Bureau provided two reasons why a land exchange alternative was infeasible. (RMPA001205; RMPA001675). First, the Bureau explained that it "does not currently have a proposal from a willing party (or group of parties) to a land exchange involving checkerboard lands in the planning area." (*Id.*). Second, the Bureau acknowledged that "if a proposal existed, a land exchange would entail extensive surveys of millions of acres for mineral value, cultural resources, and potential hazardous materials, which would likely take years to complete and demand extensive agency resources." (*Id.*). The Bureau's explanation for not taking a closer look at the land exchange alternative in greater detail was consistent with its NEPA obligations. 40 C.F.R. § 1502.14(a) (stating "for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.").

The Campaign and Friends argue that a land exchange alternative would allow the Bureau to "block" up public land within the Checkerboard to alleviate "management burdens." (ECF_50 at 45-46; ECF_51 at 46-47). Their arguments overlook the criteria for conducting land exchanges in the applicable RMP. In other words, Petitioners' land exchange alternative would require the Bureau to disregard its statutory mandate under FLPMA. *See* 43 C.F.R. § 1610.5-3 (stating that future resource management authorizations and actions "shall conform to the approved plan"); *see Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006) (discussing conformity obligations under FLPMA).

The Bureau correctly explained that a land exchange alternative did not meet the purpose and need for the action. (RMPA001205). For example, the Bureau's purpose for the RMP Amendment was to select a plan for wild horse management that was "consistent with applicable law." (RMPA001677). FLPMA requires the Bureau to manage public lands "in accordance with the land use plans" that it has adopted. 43 U.S.C. § 1732(a).

The Green River RMP states that "[e]xchanges should not be made solely for the purpose of blocking up Federal land ownership." (RMPA000191) (Disposal Criteria) (alteration added). The Rawlins RMP provides similar guidance recognizing that blocking alone is "not necessarily in the public interest" and stating that land consolidation in and of itself "is not sufficient justification for pursuing an exchange." (RMPA000499). Although Petitioners espouse "blocking" up land to "exclude private land ownership from the HMAs," they do not address how their proposed alternative is consistent with the applicable land use planning criteria the Bureau must follow. (RMPA041712-13); (*see* ECF_50 at 45-46; ECF_51 at 47).

The non-Federal landowners in the checkerboard have not indicated that they want to exchange their lands. (*See* RMPA001675). The Campaign and Friends summarily dismiss this reality as a "red herring." (ECF_51 at 47-48; *see also* ECF_50 at 46-47). But the infeasibility of a proposed alternative is no red herring because, under NEPA, "[a]gencies are not required to analyze infeasible alternatives

so long as they articulate the reasons supporting their decisions." *WildEarth Guardians*, 703 F.3d at 1186 (alteration added). Here, the Bureau identified the problem and explained why a land exchange alternative was not feasible. (RMPA001205; RMPA001675).

The Campaign expresses no respect for the interests of non-Federal landowners within the checkerboard and argues that a land exchange alternative is feasible merely because the Bureau itself **may** propose land exchanges. (ECF_51 at 47) (citing 43 C.F.R. § 2201.1(a), in part). The Campaign overlooks existing legal authorities which recognize that the Bureau cannot unilaterally execute land exchanges.

The Bureau's explanation regarding non-Federal landowners was consistent with Bureau regulations and the applicable RMPs. (*See* RMPA001675). Bureau policy states that "[l]and exchanges are discretionary, voluntary real estate transactions between the Federal and non-Federal parties." 43 C.F.R. § 2200.0-6(a) (alteration added). Additionally, land exchange regulations provide that the Bureau "shall consider only those exchange proposals that are in conformance with land use plans or plan amendments, where applicable." *Id.* at § 2200.0-6(g).

The Campaign contends that the Bureau Handbook provides "the precise circumstances [the Bureau] says renders [land exchanges] infeasible." (ECF_51 at 41 n.12) (citing Land Exchange Handbook at Section 1-4) (alterations added). The

Campaign misstates the Land Exchange Handbook because that provision does not establish any criteria for determining infeasibility, it merely identifies the various types of potential exchange transactions. Land Exchange Handbook Section at 1-5 (section discussing the "Types of Exchange Transactions")[3]; *see also* 43 C.F.R. § 2201.1-1(a) (stating the Bureau may use assembled exchanges when "practicable").

In reality, the criteria in existing land use plans govern the Bureau's land exchange decisions. 43 C.F.R. § 2200.0-6(g); (*see also* RMPA000494-97). The Rawlins and Green River RMP both make clear that the Bureau will only pursue a land exchange with a willing party. (RMPA000496) ("Acquisitions of private lands will only be pursued with willing landowners."); (RMPA000193) (same). The Bureau's explanation that it lacked a willing partner for a land exchange was reasonable because it was consistent with federal regulation and applicable RMP criteria. (*See* RMPA001675); 43 C.F.R. § 2200.0-6(g).

The State is a non-Federal landowner within the checkerboard and manages significant amounts of state trust land within the checkerboard. (RMPA045884; RMPA001665). The Campaigns' suggestion that the Bureau can unilaterally pursue a land exchange is legal fiction. (*See* ECF_51 at 47-48) (citing 43 C.F.R. § 2201.1(a) and arguing the Bureau has the authority to solicit land exchanges on its own). FLPMA expressly limits the use of eminent domain "only if necessary to secure

---

[3] https://www.blm.gov/sites/blm.gov/files/H-2200-1.pdf

access to public lands" and "then only if the lands so acquired are confined to as narrow a corridor as necessary to serve such purpose." 43 U.S.C. § 1715. Even with that limitation in FLPMA, the Bureau cannot compel the State into a land exchange. As a condition of statehood, Congress conveyed state trust lands to Wyoming with the express condition that those lands "shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States[.]" Act of 1890 § 5, 26 Stat. 664 at 223 (alteration added).

Finally, the Petitioners challenge the Bureau's reasoning that even if a proposal from landowners existed, a land exchange of this nature would require surveys on over a million acres of land and strain agency resources. (*See* ECF_50 at 47-48; ECF_51 at 48-49). The Bureau's reasoning was sound because any land exchange requires a determination of public interest, an appraisal, an equal value exchange, conformity with land use plans; and a separate NEPA analysis. *See* 43 U.S.C. § 1716(a)-(h); 43 C.F.R. § 2200.0-6(a)-(h).[4] The presence of leasable minerals in the checkerboard and surrounding lands adds additional administrative layers because the existing RMPs direct the Bureau to avoid exchanging lands involving leasable minerals. (RMPA000191; RMPA000503). Considering the legal obligations involved in conducting a land exchange, it was reasonable for the Bureau

---

[4] Petitioners are noticeably silent on how a proposed land exchange would meet the public interest factors outlined in FLPMA. (*See* ECF_50 at 43-49; ECF_51 at 44-49); 43 U.S.C. § 1716(a).

to conclude in this instance that the process would "take years to complete and demand extensive agency resources." (RMPA001675).

Petitioners offer a land exchange as a panacea but the Bureau needs a willing partner. NEPA does not require agencies to pursue in-depth consideration of infeasible alternatives and the Bureau's explanation that it lacked a willing party to conduct an exchange was not arbitrary and capricious. *See Airport Neighbors All. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996) (finding agency was not arbitrary and capricious for dismissing an alternative that was practically infeasible). Therefore, this Court should find that the range of alternatives in the RMP Amendment were reasonable.

## B.    The Bureau took a hard look at the impacts of the RMP Amendment.

Friends argue that the Bureau did not take the requisite hard look at the environmental consequences of the RMP Amendment because it purportedly reached a "predetermined decision." (ECF_50 at 56-61). Specifically, Friends contend that the Bureau ignored the supposed positive impacts of wild horses on the environment. (*Id.* at 56-57). But the Bureau complied with NEPA because it did not commit itself to a particular outcome and discussed the points raised by Friends. (*See* RMPA001639) (responding to protest). Most importantly, the Bureau recognized that a balance was needed in the planning area because wild horses can have detrimental impacts on a variety resources including wildlife and water quality.

NEPA requires agencies to take a "hard look" at the environmental impacts of their decisions before the decision is made. 42 U.S.C. § 4332(2)(C); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1263 (10th Cir. 2011). "[I]f an agency predetermines the NEPA analysis by committing itself to an outcome, the agency likely has failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily and capriciously." *Wyoming*, 661 F.3d at 1264 (citation omitted) (alteration added). Courts have a "high" standard for finding that an agency predetermined its results. *Id.* Specifically, the Tenth Circuit has stated:

> [P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action.

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010) (alteration added) (emphasis in original).

The Bureau prepared the RMP Amendment with a balance in mind. (RMPA001193) (stating the Bureau's purpose for the RMP Amendment was to consider "the effects on wild horses, other resources, and resource uses that would result from different management configurations" in the planning area). Friends note their concerns with the planning history where the Bureau "sought to implement the

terms of the 2013 Consent Decree" but provide record evidence that the Bureau "*irreversibly and irretrievably* committed itself to a plan of action" based on its environmental analysis. (ECF_50 at 57-58); *Forest Guardians*, 611 F.3d at 715.

The record demonstrates that the Bureau did not commit itself to a particular outcome. For example, the Bureau outlined the changes it made between the draft environmental impact statement and the FEIS. (RMPA001177). The Bureau's preferred alternative originally zeroed out the White Mountain HMA. (RMPA001012). But after additional review and public comment, the Bureau opted to retain the White Mountain HMA and manage it for 205 to 300 wild horses. (RMPA001177; RMPA001667).

Friends have not met their significant burden of demonstrating that the Bureau committed itself to a particular course of action in the RMP Amendment. *See Forest Guardians*, 611 F.3d at 1264 (discussing the "high" standard the Tenth Circuit has adopted for predetermination challenges). The argument advanced by RTF with respect to a "predetermined outcome" fails for the same reason because they cite no record evidence that suggests the Bureau committed itself to a particular outcome in its analysis. (*See* ECF_49 at 54-56).

The Bureau also did not ignore the environmental impacts attributable to wild horses. (*See* ECF_50 at 56); (RMPA001639) (responding to protest). The FEIS discussed both the positive and negative impacts of wild horses on vegetation and

recreation. (*See* RMPA001260-63; RMPA001280-81). And as additional evidence that the Bureau did not arrive at a predetermined conclusion, it revised portions of Section 4.2.2 based on a comment "to explain some of the potentially positive impacts wild horses may have on soil resources." (RMPA001639).

Above all, the analysis in the RMP Amendment looked well beyond just wild horses. The WGFD asked the Bureau to perform "a thorough analysis of impacts to wildlife populations and habitat (i.e. pronghorn, sage-grouse, forage, water sources and associated living space)" in its decision. (RMPA001841). In response to the draft environmental impact statement, WGFD reiterated the need to consider how wild horses compete with wildlife for habitat. (*See* RMPA041680).

The Bureau recognized in the FEIS that wild horses compete with wildlife for forage, water, and cover and that wild horses may defend water sources to the detriment of wildlife. (RMPA001263-64). The FEIS found that the RMP Amendment would "improve habitat conditions, and provide greater forage and cover for big game and other wildlife within the HMAs." (RMPA001267). It also concluded that the reduced presence of wild horses under the RMP Amendment will reduce damage to riparian areas and improve water quality. (*Id.*). These findings supported the Bureau's decision that it selected the environmentally preferable alternative because the RMP Amendment "provides the greatest overall benefit to resource values." (RMPA01677).

Regardless, courts typically defer to technical choices about how to approach evaluating environmental impacts, "unless there is good reason to suspect that the agency made that choice for improper reasons." *W. Watersheds Project v. BLM*, 76 F.4th 1286, 1302 (10th Cir. 2023). Here, the record demonstrates that the Bureau made a good faith inquiry into the environmental impacts of the RMP Amendment. Because Friends and RTF do not demonstrate that the Bureau acted with bias towards a particular outcome, this Court should find that the RMPA Amendment did not violate NEPA. *See Forest Guardians*, 611 F.3d at 713 (stating an agency is arbitrary and capricious when its failure to consider the environmental consequences is "due to its bias in favor" of a particular outcome).

## CONCLUSION

The Bureau's decision to adopt changes to wild horse HMAs and AML in an RMP Amendment was squarely consistent with the Act, FLPMA, and NEPA. For the abovementioned reasons, the State of Wyoming respectfully asks this Court to uphold the Bureau's wild horse RMP Amendment.

[REMAINDER INTENTIONALLY LEFT BLANK]

Dated this 4th day of April, 2024.

/s/ *Travis Jordan*
Travis Jordan, WSB No. 7-5721
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Counsel for Intervenor-Respondent*
*State of Wyoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,064 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of D. Wyo. Local Civ. R. 10.1(a) and Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Word 2010 in 14 point font size and Times New Roman.

*/s/ Travis Jordan*
Travis Jordan

46

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April, 2024, I electronically filed the

foregoing with the Clerk by using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

*/s/ Travis Jordan*
Travis Jordan
