Constance E. Brooks, cbrooks@fwlaw.com
Danielle Bettencourt (WY Bar No. 8-6782), dbettencourt@fwlaw.com
FAIRFIELD & WOODS, P.C.
1801 California Street, Suite 2600
Denver, CO 80202-2645
P: (303) 894-4431 F: (303) 830-1033

Galen West (WY Bar No. 5-1453), galen.west@westlawofficepc.com
West Law Office, P.C.
P.O. Box 1020
Rock Springs, WY 82902
P: (307) 362-3300

*Counsel for Respondent-Intervenor*

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, et al. <div align="center">Petitioners,</div> <div align="center">v.</div> TRACY STONE-MANNING, et al., <div align="center">Respondents,</div> <div align="center">and</div> STATE OF WYOMING and ROCK SPRINGS GRAZING ASSOCIATION, <div align="center">Respondent-Intervenors</div> | **Civil Nos: 2:23-cv-84-KHR (Lead); 2:23-cv-87-KHR (Consolidated); 2:23-cv-117-KHR (Consolidated)** |
| RETURN TO FREEDOM, et al., <div align="center">Petitioners,</div> <div align="center">v.</div> DEB HAALAND, et al., <div align="center">Respondents,</div> <div align="center">and</div> ROCK SPRINGS GRAZING ASSOCIATION, <div align="center">Respondent-Intervenor</div> | **RESPONDENT-INTERVENOR ROCK SPRINGS GRAZING ASSOCIATION'S CONSOLIDATED RESPONSE BRIEF** |
| FRIENDS OF ANIMALS, <div align="center">Petitioners,</div> <div align="center">v.</div> DEB HAALAND, et al., <div align="center">Respondents,</div> <div align="center">and</div> ROCK SPRINGS GRAZING ASSOCIATION, <div align="center">Respondent-Intervenor</div> | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

**RESPONSIVE STATEMENT OF FACTS** ........................... 5

*Background* ...................................................................... 5

*1979 Agreement and Judge Kerr's Decision* ...................... 8

*Subsequent Litigation and Associated Consent Decrees* .... 11

*Implementation of the 2013 Consent Decree: 2013-2023* ... 15

*Rock Springs and Rawlins Field Offices' RMP Amendment* ... 18

**ARGUMENT** ................................................................. 18

I.   BLM's Revision to the HMA Boundaries is Consistent with the Dual Mandates Under the Wild Horse Act ................................. 18

     A.   Section 4 Right to Removal is Clear, Mandatory and Ministerial ........................................................... 20

     B.   BLM's Authority to Establish and Amend HMAs .................. 24

     C.   BLM's Revisions to the HMA Boundaries was Reasonable and Supported by the Record .................................... 29

II.  BLM's RMP Revisions to Adjust HMA Boundaries is Consistent with FLPMA ............................................................... 31

III. The FEIS Complies with NEPA .................................... 33

     A.   Range of Alternatives Meets Purpose and Need of the RMP Amendment and NEPA Requirements .............................. 33

     B.   Alternatives Supported by Petitioners Not Responsive to Checkerboard Management .......................................... 35

1.   *Land Exchange Outside BLM's Authority* ...................35

2.   *Reduced Livestock Grazing Alternative Not Responsive to WHA Conundrum*........................................................36

C.   Wild Horse Management on Smaller HMAs Infeasible..........37

D.   Other Hard Look Issues Lack Merit........................................38

**CONCLUSION**........................................................................................**41**

# TABLE OF AUTHORITIES

## CASES

*Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426 (10th Cir.1996) ................................................................................ 34

*Am. Horse Protection Ass'n, Inc. v. Watt*, 694 F.2d 1310 (D.C. Cir. 1982) ........................................................................................ 22, 32

*Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D. D.C. 2020) ............................................................................................ 28

*Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016) ................................................................................... passim

*Am. Wild Horse Pres. Campaign v. Zinke*, 2017 WL 11450184, at *2 (D. Wyo. Oct. 13, 2017) ......................................................... 16

*Am. Wild Horse Pres. Campaign v. Zinke*, Case No. 2:17-cv-00170-NDF, (D. Wyo. Jan. 9, 2019) ................................................... 16

*Apache Stronghold v. United States*, 95 F.4th 608 (9th Cir. 2024) ........ 36

*Cloud Found. v. U.S. Bureau of Land Mgmt.*, 2013 WL 1249814 at *10 (D. Nev. Mar. 26, 2013) ..................................................... 22, 23, 32

*Craic C. Downer*, 111 IBLA 339 (Oct. 31, 1989) .................................... 25

*Fallini v. Hodel*, 783 F.2d 1343 (9th Cir. 1986) ..................................... 20

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......... 19

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006) ................................................................................ 25, 28

*Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438 (S.D. N.Y. 2010).... 25

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ................................................. 20

*Mountain States Legal Found. v. Hodel*, 799 F.2d 1423 (10th Cir. 1986) ................................................................................ 21

*N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 702 F. App'x 708, 710 (10th Cir. 2017) ...................................................... 24

*Roaring Springs Assoc. v. Andrus*, 471 F. Supp. 522 (D. Or. 1978) ....... 20

*Rock Springs Grazing Ass'n v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013) ................................................................... passim

*RSGA v. U.S. Dep't of Interior*, Case No. 2:23-cv-0048-NDF (D. Wyo. Jan. 8, 2024) ............................................................. 17

*Sackett v. Envtl. Prot. Agency*, 598 U.S. 651 (2023) .............................. 19

*United States ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414 (D. Wyo. 1985), aff'd 848 F.2d 1502 (10th Cir. 1986) ............................. 7, 38

*United States v. Chavez*, 2024 WL 129115, at *4 (D. N.M. Jan. 11, 2024) ................................................................................ 23

*Utah Envtl. Congress v. Bosworth*, 439 F.3d 1184 (10th Cir. 2003) ...... 33

*W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017) ................................................................... 28

*Western Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264 (10th Cir. 2013) ........................................................ 34, 37, 38

*Wyoming v. United States*, 661 F.3d 1209 (10th Cir. 2011) ................... 34

**STATUTES**

16 U.S.C. §§ 1331-1340 ...................................................................... 1

16 U.S.C. § 1332(c) ........................................................................ 4, 25

16 U.S.C. § 1332(f) ............................................................................ 10

16 U.S.C. § 1333 ................................................................................. 2

16 U.S.C. § 1333(a) ...................................................................... 22, 24

16 U.S.C. § 1333(b)(a)....................................................................26

16 U.S.C. § 1333(b)(2)....................................................................32

16 U.S.C. § 1334 .............................................................2, 20, 21

16 U.S.C. § 1339 ...........................................................................25

42 U.S.C. § 4321, et seq.................................................................2

43 U.S.C. § 315a .............................................................................6

43 U.S.C. § 315b .............................................................................6

43 U.S.C. §§ 1061-1066 ..........................................................7, 38

43 U.S.C. § 1701, et seq.................................................................1

43 U.S.C. § 1701(a)(7)..................................................................31

43 U.S.C. § 1702(c) .......................................................................31

43 U.S.C. § 1702(l).........................................................................31

43 U.S.C. § 1712(e)(2)..................................................................31

43 U.S.C. § 1715(a) .......................................................................35

43 U.S.C. § 1716(a) .......................................................................35

43 U.S.C. § 1732(a) .................................................................31, 32

43 U.S.C. § 1901(b)(4).............................................................23, 32

Pub. L. No. 113-291, 128 Stat. 3292, § 3003 (2014)................36

**RULES**

51 Fed. Reg. 7410 (Mar. 3, 1986) ............................................26

**REGULATIONS**

43 C.F.R. § 1610.4–5.....................................................................34

43 C.F.R. § 4180.2 ........................................................................................37

43 C.F.R. § 4700.0-5(d) ...............................................................................25

43 C.F.R. § 4710.1 ........................................................................................26

43 C.F.R. § 4710.3-1 ..............................................................................22, 26

43 C.F.R. § 4710.4 ...........................................................................22, 26, 28

43 C.F.R. § 4710.7 ........................................................................................26

43 C.F.R. § 4720.2-1 ....................................................................................20

# INTRODUCTION

The United States Bureau of Land Management (BLM), pursuant to its express authority under the Wild and Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. §§ 1331-1340, and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701, *et seq*., amended the Rocks Springs' and Rawlins' Resource Management Plans (RMP) to address wild horse management in response to the loss of consent to maintain wild horses on the private land within the boundaries of three herd management areas (HMAs). For the past four decades, the Rock Springs Grazing Association (RSGA) tolerated wild horses on its private lands within the Wyoming Checkerboard and this consent allowed BLM to include the private land sections RSGA owns and control in the HMAs.

RSGA revoked its consent in October of 2010 due to BLM's proven inability to maintain the mandatory wild horse numbers, in addition to increased resource demands from new regulations and plans. Pursuant to the 2013 Consent Decree and the WHA, BLM took proper steps to remove the Checkerboard lands and revise the HMAs through a RMP revision and associated Final Environmental Impact Statement (FEIS). The amendment addresses the loss of the private lands and adjacent

public lands in the Checkerboard for HMA designation, and the related management issues.

Petitioners[1] challenge the revisions to the HMAs and associated appropriate management levels (AMLs) as violating the WHA, FLPMA, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq*. However, Petitioners narrow reading of the WHA, and specifically Section 3, 16 U.S.C. § 1333, ignores the remaining provisions of the WHA and would ultimately make Section 4, 16 U.S.C. § 1334, superfluous. Private landowners, including RSGA, would have no other means to remove wild horses from their private lands within the Checkerboard under Petitioners' limited reading of the WHA. Congress never intended such restrictions on BLM's management of wild horses nor intended to require private landowners to be burdened by involuntarily maintaining the wild horses on private lands.

---

[1] This consolidated action involves three separate groups of Petitioners and their respective briefs: ECF No. 49, Petitioners Return to Freedom, *et al.'s* (RTF) opening brief; ECF No. 50, Petitioner Friends of Animal's (FOA) opening brief; and ECF No. 51, Petitioners American Wild Horse Campaign, *et al.'s* (AWHC) opening brief (collectively referred to as Petitioners).

The RMP revision is necessary to meet the WHA's dual mandates to manage wild horses on public lands but remove wild horses from private land. Section 3 of the WHA authorizes the BLM to protect and manage wild horses on *public lands* through the designation of specific areas where wild horses were found in December of 1971. BLM also has the express, mandatory duty under Section 4 to remove wild horses that stray from public to *private lands* and by extension to secure consent when private lands are included in the HMA. The BLM must comply with both Section 3 and Section 4 on the Checkerboard, and this Court has recognized that "BLM is statutorily obligated to manage wild horses in the [Checkerboard] consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented." *Rock Springs Grazing Ass'n v. Salazar*, 935 F. Supp. 2d 1179, 1188 (D. Wyo. 2013) (hereinafter *RSGA v. Salazar*). Section 3's requirements the HMAs maintain a "thriving natural ecological balance" consistent with other multiple uses simply does not apply to private lands.

The WHA requires the BLM to manage wild horses through the designation of specific public land ranges (i.e. HMAs) and assignment of

AMLs using FLPMA's planning procedures. Petitioners again provide a limited and incorrect reading of the WHA by insisting that changes to HMA boundaries can only occur when an "excess" determination is made. Petitioners are applying the triggers for a wild horse gather rather than the objective for HMA designation or changes in designation. Under its plain language, the WHA only requires that in designating HMAs the BLM does "not exceed" the wild horses "known territorial limits" and that it contains only the "amount of land necessary to sustain an existing herd or herds" of wild horses. 16 U.S.C. § 1332(c).

Finally, the BLM's decision to revise the HMAs within the Rocks Springs and Rawlins Field Offices complied with the statutory mandates of FLPMA and NEPA. BLM appropriately balanced the multiple uses on the public lands and defined the HMA boundaries where most appropriate, reduced resource conflicts, and conformed to management of the other uses, including big game and other wildlife. BLM also considered a reasonable range of alternatives, excluded infeasible or impracticable alternatives proposed by Petitioners, and took a hard look at the environmental impacts of its final decision. Therefore, this Court

4

should uphold the BLM's RMP Amendment, Record of Decision (ROD), and FEIS.

## RESPONSIVE STATEMENT OF FACTS

RSGA supports the BLM's and the State of Wyoming's responsive briefs and supplements their arguments to present RSGA's experience. The other parties in this case have all outlined the statutory/legal background for this litigation and RSGA will avoid any additional duplication by not repeating a summary of the statutes at issue. The RSGA instead incorporates the statutory background as provided by the BLM. ECF No. 54 at 14-19. The RSGA has also attempted to avoid duplicating the factual background of the case as provided by the Petitioners and BLM but provides the following discussion in response to the Petitioners' briefs and to provide additional historic context.

*Background*

RSGA incorporated in 1907 to assemble the land rights to use the rangeland resources within part of the Wyoming Checkerboard, which at that time was owned by the United States, the Union Pacific Railroad, and the State of Wyoming. *RSGA v. Salazar*, 935 F. Supp. 2d at 1182. RSGA sought to conserve range resources by controlling the grazing on

the odd-numbered sections of private land under continuously held Union Pacific Railroad surface leases for only grazing and haymaking. ECF No. 42-1. Decl. of John Hay, III at ¶¶ 3-4, 6. RSGA still holds the grazing lease with the current surface landowners, which include Aggie Grazing LLC, Sweetwater Surfaces, LLC, Wild Cat Coal Company, and Anadarko Land Company. *Id.* at ¶ 4. In total, RSGA has the right to use the surface or owns over one million acres of non-federal land in the Wyoming Checkerboard. *Id.*

After enactment of the Taylor Grazing Act (TGA) in 1934, 43 U.S.C. §§ 315a, 315b, RSGA secured the grazing preference and permit for the adjoining federal lands. ECF No. 42-1. Decl. of John Hay, III at ¶ 5. The BLM Rock Springs Grazing Allotment boundaries encompass both the private and public lands within the Checkerboard. This allotment, which is the largest single BLM grazing allotment, has a long history of limiting livestock grazing to the winter months. *Id.* at ¶¶ 6-7. Generally, dormant season grazing has less of an impact and allows for grasses and other forage to be left for wildlife. *Id.* at ¶ 7.

RTF incorrectly claims that ranchers have used their private land to "control" what happens across the public land sections of the

Checkerboard (ECF No. 49 at 23). Instead RSGA and BLM developed a partnership to coordinate the use and management of the Wyoming Checkerboard. ECF No. 42-1, Decl. of John Hay, III at ¶ 8; *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1180 (10th Cir. 2016) (*hereafter AWHPC v. Jewell*). This Court has recognized that the public and private lands in the Wyoming Checkerboard cannot be managed in isolation or without due consideration to the alternating land ownership pattern. *See RSGA v. Salazar*, 935 F. Supp. 2d at 1182-83. Federal law prohibits fencing of private and public lands and wild horses, like other big game and wildlife, move freely between the one-mile sections of private and public lands. 43 U.S.C. §§ 1061-1066; *see also United States ex rel. Bergen v. Lawrence*, 620 F. Supp. 1414, 1420 (D. Wyo. 1985), *aff'd* 848 F.2d 1502 (10th Cir. 1986) (rancher liable for building fences on private lands in Wyoming Checkerboard that interrupted antelope winter migration).

In recognition of managing the lands in concert, the RSGA previously agreed to tolerate a specific number of wild horses on its private lands in the Checkerboard (*infra* at 8), continued to limit livestock grazing to the winter, and has granted surface use agreements,

easements, and rights-of-way on and across its private land to support projects on the adjacent public land parcels. ECF No. 42-1, Decl. of John Hay, III at ¶ 8. This relationship is mutually beneficial and essential for both the BLM and RSGA.

*1979 Agreement and Judge Kerr's Decision*

The Petitioners throughout their briefs attempt to cast RSGA as the villain in the revision to the wild horse HMA boundaries, while ignoring previous recognition from original wild horse advocacy groups, the BLM, and this Court of RSGA's right under the WHA to choose whether to allow wild horses to remain on their private lands. RSGA's consent was an essential part of the boundary determinations for the 1982 HMAs. In 1972, the BLM inventoried wild horses in the Rock Springs area and estimated about 2,364 wild horses with about half, or 1,116, horses located on RSGA's private lands. RMPA-048355 at 048356.

After the BLM failed to act on RSGA's request to remove wild horses from its private lands, RSGA met with the International Society for the Protection of Mustangs and Burros and Wild Horses Yes! in January 1979 to discuss the appropriate number of wild horses for the Rock Springs District based on historic wild horse use. *RSGA v Salazar*,

935 F. Supp. 2d at 1183 n.4. They agreed to a total of 1,500 wild horses within the entire District and of that total, RSGA agreed to tolerate 500 horses on the Checkerboard. *Id.*; RMPA-043831; RMPA-043833; RMPA-043835-043836. The 1979 Agreement between RSGA and the wild horse advocacy groups was also predicated on the BLM proving it was capable of scheduling and implementing gathers to maintain agreed upon wild horse numbers. RMPA-043831; RMPA-043835.

In June 1979, when BLM abruptly shut down its gather program and a planned gather, Mountain States Legal Foundation and RSGA sued BLM to compel removal. RMPA-043840-043855. At this point, the Rock Springs area had about 6,129 wild horses with 3,413 on RSGA's private lands. RMPA-048356 at 048359. In 1981, the District Court found that "the wild horse population has dramatically increased" and ordered the BLM to "within one year from the date of this Order remove all wild horses from the checkerboard grazing lands in the Rock Springs District except that number which the RSGA voluntarily agrees to leave in said area." *Id.* The Court further ordered "within two years of the date of this Order remove all excess horses from within the Rock Springs District." *Id.* The Court defined excess as meaning "the wild horse population

exceeds the number deemed appropriate by a final environmental statement," or "the number of horses exceeds the number present in the same area at the time the Act was passed." *Id.* at RMPA-043860.

The BLM completed its environmental statement and designated HMAs throughout the Rock Springs District to include a total of 1,525 wild horses with only 500 wild horses within the Wyoming Checkerboard lands. *RSGA v Salazar*, 935 F. Supp. 2d at 1183 n.5. The BLM recognized during this process that parts of the public lands were unsuitable for grazing due to steep slopes and lack of water, and that "some of the forage requirements of wild horses may be allocated from private land," including "adequate winter range for horses," *if* the private landowners would agree to wild horses on their property. *See* RMPA-043865 at 043868, 043872-043873, 043875; *see also* ECF No. 54 at 21, 43 n.11.

The Court amended its order in 1982 to reflect the HMAs and associated AMLs and recognized that the AML for the "horse herds on the Salt Wells/Pilot Butte checkerboard lands is that level agreed to by the landowners in that area. All horses on the checkerboard above such levels are 'excess' within the meaning of 16 U.S.C. 1332(f)." RMPA-043861 at 043863 (*emphasis added*). This Court found that BLM

achieved the agreed-upon wild horse numbers in 1985. *RSGA v. Salazar*, 935 F. Supp. 2d at 1183.

While AWPC states that the HMA AMLs were established and thoroughly analyzed in the 1990s under the Green River RMP (ECF No. 51 at 21), this is not accurate. The Green River RMP retained the 1982 HMAs and the AMLs that were based on RSGA's 1979 agreement to allow 500 wild horses on the Checkerboard and a total of 1,525 wild horses in the District. *See RSGA v. Salazar*, 935 F. Supp. 2d at 1184 n.8, 1187. The BLM has also continued to recognize that "[w]ithout access to those [private] lands, approximately 1.5 million acres of adjoining and commingled public lands would be unavailable for inclusion in HMAs." RMPA-000235 at 000555.

*Subsequent Litigation and Associated Consent Decrees*

The BLM failed to consistently maintain the agreed upon number of wild horses and in August 2003, the State of Wyoming sued to enforce the HMA AMLs adopted in the Wyoming RMPs. *RSGA v. Salazar*, 935 F. Supp. 2d at 1184; ECF No. 42-1, Decl. of John Hay, III at ¶ 13. In the consent decree to settle the case, BLM agreed to gather to low AML in each HMA every three years. *RSGA v. Salazar*, 935 F. Supp. 2d at 1184.

Citing funding, BLM implementation of the 2003 Consent Decree was sporadic. *See id.* at 1184-85. BLM declined to renew the 2003 Consent Decree, even though it had failed to maintain the HMAs to the low AML throughout the State and did not gather wild horses in the three-year intervals. *See id.*

RSGA was not a party to the Wyoming case but had experienced decades of frustration with the BLM's failure to maintain wild horse numbers at AML. In October 2010, the RSGA revoked its consent to maintain wild horses on its private lands and requested that the BLM remove all wild horses from its private lands. *Id.* at 1184; ECF No. 42-1, Decl. of John Hay III at ¶ 17. This effectively rescinded the previous agreement to allow no more than 500 wild horses on its Checkerboard lands.

BLM declined the request for removal, citing the time needed to prepare a gather, lack of funds, RSGA's previous commitment to the AMLs, and the current land use plan that incorporated the previous consent. *RSGA v. Salazar*, 935 F. Supp. 2d at 1184-85; ECF No. 42-1, Decl. of John Hay III at ¶ 17. RSGA filed suit to compel removal of the wild horses. *RSGA v. Salazar*, 935 F. Supp. 2d at 1185. Several

Petitioners, including AWHC intervened. BLM and RSGA resolved the lawsuit in the 2013 Consent Decree, which was approved and made part of this Court's order dismissing the case on April 3, 2013. *Id.* at 1191-96. This Court rejected Petitioners' objections on the merits or that they were not ripe. *Id.* at 1187-91. Relevant to this case, the Court agreed that management challenges in the Checkerboard supported the proposal for HMA revision. *Id.* at 1188 ("The BLM is statutorily obligated to manage wild horses in this area consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented.").

In the 2013 Consent Decree, the BLM agreed to remove all wild horses located on RSGA's private lands, except for the White Mountain HMA, which was to be managed as non-reproducing for up to 205 wild horses. *Id.* at 1192-93, (¶¶ 1, 6(d)). Regardless of budgetary constraints, the 2013 Consent Decree required BLM to adjust its annual work plans to gather horses if census data showed AMLs would be exceeded. *Id.* at 1193 (¶ 4). If the census showed that over 200 wild horses were located on the Checkerboard lands for the Salt Wells/Adobe Town HMAs combined or 100 wild horses on the Checkerboard lands for the Great

Divid Basin HMA, then the BLM agreed to remove all wild horses from the Checkerboard. *Id.*

To implement RSGA's revocation of consent to maintain wild horses on its land, BLM agreed to initiate a plan amendment to convert the Salt Wells and Great Divide Basin HMAs to herd areas and to schedule gathers when wild horse numbers exceeded 200 wild horses in the Salt Wells herd area and 100 wild horses in the Great Divide Basin herd area. *Id.* (¶¶ 6a-b). The Adobe Town HMA boundaries were to be revised to exclude the Checkerboard lands (about 42,000 acres (*see* ECF No. 54 at 22 (Map of HMAs)) and the AML would be changed to 225-450 wild horses or lower, to reflect the redacted public and private land. *Id.* (¶ 6c). The White Mountain HMA would be managed as a non-reproducing herd with a population not to exceed 205 wild horses. Id. (¶ 6c).

BLM also committed to a gather schedule starting with the Adobe Town-Salt Wells HMAs in 2013, Great Divide Basin HMA in 2014, White Mountain HMA in 2015, and an additional gather in 2016 if necessary to achieve the numbers identified in Paragraphs 1 and 4 of the 2013 Consent Decree. *Id.* (¶ 5). This Court affirmed the 2013 Consent Decree and incorporated the Consent Decree into its order. *Id.* at 1191-96. The

Court retained continuing jurisdiction over disputes or violation of the Consent Decree. *Id.* at 1194 (¶ 8). The 2013 Consent Decree terminated 10 years after the entry of the decree or on April 3, 2023. *Id.* (¶ 11).

*Implementation of the 2013 Consent Decree: 2013-2023*

The Petitioners and BLM discuss the 2013 and 2014 wild horse gathers for the Salt Wells/Adobe Town HMAs and the Checkerboard, respectively (ECF No. 50 at 22; ECF No. 51 at 22-23; ECF No. 54 at 24-26). However, RSGA emphatically disputes the claim that the 2014 Checkerboard gather "brought the total number of horses in each HMA well below the applicable AMLs." ECF No. 54 at 24 (*citing AWHPC v. Jewell*, 847 F.3d at 1182). Wild horses occupy land outside HMA boundaries and freely move into the HMAs while the 2014 census was limited to the Checkerboard. The conclusion that wild horse numbers were below AML was also based on subtracting the wild horses gathered from the 2014 Spring aerial census. *See* RMPA-044145 at 044148. BLM did not conduct another census until the Spring of 2015 when the census disproved the claim that wild horse numbers were ever below AML in any one of the HMAs. RMPA-044153 at 044155. Instead, wild horse

populations within each HMA were within AML range or above high AML only six months after the 2014 gather. *Id.*

BLM conducted only two more gathers after 2014, both seeing challenges brought by some of the Petitioners in this consolidated litigation. The 2017 gather involved the removal of 1,560 wild horses from the Great Divide Basin, Salt Wells, and Adobe Town HMAs. *Am. Wild Horse Pres. Campaign v. Zinke*, 2017 WL 11450184, at *2 (D. Wyo. Oct. 13, 2017) (hereafter *AWHPC v. Zinke*). BLM faced objections for not counting foals with mares as individual adults for the gather, even though foals are not counted in the AML or the excess determination. *Id.* at *1, 3-4; *see* RMPA-049414 at 049430. The District Court denied the preliminary injunction but remanded the decision for failing to explain its policy of not counting foals to determine compliance with AML and the specific number of "excess" horses. *AWHPC v. Zinke*, Case No. 2:17-cv-00170-NDF, ECF No. 66 at 9-11 (D. Wyo. Jan. 9, 2019). RSGA has consistently commented that the exclusion of foals for either the excess determination or when gathering to reach low AML led to an under count and/or gather that prevented the BLM from achieving its goals of low

AML. *See e.g.* RMPA-043982 at 043989-043990; RMPA-044001 at 044008-044009; RMPA-044010 at 044014; RMPA-044030 at 044032.

The next wild horse gather did not occur until the Fall of 2021, when 3,555 excess wild horses, or more than double the authorized AML for the entire Rock Springs Field Office, were removed to "maintain a thriving natural ecological balance." *See RSGA v. U.S. Dep't of Interior*, Case No. 2:23-cv-0048-NDF, ECF No. 52 at 22 (D. Wyo. Jan. 8, 2024). While a large number of wild horses were gathered, the 2022 infra-red census [2] conducted only a year later demonstrated that wild horse management failed to reach low AML in any HMA. *Id.* The infra-red census report confirmed 4,388 wild horses in the Rock Springs Field Office and about half were on the Checkerboard. *Id.* Within a year of the 2021 gather, wild horse numbers were *three times* above high AML and have only continued to grow. Using BLM's modest 20 percent annual population increase estimate for 2023 and 2024 foal crop, the wild horse numbers in the Rock Springs Field Office HMA now exceed 6,000 horses or almost equal to the number in 1981.

---

[2] RTF inaccurately stated that the latest census data was from 2019. ECF No. 49 at 25.

*Rock Springs and Rawlins Field Offices' RMP Amendment*

The Petitioners and the BLM already address the timeline of the Rock Springs and Rawlins Field Offices' Wild Horse Management RMP Amendment, in addition to the alternatives analyzed and final ROD. *See* ECF No. 49 at 29-31; ECF No. 50 at 23-28; ECF No. 51 at 24-29; ECF No. 54 at 26-29. RSGA commented extensively on this RMP Amendment, which was based on the 2013 Consent Decree and on RSGA's revocation of consent to allow wild horses to be managed on its private lands within the Checkerboard. RMPA-001808; RMPA-043802; RMPA-047328. The Wyoming Game and Fish Department (WGFD) and Wyoming Department of Agriculture also served as cooperating agencies throughout the revision process and provided extensive comments along with the Wyoming Governor and Wyoming State Lands. RMPA-001840; RMPA-001943; RMPA-001997; RMPA-041669; RMPA-041679; RMPA-045872; RMPA-045880; RMPA-045884; RMPA-048331.

## ARGUMENT

I. **BLM'S REVISION TO THE HMA BOUNDARIES IS CONSISTENT WITH THE DUAL MANDATES UNDER THE WILD HORSE ACT**

The Petitioners focus solely on Section 3 while ignoring BLM's mandatory obligations under Section 4 in arguing that the BLM's

decision to revise the HMAs to exclude the Checkerboard lands violates the WHA. *See* ECF No. 49 at 34-41; ECF No. 50 at 31-36; ECF No. 51 at 34-40. The Petitioners essentially read Section 4 out of the WHA and insert an extra-legal mandate that private lands remain forever within HMA boundaries regardless of the landowner's consent or lack thereof. The WHA cannot be read to support this theory especially when it results in each provision being read in isolation of the other provisions. *Sackett v. Envtl. Prot. Agency*, 598 U.S. 651, 674-75 (2023) (holding that provision in a statute cannot be viewed in isolation and "may only become evident when placed in context" (*quoting FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). BLM has properly balanced its Section 3 and Section 4 mandates in adjusting the HMA boundaries under the RMP amendments to account for RSGA's revocation of consent to allow wild horses on its private land and to manage its land and associated forage as part of the HMA.

When considering the interpretation of a statute, the Court always starts with the plain text of the statute. *Sackett*, 598 U.S. at 671. Similarly, when Congress delegates to agencies the power to implement a statute through the promulgation of rules, then the first step in

interpreting the regulation is to give effect to its plain language. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412, 2415 (2019). This is because "hard interpretative conundrums, even relating to complex rules, can often be resolved" by reviewing the statutory or regulatory language. *Id.*

A. <u>*Section 4 Right to Removal is Clear, Mandatory and Ministerial*</u>

While the Petitioners would like to ignore Section 4 of the WHA and require private landowners to house wild horses on their private lands indefinitely, Congress never intended to allow this outcome. Under Section 4 of the WHA, Congress directed BLM that it "<u>*shall*</u> arrange to have [wild horses] removed" from private lands if notified by landowners that the horses have strayed from public lands onto privately owned land. 16 U.S.C. § 1334; 43 C.F.R. § 4720.2-1. Courts consistently hold that Section 4 imposes a clear and unequivocal command or ministerial duty onto the BLM to honor removal requests and, by extension, revocation of consent to maintain wild horses on private lands. *Roaring Springs Assoc. v. Andrus*, 471 F. Supp. 522, 526 (D. Or. 1978) (". . . the Secretary has a ministerial duty to remove the wild horses and burros from private lands. As to the duty of removal, the statute does not speak in discretionary terms."); *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986) ("Upon

notification, the BLM has a plainly prescribed, ministerial duty to remove the horses."); *AWPHC v. Jewell*, 847 F.3d at 1192 (J. McKay concurring) ("The problem that keeps bringing this matter to the court arises from the one section of the act which is clear, unmistakable, mandatory, and non-discretionary: Section 4. Under this section, private landowners have the absolute right to exclude wild horses and burros from their land.").

This Court agreed in *RSGA v. Salazar* when it affirmed the 2013 Consent Decree, citing 16 U.S.C. § 1334 and the regulations, that: "The BLM is statutorily obligated to manage wild horses in [the Checkerboard] consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented." 935 F. Supp. 2d at 1188. The U.S. Court of Appeals for the Tenth Circuit also recognized that the BLM has "an affirmative and mandatory duty to remove wild horses from private lands at the request of landowners, consistent with congressional intent that these horses be maintained on public lands." *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1436 (10th Cir. 1986) (hereafter *MSLF v. Hodel*) (J. Barrett dissenting).

The WHA also requires the BLM to "protect and manage" wild horses "as components of the public lands." 16 U.S.C. § 1333(a). Section 3 further requires the BLM to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* The thriving natural ecological balance requirement is not a limitation nor does it "sharply constrain[] BLM's authority to remove horses." *See* ECF No. 51 at 30-31. It provides additional direction on how BLM's two duties to <u>protect</u> and <u>manage</u> wild horses on public lands "coexist and are equal." *Cloud Found. v. U.S. Bureau of Land Mgmt.*, 2013 WL 1249814 at *10 (D. Nev. Mar. 26, 2013). Section 3 direction applies to <u>public</u> lands designated for wild horse management or HMAs. *See* 16 U.S.C. § 1333(a); 43 C.F.R. §§ 4710.3-1, 4710.4.

Under the 1978 amendments to the WHA, Congress "cut back on the protection the Act affords wild horses, and [] reemphasize[d] other uses of the natural resources wild horses consume." *Am. Horse Protection Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982). "[P]ublic ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Id.* at 1317. FLPMA further makes it clear that

wild horses are to be removed if they "pose a threat to themselves and their habitat and to other rangeland values." 43 U.S.C. § 1901(b)(4). Simply put, the WHA "cannot be read to give horses priority over any other species on the range." *Cloud Found. v. U.S. Bureau of Land Mgmt.*, 2013 WL 1249814, at *9.

Just as Congress recognized that the protection of wild horses is not prioritized over any other species on the range and that multiple use management controls the public lands, it also recognized in Section 4 that the protection of wild horses on public lands did not extend to private lands or otherwise override private property rights. As the BLM explained, the WHA's provisions "should be read 'together and in harmony,' rather than in a piecemeal fashion." ECF No. 54 at 41 (*quoting United States v. Chavez*, 2024 WL 129115, at *4 (D. N.M. Jan. 11, 2024)). All parties acknowledge the alternating public and private land sections of the Checkerboard have caused longstanding issues. However, this does not allow the BLM to ignore or override RSGA's Section 4 rights under the WHA to have wild horses removed from its private property and to revoke its consent to have its lands managed as part of an HMA. *See RSGA v. Salazar*, 935 F. Supp.2d at 1188; *AWHPC v. Jewell*, 847 F.3d at

1192 (J. McKay concurring). Management difficulties do not excuse failure to follow the law.[3]

B. _BLM's Authority to Establish and Amend HMAs_

The Petitioners' argument that an HMA can only be revised if an "excess" determination is made (_see_ ECF No. 49 at 39-41; ECF No. 50 at 33-36; ECF No. 51 at 30-36) incorrectly conflates the management decisions to implement HMAs with the WHA's broad grant of authority to the BLM to "designate and maintain specific ranges on public lands" for the protection of wild horses and burros. 16 U.S.C. § 1333(a). Section 3's requirement to _manage_ wild horses to "achieve and maintain a thriving natural ecological balance on public lands" is not a requirement of the BLM's _designation_ of range(s). Similarly, excess decisions are tied to removal which implement AMLs in the HMA.

The WHA requires horses "to be considered in the area where presently found" (16 U.S.C. § 1331), but the statute does not require the BLM to maintain horses in the same number and wherever they were in

---

[3] Doctrines of _res judicata_ and issue preclusion bind AWHC and other Petitioners to the previous holdings in the wild horse cases in front of this Court. _See N.M. Off-Highway Vehicle All. v. U.S. Forest Serv._, 702 F. App'x 708, 710 (10th Cir. 2017)

1971 or forever, as claimed by Petitioners. *See* ECF No. 51 at 30-31. The WHA also does not authorize maintenance of wild horses on public lands where they were not found as of December 1971. 16 U.S.C. § 1339. The WHA only requires that the designated range(s) "*not exceed*" the wild horses' "*known territorial limits*" and that it contains only the "amount of land necessary to sustain an existing herd or herds" of wild horses. 16 U.S.C. § 1332(c) (*emphasis added*); *see Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 450 (S.D. N.Y. 2010); *Craic C. Downer*, 111 IBLA 339, 342-43 (Oct. 31, 1989).

To implement this statutory mandate, BLM promulgated regulations that call for the establishment of "specific ranges" for the protection and maintenance of wild horses. *Habitat for Horses*, 745 F. Supp. 2d at 450; *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see also* 16 U.S. § 1336 (granting the Secretary authority to issue regulations to further the purposes of the WHA). BLM defined a "herd area" as only that "geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0-5(d). BLM then looked to the herd areas to designate HMAs that are "established for the *maintenance* of wild horse and burro herds." 43

C.F.R. § 4710.3-1; *see also* RMPA-049414 at 049420. HMAs are to be determined as part of the FLPMA planning process. 43 C.F.R. § 4710.1.

The regulations require BLM to consider specific factors in delineating HMAs, including: "the appropriate management level for the herd, the habitat requirements of the animals, the *relationships with other uses of the public and adjacent private land*, and the constraints contained in § 4710.4." 43 C.F.R. § 4710.3-1 (*emphasis added*). When the regulations were revised in 1986, BLM noted that "the effect on nearby private land of management for wild horses and burros should be taken into account in delineating herd management areas." 51 Fed. Reg. 7410, 7411-12 (Mar. 3, 1986). HMA decisions are to include consultation with federal and state wildlife officials, 16 U.S.C. § 1333(b)(a), and inclusion of private land within a HMA required landowner consent. 43 C.F.R. § 4710.7.

As BLM addressed in its response brief (ECF No. 54 at 41-42), BLM's Wild Horses and Burros Management Handbook provides further clarification on the designation of HMAs and consideration of private lands. RMPA-049414. For instance, BLM should not manage all or part of a herd area for wild horses if there are "intermingled and unfenced

private lands within HAs where the landowners are unwilling to make them available for [wild horse] use." *Id.* at RMPA-049421. This is the exact situation faced in this case involving the Wyoming Checkerboard lands. As BLM noted, RSGA was the only landowner in the Checkerboard to grant BLM consent to maintain wild horses on private lands. ECF No. 54 at 58.

The HMAs were first established based on RSGA's consent to allow 500 wild horses on its private lands within the Checkerboard. *RSGA v. Salazar*, 935 F. Supp. 2d at 1183 n.4. Once RSGA revoked that consent in October of 2010, BLM cannot continue to manage RSGA's private lands, and the adjacent public land sections, as part of the HMAs for wild horses due to the intermingled and unfenced nature of the Checkerboard. *See AWHPC v. Jewell*, 847 F.3d at 1192 (J. McKay concurring) (BLM must "go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands."). Section 4 mandates the removal of wild horses from private lands upon landowner request and the removal of the private land from the HMA boundaries. The plain language of the WHA and the implementing regulations give BLM authority and discretion to

27

designate, maintain, and amend HMA boundaries on public lands as it has done in this RMP revision.

It is equally important that the management of wild horses is confined to HMAs. The HMA setting AML and the later determination of excess incorporated the objective of maintaining a "thriving natural ecological balance" while managing wild horses at a minimal feasible level. These apply only to HMA implementation. As the court held in *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 139 (D. D.C. 2020):

> To carry out its duty to manage the wild horses on the public lands under its control, BLM has created two types of areas: "herd management areas" ("HMAs") and "herd areas" ("HAs"). HMAs are managed for wild horses. "In each [HMA], the Bureau determines an 'appropriate management level' ('AML') for the wild horse and burro populations." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006). BLM defines AML "as 'the median number of adult wild horses or burros determined through BLM's planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular area.'" *Id.* By contrast, HAs are areas not managed for wild horses. *See* 43 C.F.R. § 4710.4 ("Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas."). Consequently, "[t]he AML of a given HA is typically zero." *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1274 n.5 (D. Utah 2017).

This Court should reject Petitioners' efforts to conflate criteria for management of wild horses in designated HMAs with management of public lands outside of HMAs, where wild horses are not consistent with the land use plans.

C.   _BLM's Revisions to the HMA Boundaries was Reasonable and Supported by the Record_

Not only do the adjustments to convert the Great Divide Basin and Salt Wells HMA to herd areas and reduce the Adobe Town HMA to exclude the Checkerboard comply with the WHA, but BLM's decision was also reasonable and supported by the record. _See_ ECF No. 54 at 43-45. BLM explained on multiple occasions in the FEIS and ROD that it could not continue to maintain the former Checkerboard HMAs without landowner consent. _See id._ This is also consistent with BLM's recognition that it needed RSGA's consent originally before establishing the Checkerboard HMAs in 1982. RMPA-000235 at 000555 ("Without access to those [private] lands, approximately 1.5 million acres of adjoining and commingled public lands would be unavailable for inclusion in HMAs."). This Court also recognized in its amended order in 1982 that "horse herds on the Salt Wells/Pilot Butte checkerboard lands is that level agreed to

by the landowners in that area." RMPA-043861 at 043863; *see also RSGA v. Salazar*, 935 F. Supp. 2d at 1184 n.8, 1187.

In addition, the HMAs may have had appropriate forage and water when the public and private lands of the Checkerboard were included but this is no longer the case with private Checkerboard lands removed from HMAs. *See* ECF No. 54 at 43-44. The major benefit of entering into a cooperative agreement with RSGA was to "reduce use pressure on the adjoining solid block public lands" and to "provide adequate winter range for horses throughout the Big Sandy Planning Unit." RMPA-043865 at 043875. "[S]ome of the forage requirements of wild horses may be allocated from private land." *Id.* at RMPA-043868.

More specifically, RSGA's consent would "provide continued protection of the wild horses during times of severe winters allowing horses maintained north of the checkerboard line to move south to elude heavy snow depth areas." *Id.* at RMPA-043875. The Checkerboard lands are "at a lower elevation then the adjoining solid block lands and are heavily used in winter by horses." *Id.* If not for the agreement with RSGA "to allow some wild horse use on their lands . . . horses would be totally removed from such ranges." RMPA-043877 at 043901.

30

## II. BLM's RMP Revisions to Adjust HMA Boundaries is Consistent with FLPMA

RSGA agrees and incorporates BLM's response (ECF No. 54 at 50-55) to Petitioner RTF's claim that BLM failed to comply with FLPMA when revising the RMP to address wild horse management (ECF No. 49 at 47). FLPMA requires the BLM to manage public lands in manner that promotes multiple use (43 U.S.C. §§ 1701(a)(7), 1732(a)), which "means the management of the public lands and their various resource values so that they are utilized *in the combination* that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c). FLPMA further recognizes that multiple use includes "the use of some land for less than all of the resources." *Id.*

FLPMA also elevates certain multiple uses to principal or major uses, and these included "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." 43 U.S.C. § 1702(l). Closure of public lands by classification or a withdrawal for any one of the above uses triggers reporting and plan decisions. 43 U.S.C. §§ 1712(e)(2) (plan decision affecting 100,000 acres), 1714 (mineral withdrawal greater than 5,000 acres).

31

While wild horses may fall under wildlife as a principal use, wild horses are to be managed equally to all other fish and wildlife uses. *See Cloud Found. v. U.S. Bureau of Land Mgmt.*, 2013 WL 1249814, at *9 (The WHA "cannot be read to give horses priority over any other species on the range."). FLPMA recognizes and continues the policy under the WHA to protect wild horses from "capture, branding, harassment, or death," but also makes it clear that wild horses are to be removed if they "pose a threat to themselves and their habitat and to other rangeland values." 43 U.S.C. § 1901(b)(4). "[P]ublic ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Watt*, 694 F.2d at 1317. BLM's RMP amendment accomplishes FLPMA's multiple use mandate by protecting other uses and resource values by converting HMAs to herd areas, while at the same time maintaining a wild horse herd population in a portion of the planning area. *See* RMPA-001656 at 001677.

The wild horse HMAs must also be consistent with the Green River RMP as amended in 2015 to provide for and protect Greater Sage-Grouse priority habitat. *See* 43 U.S.C. § 1732(a); 16 U.S.C. § 1333(b)(2); *see also* RMPA-053875 at 053927 (BLM is to manage HMAs within Greater Sage-

Grouse habitat within established AML to achieve and maintain Greater Sage-Grouse habitat). During commenting on the RMP amendment, RSGA provided BLM with information identifying and documenting previous concerns that feral horses had outsized impacts on Greater Sage-Grouse habitat, especially on forbs and grasses. RMPA-043802 at 043824; RMPA-044044 at 044049-044050; RMPA-047328 at 047352.

## III. THE FEIS COMPLIES WITH NEPA

Petitioners allege that BLM failed to consider a reasonable range of alternatives and to take a hard look at the relevant data and impacts in violation of NEPA. ECF No. 49 at 49-60; ECF No. 50 at 43-65; ECF No. 51 at 44-49. BLM (ECF No. 54 at 55-72) and the State of Wyoming (ECF No. 55 at 43-54) have responded to these arguments and RSGA adds support for those arguments below.

A.    _Range of Alternatives Meets Purpose and Need of the RMP Amendment and NEPA Requirements_

The Tenth Circuit reviews environmental impact statements to determine if the agency took a "hard look" at the issues. _Utah Envtl. Congress v. Bosworth_, 439 F.3d 1184, 1195 (10th Cir. 2003). The range of alternatives is measured by "a rule of reason and practicality." _Id._ (citing

*Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir.1996)).

The Tenth Circuit has continued to apply the "rule of reason and practicality" to find that the objectives of the proposed action define the range of reasonable alternatives. In *Western Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1276 (10th Cir. 2013), the court affirmed the BLM decision not to fully analyze the alternative of no grazing because while range health was important, BLM direction to manage for livestock grazing fell within FLPMA's multiple use objectives. Thus, BLM reasonably did not analyze the "no grazing" alternative because it was "infeasible, ineffective, or inconsistent with the basic policy objectives." *Id.*; *see also Wyoming v. United States*, 661 F.3d 1209, 1244-46 (10th Cir. 2011) (affirming very limited range of roadless rule alternatives that only addressed restricting road construction and timber); *see also* 43 C.F.R. § 1610.4–5 ("[T]he decision to designate alternatives for further development and analysis remains the exclusive responsibility of the BLM.").

The FEIS range of alternatives was bound by both Sections 3 and 4 of the WHA, as well as FLPMA. Judge McKay of the Tenth Circuit

34

presented a solution when he wrote: "It seems to me that the only way the BLM can ultimately lawfully achieve its Section 3 duty to maintain wild herds and prevent destruction of viability caused by over grazing on public lands is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands." *AWHPC v. Jewell*, 842 F.3d at 1192. In the Wild Horse FEIS, BLM did just that when it devised the range of alternatives. The fact that it was based on the 2013 Consent Decree does not change the analysis, because the 2013 Consent Decree cited and incorporated Section 4. *RSGA v. Salazar*, 935 F. Supp. 2d at 1192.

### B.   *Alternatives Supported by Petitioners Not Responsive to Checkerboard Management*

Petitioners object to the failure of the FEIS to consider no grazing or reduced grazing, or a land exchange. ECF No. 49 at 55 n.16; ECF No. 50 at 45-49, 51-55; ECF No. 51 at 46-49. Petitioners' alternative did not conform to applicable law or were not reasonable nor feasible.

#### 1.   *Land Exchange Outside BLM's Authority*

FLPMA authorizes land exchanges, 43 U.S.C. §§ 1715(a), 1716(a), but the Petitioners omit both the number of affected land interests and the scope of a land exchange involving more than two million acres. Even

35

much smaller land exchanges but equally controversial will require an act of Congress. The Resolution Copper Project and Land Exchange proposed to convey 5,640 acres in exchange for 2,422 acres of federal land. *See* Pub. L. No. 113-291, 128 Stat. 3292, § 3003 (2014). The exchange remains stalled 10 years later. *See Apache Stronghold v. United States*, 95 F.4th 608 (9th Cir. 2024) (challenging the land exchange). In short, what might appear to be simple on paper is infeasible both as to time-frame and the extent of affected interests.

A possible Wyoming Checkerboard land exchange is further complicated by the fact that BLM has no jurisdiction or authority over the split estates and mineral interests held by several companies in the form of mineral deeds and leases. The State of Wyoming also has a significant interest in the adjacent state land sections found in most of the townships. *See* ECF No. 55 at 48. On its face, this alternative is neither feasible nor reasonable.

    2.    *Reduced Livestock Grazing Alternative Not Responsive to WHA Conundrum*

The issue giving rise to the RMP revision is not competition for forage but the right of the landowner to withdraw its private land from HMA management. As the Tenth Circuit held in *Western Watersheds*

*Project*, decreasing livestock animal unit months (AUMs) was not a feasible or responsive alternative in light of BLM's "multiple use mandate, which is reflected in the Lander RMP, the FLPMA, and the Taylor Grazing Act—all of which contemplate livestock grazing on the land." 721 F.3d at 1276. RSGA holds the federal grazing permit and has legitimate concerns about maintaining range health (43 C.F.R. § 4180.2) and conserving Greater Sage-Grouse habitat, as well as big game habitat.

Moreover, RSGA is entitled to revoke its consent regardless. *See supra 18-24, Argument Section I.A (including introduction under Argument Section I)*. When the important objectives under FLPMA are considered, BLM rejection of the reduced or no grazing alternative is entirely consistent with federal law.

C.   *Wild Horse Management on Smaller HMAs Infeasible*

BLM also rejected the alternative of reducing the land areas to HMAs on only public lands outside the Checkerboard because wild horses could not be confined to the public lands and BLM would face ongoing requests to gather off private lands. RMPA-001656 at 001678-001679. While BLM describes it as technically infeasible, it is also unlawful and no agency need consider an alternative that is unlawful. *See W.*

*Watersheds Project*, 721 F.3d at 1276 (holding BLM reasonably chose not to consider a no grazing alternative which would violate FLPMA and TGA).

As the incorporated map shows, the Checkerboard lands within the former HMA boundaries make up at least half or up to 75% of the HMA land for Salt Wells, White Mountain and Great Divide Basin herd areas. *See* ECF No. 54 at 22. Fences at the Checkerboard boundary would violate the Unlawful Enclosures Act, 43 U.S.C. §§ 1061-1066, and conflict with Greater Sage Grouse and big game management established in the current land use plan. ECF No. 54 at 28-29, 44-45; RMPA-001656 at 001679-001680; *see also* RMPA-053925 at 053925 (Where documented wildlife conflicts with fencing on public lands occur, fences will be modified, reconstructed, or, if necessary, removed."). Any boundary fence would also likely run east and west, blocking key big game migration corridors. A similar, but shorter fence was held unlawful in *Lawrence*, 620 F. Supp. at 1420.

D.   <u>*Other Hard Look Issues Lack Merit*</u>

Petitioners raise other objections, namely that the FEIS fails to address genetic diversity, and that continued livestock grazing

represents significant environmental issues. ECF No. 49 at 40-44, 48-51; ECF No. 50 at 49-58. Generally, herd size needs to be between 150-200 wild horses for genetic diversity. RMPA-001178 at 001324-01325. The Little Colorado HMA, which shares an unfenced boundary with the White Mountain HMA, remains unchanged. Wild horses move freely between the two HMAs, thus ensuring the direction of genetic diversity. Similarly, the FEIS retains the Adobe Town HMA and the new AML also conforms to genetic diversity guidance, consistent with the Rawlins RMP. *See id.*; *see* also ECF No. 54 at 69.

As RSGA wrote in its comments on the EIS and its Protest, livestock grazing differs materially from wild horse use. RMPA-043802 at 043824; RMPA-044044 at 044049-044050; RMPA-047328 at 047352. Grazing occurs during defined time periods set in the permit. RSGA shareholders graze the permit in late fall to March or the dormant season. ECF No. 42-1, Decl. of John Hay, III at ¶¶ 6-7. Many RSGA shareholders still graze sheep, which are herded to different locations throughout the permitted time-period. *See id.* Other shareholders herd cattle much the same way, due to the lack of fenced pastures and other improvements. *See id.*

39

Wild horse grazing patterns differ materially with significant environmental impacts. RMPA-043802 at 043824; RMPA-044044 at 044049-044050; RMPA-047328 at 047352. Petitioners support for wild horses fails to consider these significant environmental impacts recognized by U.S. Fish and Wildlife Service and University of Wyoming research. *See id.* The year-long use of the same area, clipping effect that removes most of the plant growth, the preference for grasses and forbs that provide essential elements of sage brush ecosystem necessary for Greater Sage Grouse, and the territorial nature of wild horses disrupt wildlife and habitat. *See id.* These are all environmentally significant impacts which do not occur with managed livestock grazing. The BLM's inability to control wild horse numbers greatly increases these impacts.

RTF also objected to intensive population suppression and failure to identify the specific population management tools. ECF No. 49 at 57-58. The ROD, however, dropped the non-reproducing herd condition for White Mountain HMA and returned to the current measures of inoculation and balancing herd sex ratios. RMPA-001656 at 001679.

## CONCLUSION

For the above stated reasons and as further argued in BLM's and the State of Wyoming's response brief, RSGA asks this Court to uphold the BLM's Rock Springs and Rawlins RMP Amendment, ROD, and supporting FEIS.

Date: April 5, 2024

Respectfully submitted:

| | |
|---|---|
| /s/ Constance E. Brooks<br>Constance E. Brooks, *pro hac vice*<br>cbrooks@fwlaw.com<br>Danielle Bettencourt (Wyo. Bar No. 8-6782)<br>dbettencourt@fwlaw.com<br>Fairfield and Woods, P.C.<br>1800 California Street, STE. 2600<br>Denver, CO 80202-2645<br>T: (303) 894-4431<br>F: (303) 830-1033<br><br>Counsel for Petitioner | /s/ Galen West<br>L. Galen West<br>galen.west@westlawofficepc.com<br>West Law Office, P.C.<br>409 Broadway, Suite A<br>Rock Springs, Wyoming 82902<br>T: (307) 362-3300<br>F: (307) 362-3309 |

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2024, I electronically filed the foregoing **RESPONDENT-INTERVENOR ROCK SPRINGS GRAZING ASSOCIATION'S CONSOLIDATED RESPONSE BRIEF** with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ Constance E. Brooks
CONSTANCE E. BROOKS

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. of App. P. 32(a)(5)(A) and Tenth Circuit Rule 32(a), and the type style requirements of Fed. R. App. P. 32(a)(7)(B)(i) because this brief has been prepared in a proportionally spaced typeface using Word in Century School Book and 14-point font and contains 8,368 words as determined by the word count function in Word.

/s/ Constance E. Brooks
CONSTANCE E. BROOKS